Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZIQI ZHANG, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> 17 EDUCATION & TECHNOLOGY GROUP INC., ANDY CHANG LIU, MICHAEL CHAO DU, DUN XIAO, TUCK LYE KOH, COLLEEN A. DE VRIES, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS (ASIA) L.L.C., BOFA SECURITIES, INC., CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED, TIGER BROKERS (NZ) LIMITED, and COGENCY GLOBAL INC., <br><br> Defendants. | No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>CLASS ACTION</u> <br><br> JURY TRIAL DEMANDED |

Plaintiff Ziqi Zhang ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, announcements, public filings, wire and press releases published by and regarding 17 Education & Technology Group Inc. ("17EdTech" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded 17EdTech securities pursuant and/or traceable to the registration statement and related prospectus (collectively, the "Registration Statement") issued in connection with 17EdTech December 2020 initial public offering (the "IPO" or "Offering"), seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act").

2.      On December 4, 2020, Defendants held the IPO, issuing approximately 27,400,000 American Depositary Shares ("ADSs") to the investing public at $10.50 per ADS, pursuant to the Registration Statement.

3.      By the commencement of this action, the Company's ADSs trade significantly below the IPO price. As a result, investors were damaged.

## JURISDICTION AND VENUE

4.      The claims alleged herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.

1

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act (15 U.S.C. §77v(a)).

6.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as a significant portion of the Defendants' actions, and the subsequent damages took place within this District.

8.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of 17EdTech securities in this District.

## PARTIES

9.     Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the corrective disclosure.

10.     Defendant 17EdTech purports to be a leading education technology company in the People's Republic of China ("PRC") which provides K-12 education services in the PRC, including with an "in-school + after-school" integrated model which provides a smart in-school classroom solution that delivers data-driven teaching, learning and assessment products.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

11.    The Company is incorporated in the Cayman Islands and its head office is located at 16/F, Block B, Wangjing Greenland Center, Chaoyang District, Beijing, 100102, PRC. 17EdTech's securities trade on the NASDAQ Exchange ("NASDAQ") under the ticker symbol "YQ."

12.    Defendant Andy Chang Liu ("Liu") was at the time of the IPO the Company's Chief Executive Officer and Chairman of the Board of Directors. Defendant Liu reviewed, contributed to, and signed or caused to be signed the Registration Statement.

13.    Defendant Michael Chao Du ("Du") was at the time of the IPO the Company's Chief Financial Officer and a Director. Defendant Du reviewed, contributed to, and signed or caused to be signed the Registration Statement.

14.    Defendant Dun Xiao ("Xiao") was at the time of the IPO a Director of the Company. Defendant Xiao reviewed, contributed to, and signed or caused to be signed the Registration Statement

15.    Defendant Tuck Lye Koh ("Koh") was at the time of the IPO a Diretor of the Company. Defendant Koh reviewed, contributed to, and signed or caused to be signed the Registration Statement.

16.    Defendant Colleen A. De Vries ("De Vries") was at the time of the IPO 17EdTech's duly authorized representative in the United States. Defendant De Vries signed the false and misleading Registration Statement on her own behalf and on behalf of Defendant Cogency Global Inc. ("Cogency Global"), Defendant De Vries' employer.

17.    Defendants Liu, Du, Xiao, Koh, and De Vries are sometimes referred to herein as the "Individual Defendants."

18.    Each of the Individual Defendants signed or authorized the signing of the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and

3

contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential 17EdTech investors, all motivated by their own and the Company's financial interests.

19.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an investment banking firm that acted as a representative underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Morgan Stanley's address is 1585 Broadway, New York, New York 10036.

20.    Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") is an investment banking firm that acted as a representative underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Goldman Sach's corporate headquarters are located at 68th Floor, Cheung Kong Center, 2 Queen's Road, Central, Hong Kong, Special Administrative Region of the PRC.

21.    Defendant BofA Securities, Inc. ("BofA") is an investment banking firm that acted as an underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. BofA's address is One Bryant Park, New York, NY 10036.

22.    Defendant China Renaissance Securities (Hong Kong) Limited ("China Renaissance") is an investment banking firm that acted as an underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. China Renaissance's address is Units 8107-08, International Commerce Center, No.1 Austin Road West, Kowloon, Hong Kong, Special Administrative Region, PRC.

23.    Defendant Tiger Brokers (NZ) Limited ("Tiger Brokers") is an investment banking firm that acted as an underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Tiger Brokers' address is Level 27/151 Queen Street, Auckland CBD, Auckland 1010, New Zealand.

4

24.    Defendants Morgan Stanley, BofA, China Renaissance, and Tiger Brokers are referred to herein as the "Underwriter Defendants."

25.    Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)    The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared substantial fees from the IPO collectively. The Underwriter Defendants arranged a roadshow prior to the IPO during which they, and representatives from the Company, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b)    The Underwriter Defendants also obtained an agreement from the Company and the Individual Defendants that 17EdTech would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

(c)    Representatives of the Underwriter Defendants also assisted the Company and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of the Company, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, and current corporate information concerning the Company's most up-to-date operational and financial results and prospects.

(d)    In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with the Company's lawyers, management, and top executives and engaged in "drafting

5

sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Company's securities would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about the Company's would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the Company's existing problems as detailed herein.

26.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiff and the other members of the Class.

27.     Defendant Cogency Global was 17EdTech's authorized U.S. representative for purposes of the IPO. Defendant De Vries, who signed the Registration Statement, was an employee of Defendant Cogency Global. As a result, Defendant Cogency Global is liable for the securities law violations committed by Defendant De Vries in its capacity as employer and as a control person under the Securities Act.

28.     The Company, the Individual Defendants, the Underwriter Defendants, and Cogency Global are referred to herein, collectively, as the "Defendants."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

## SUBSTANTIVE ALLEGATIONS

### Background Information

29.    17EdTech offered tutoring services related to academic subjects to students from kindergarten through the last year of senior high school ("K-12 Academic AST Services"), in the PRC at the time of the IPO but ceased this core offering at the end of 2021, merely a year after the IPO.

30.    PRC authorities have been targeting private education companies and tutoring companies, especially including those that are Western-financed, for reform publicly since at least February 2019, when Chinese authorities, including China's State Council, publicly proposed a 2018-2022 plan for modernizing Chinese education, which noted practices that Chinese authorities intend to reform, including restricting foreign investment in education and reducing the burden of education and tutoring.[1]

31.    In January 2021, the month after the IPO, Chinese authorities publicly made clear within the PRC, again, that they would reform the private tutoring industry in which 17EdTech operated. The Central Commission for Discipline Inspection, the highest internal enforcement division of the Chinese Communist Party, and the National Supervision Commission of the PRC released an article warning about reforms of abuses by private education companies.

32.    Still in January 2021, the month after the IPO, on January 7, 2021, at a national education conference, the PRC's Minister of Education Chen Baosheng publicly confirmed that "great efforts would be made to regulate and rectify after-school tutoring institutions[.]"

---

[1] Some of these proposals, actions, and regulations are noted throughout. *E.g.,* ¶¶ 30-37 and 45-46. *See* http://www.gov.cn/zhengce/2019-02/23/content_5367988.htm.

7

33.    At the end of January 2021, the Office of the Education Supervision Committee of the State Council held, by video, its official conference on supervision. There, a number of Provincial education departments identified reducing the "Double Burden" imposed by private off-campus tutoring by companies like 17EdTech on top of an already large homework burden as the most important task for education supervision for 2021.

34.    On March 6, 2021, PRC President Xi Jinping publicly confirmed that the PRC will "resolutely reform all activities that infringe on [the People's] interests under the banner of education." At the Chinese People's Political Consultative Conference, President Xi described the after-school tutoring business as a "social problem." Consistent with President Xi's mandate, further rules to limit private afterschool tutoring were discussed at the Chinese Communist Party's annual Parliamentary Session held in March 2021. Liang Tingfu, a Beijing-based educational scholar, publicly warned that the coming crackdown might be more severe than previous reforms.[2]

35.    On March 31, 2021, the Ministry of Education publicly stated that it had recognized reducing the "Double Burden" of after-school tutoring on top of homework as a key task for 2021.

36.    In May 2021, Yu Minhong, founder of competitor New Oriental Education & Technology Group Inc., was quoted by Shanghai news outlet *ThePaper*: "the instant benefits and quick success sought by investors do not work

---

[2] *See* https://supchina.com/2021/03/17/uncertainty-roils-chinese-private-tutoring-industry-over-feared-regulatory-crackdown/.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

in the education industry, and a crackdown on online education, which is full of 'chaotic misbehavior', is imminent."[3]

37.    On May 21, 2021, Xi Jinping presided over a meeting of the Central Committee of the Chinese Communist Party, and the Central Committee's Commission for Deepening Overall Reform, during which the Central Committee adopted "The Opinions of Further Reducing the Burden of Homework and Off-Campus Tutoring for Students in the Compulsory Education Period[.]" Among other things, the Committee expressed concerns that too much after-school tutoring could affect students' physical and mental health.

38.    In light of the proposed, discussed, and enacted reforms from and connected to the 2018-2022 plan for modernizing Chinese education, several other Chinese education technology firms, including VIPKid, Huohua Siwei, Zuoyebang and Yuanfuda, reportedly scrapped or postponed plans for initial public offerings.[4]

39.    On July 23, 2021, mere months after the IPO, Chinese authorities formally revealed to the public continued regulations which banned after-school tutoring companies that teach the school curriculum from making profits, raising capital, or going public. These measures formally ended any potential growth in the for-profit tutoring sector in the PRC.

### 17EdTech's False and/or Misleading Registration Statement

40.    On November 13, 2020, 17EdTech filed with the SEC a registration statement on Form F-1, which in combination with subsequent amendments on Form F-1/A and filed pursuant to Rule 424(b)(4), are collectively referred to as the Registration Statement and issued in connection with the IPO.

---

[3] *See* http://epaper.chinadaily.com.cn/a/202105/19/WS60a43ecca31099a23435630e.html.
[4] https://www.yahoo.com/now/china-wrecks-ipo-plans-high-093410458.html.

41.     On December 4, 2020, 17EdTech filed with the SEC the final prospectus for the IPO on Form 424B4 (the "Prospectus"), which forms part of the Registration Statement. In the IPO, 17EdTech sold 27,400,000 ADSs at $10.50 per ADS.

42.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

43.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

44.     Throughout the Registration Statement, 17EdTech neglected to raise the real and existential concerns about the ongoing discussions and actions of Chinese authorities related to 17EdTech's K-12 education services and instead touted its K-12 Academic AST Services.

45.     Indeed, even while discussing recent, potential, and proposed regulatory changes, the Registration Statement did not reveal that 17EdTech's K-12 Academic AST Services could (and would) be shut down in one year's time. Instead, the Registration Statement merely stated the following, including a long section devoted to recent regulations, in relevant part:

> **General Factors Affecting Our Results of Operations**
> Our results of operations are affected by the general factors driving China's education industry. We have benefited from China's overall economic growth, significant urbanization rate, and higher per capita disposable income of households, and increased penetration of internet and mobile applications in China. ***Our results of operations are also subject to changes in the regulatory landscape affecting China's education industry, particularly uncertainties relating to both in-***

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

*school and after-school educational services. The PRC government regulates various aspects of our business and operations, including the qualification, licensing or filing requirements for entities that provide education services and limitations on foreign investments in the education industry.* See "Risk Factors—Risks Relating to Our Business and Industry—Uncertainties exist in relation to new legislation or proposed changes in the PRC regulatory requirements regarding online private education and smart in-school classroom solutions, which may materially and adversely affect our business, financial condition and results of operations."

\*      \*      \*

**Regulation Relating to After-school Tutoring and Educational Apps**

On February 13, 2018, the MOE, the Ministry of Civil Affairs, the Ministry of Human Resources and Social Security and the SAMR jointly promulgated the Circular on Alleviating After-school Burden on Primary and Secondary School Students and Implementing Inspections on After-school Training Institutions, pursuant to which the government authorities will carry out a series of inspections on after-school training institutions and order those with material potential safety risks to suspend business for self-inspection and rectification and those without proper establishment licenses or school operating permits to apply for relevant qualifications and certificates under the guidance of competent government authorities. …

On August 6, 2018, the General Office of the State Council issued the Opinion on the Regulation of the Development of After-school Training Institutions, or State Council Circular 80, which primarily regulates the after-school training institutions targeting students in elementary and middle schools. …

On November 20, 2018, the General Office of the MOE, the General Office of the SAMR and the General Office of the Ministry of Emergency Management jointly issued the Notice on Improving the Specific Governance and Rectification Mechanisms of After-school Education Institutions, which provides that provincial regulatory authorities of education should be responsible for being filed with the

11

training institutions that use internet technology to provide online training and target primary and secondary school students. …

On June 10, 2020, the General Office of MOE and the General Office of SAMR promulgated the Notice on Issuing the Form of Service Contract for After-school Training Provided to Primary and Secondary School Students, which requires the local competent regulatory authorities to guide the relevant parties to use the form of service contract for after-school training activities provided to primary and secondary school students. …

The MOE and certain other PRC government authorities jointly promulgated the Implementation Opinions on Regulating Online After-school Training, or the Online After-school Training Opinions, as effective on July 12, 2019. The Online After-school Training Opinions is to regulate academic after-school training involving internet technology provided to students in primary and secondary schools. …

The Online After-school Training Opinions further provides that the competent provincial regulatory authorities of education should, jointly with other provincial government authorities, review the filings and qualifications of the online after-school training institutions by the end of December 2019, focusing on the following matters: (i) the training content should not include online games or other content or links irrelevant with the training itself, and should not be beyond the scope of relevant national school syllabus. No illegal publications may be published, printed, reproduced or distributed, and no infringement or piracy activities may be conducted during the training. The training content and data should be stored for more than one year, among which the live streaming teaching videos should be stored for more than six months; (ii) each course should not be longer than 40 minutes and should be taken at intervals of not less than 10 minutes, and the training time should not conflict with the teaching time of primary and secondary schools. Each live-streaming course provided to students receiving compulsory education should not end later than 9:00 p.m., and no homework should be left for primary school students in Grade 1 and Grade 2. …

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

On April 21, 2020, the Ministry of Human Resources and Social Welfare and other government authorities jointly promulgated the Notice of Implementing the Phased Measures of "Taking Certificate after Starting Career" for Certain Occupations under COVID-19, pursuant to which all college graduates who are eligible for the teacher qualification examination and meet the requirements of teacher qualification regarding ideological and political criteria, language skills and physical conditions are allowed to start to teach before obtaining the teacher qualification licenses. The teacher qualification licenses will not be a mandatory precondition for college graduates if they are hired prior to December 31, 2020.

(Emphasis added.)

46.    Rather than disclose the real and existential concerns about the ongoing discussions and actions of Chinese authorities, the Registration Statement vaguely discussed China's regulatory regime with regards to 17EdTech's K-12 Academic AST Services. Thus, the risk disclosures themselves were materially misleading because they failed to disclose the risk and true likelihood of 17EdTech's Academic AST Services ending due to imminent regulatory action by Chinese authorities. Specifically, the Registration Statement represented that:

**Risks relating to our business and industry**
Risks and uncertainties relating to our business and industry include, but are not limited to, the following:

…

- *Uncertainties* exist in relation to new legislation or proposed changes in the PRC regulatory requirements regarding online private education and smart in-school classroom solutions, which may materially and adversely affect our business, financial condition and results of operations; and

- *We face uncertainties* with respect to the development of regulatory requirements on operating licenses and permits for our online education services in China. *Failure to renew and maintain requested licenses or permits in a timely manner or obtain newly required ones due to adverse changes in regulations or policies*

13

*could have a material adverse impact on our business, financial condition and results of operations.*

**Risks relating to our corporate structure**

Risks and uncertainties relating to our corporate structure include, but are not limited to, the following:

• If the PRC government finds that the agreements that establish the structure for operating certain of our operations in China do not comply with PRC regulations relating to the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations;

\*      \*      \*

**Risks Relating to Our Business and Industry**

*We have a limited operating history with our online after-school tutoring business, which makes it difficult to predict our prospects and our business and financial performance.*

… Our net revenues from online K-12 tutoring services grew by 283.0% from RMB93.9 million in 2018 to RMB359.6 million (US$53.0 million) in 2019 and increased by 312.4% from RMB182.1 million in the nine months ended September 30, 2019 to RMB751.1 million (US$110.6 million) in the nine months ended September 30, 2020. …

\*      \*      \*

*Uncertainties exist in relation to new legislation or proposed changes in the PRC regulatory requirements regarding online private education and smart in-school classroom solutions, which may materially and adversely affect our business, financial condition and results of operations.*

***The private education industry and smart in-school classroom solution industry in the PRC are subject to regulations in various aspects. Relevant rules and regulations are relatively new and evolving and could be changed to accommodate the development of the education, in particular, the online private education, markets***

14

*and the further adoption of smart in-school classroom solutions from time to time.*

Pursuant to the amended Law for Promoting Private Education, or the amended Private Education Law, a private school must obtain a private school operating permit. See "Regulation—PRC Regulations—Regulation Relating to Private Education." However, we are an online tutoring service provider, which is different from traditional offline education service providers, and it remains unclear in practice as to whether and how an online tutoring service provider like us needs to comply with the operating permit requirement under the amended Private Education Law. In August 2018, the Ministry of Justice, or MOJ, published the draft amendment to the Regulations on the Implementation of the Law for Promoting Private Education of the PRC, or MOJ Draft, for public comment. According to the MOJ Draft, we must file with the department of education at the provincial level, as we provide online non-diploma-awarding education services. … As of the date of this prospectus, the MOJ Draft is still pending for final approval and has not come into effect. It remains uncertain when and how the MOJ Draft would come into effect, and whether and how local governments would promulgate rules related to the filing or licensing requirement applicable to online education service providers like us. …

Furthermore, the Ministry of Education, or the MOE, jointly with certain other PRC government authorities, promulgated the Implementation Opinions on Regulating Online After-School Training, or the Online After-School Training Opinions, effective on July 12, 2019. The Online After-School Training Opinions are intended to regulate academic after-school training involving internet technology provided to students in primary and secondary schools. … The Online After-School Training Opinions also impose a number of new regulations requiring, among other things, that (i) each class shall not last longer than 40 minutes and shall be taken at intervals of not less than 10 minutes; (ii) live streaming courses provided to students receiving compulsory education shall not end later than 9:00 p.m.; (iii) fees shall not be collected in a lump sum for more than 60 classes when charged based on the number of classes, or for a course length of more than three months when charged based on the length of the course; and (iv) instructors providing after-school tutoring services related to

15

academic curriculum are required to obtain the necessary teaching qualification licenses. According to the Online After-School Training Opinions, provincial education regulatory authorities shall promulgate local implementing rules regarding these filing requirements. See "Regulation—PRC Regulations—Regulation Relating to After-school Tutoring and Educational Apps."

We have completed the filings in accordance with the Online After-School Training Opinions with respect to our major online after-school tutoring platform, training contents and instructors, and we are in the process of completing filings or updating the filing information for the rest of them. As the Online After-School Training Opinions are relatively new and evolving, we cannot assure you that we are in full compliance with all relevant rules or we will be able to timely obtain or maintain all the necessary filings. …

Moreover, the MOE, jointly with certain other PRC government authorities, issued the Opinions on Guiding and Regulating the Orderly and Healthy Development of Educational Mobile Apps on August 10, 2019, or the Opinions on Educational Apps, which requires, among others, mobile apps that offer services for school teaching and management, student learning and student life, or home-school interactions, with school faculty, students or parents as the main users, and with education or learning as the main application scenarios, be filed with the competent provincial regulatory authorities for education. …

Given the foregoing, the interpretation and application of the existing laws and regulations and the newly promulgated implementation rules and interpretations, if any, that govern the online private education industry and the smart in-school classroom solution industry would create substantial uncertainties regarding the legality of our business operation, which create risks that we may be found to violate the existing laws and regulations and any newly promulgated implementation rules and interpretations. It is also uncertain whether and how PRC government authorities would further promulgate new laws and regulations applicable to online training institutions and the smart in-school classroom solution industry, including those promulgated to apply more stringent social and ethical standards in the education sector in general. There is no assurance that we can comply with any newly promulgated laws and regulations in a timely manner

16

or at all, and any failure to comply may materially and adversely affect our business, financial condition and results of operations.

*We face uncertainties with respect to the development of regulatory requirements on operating licenses and permits for our online education services in China. Failure to renew and maintain requested licenses or permits in a timely manner or obtain newly required ones due to adverse changes in regulations or policies could have a material adverse impact on our business, financial condition and results of operations.*

\*      \*      \*

**Risks Relating to Our Corporate Structure**

*If the PRC government finds that the agreements that establish the structure for operating certain of our operations in China do not comply with PRC regulations relating to the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations.*

Foreign ownership in entities that provide value-added telecommunication services (except for e-commerce, domestic multi-party communications, store-and-forward and call center), such as provision of online course content, is subject to restrictions under current PRC laws and regulations. …

… However, we have been further advised by our PRC counsel that there are substantial uncertainties regarding the interpretation and application of current or future PRC laws and regulations. Thus, the PRC government may ultimately take a view contrary to the opinion of our PRC counsel. If the PRC government otherwise find that we are in violation of any existing or future PRC laws or regulations or lack the necessary permits or licenses to operate our business, the relevant governmental authorities would have broad discretion in dealing with such violation, including, without limitation:

- revoking the business licenses and/or operating licenses of such entities;

- imposing fines on us;

- confiscating any of our income that they deem to be obtained through illegal operations;

- discontinuing or placing restrictions or onerous conditions on our operations;

- placing restrictions on our right to collect revenues; and

- shutting down our servers or blocking our application/softwares.

(Emphasis added.)

47.     The statements contained in ¶¶ 45 and 46 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the Registration Statement was false and/or misleading and/or failed to disclose that: (1) Defendant 17EdTech's K-12 Academic AST Services would end less than a year after the IPO; (2) as part of its ongoing regulatory efforts, Chinese authorities would imminently curtail and/or end 17EdTech's core business; and (3) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

48.     Then on July 23, 2021, the Company issued a press release entitled "17 Education & Technology Group Inc. Responds to Media Reports" which announced, in relevant part, that:

> … certain English and Chinese language media outlets reported that the PRC regulators are considering a new set of regulations concerning after-school tutoring service related to school subjects taught in China's compulsory education system. The regulations have not been published, and the Company has not received official notification of the regulations. It is the Company's policy not to comment on market speculations.

18

49.     On this news, 17EdTech's ADS price fell $3.56 per ADS, or 39%, to close at $5.64 per ADS on July 23, 2021, on unusually heavy trading volume.

50.     Then on July 26, 2021, the Company issued a press release entitled "17 Education & Technology Group Inc. Provides Update on New Regulations" which announced, in relevant part, that:

> 17 Education & Technology Group Inc. (Nasdaq: YQ) ("17EdTech" or the "Company"), a leading education technology company in China with an "in-school + after-school" integrated model, announced that, on July 24, 2021, China's official state media, including Xinhua News Agency and China Central Television, announced the Opinions on Further Alleviating the Burden of Homework and After-School Tutoring for Students in Compulsory Education (the "Opinion"), issued by the General Office of the CPC Central Committee and the General Office of the State Council. The Opinion contains high-level policy directives about requirements and restrictions related to the compulsory education system in China, as well as online and offline after-school tutoring services, including, among others, (i) *institutions providing after-school tutoring services on academic subjects in China's compulsory education system, or Academic AST Institutions, need to be registered as non-profit*; (ii) changing the current registration-based regime for operating online Academic AST Institutions to a government approval-based regime, (iii) alleviating the amount of homework that students are required to complete, (iv) *foreign ownership in Academic AST Institutions is prohibited, including through contractual arrangements, and companies with existing foreign ownership need to rectify the situation*; (v) *listed companies are prohibited from raising capital to invest in businesses that teach academic subjects in compulsory education*; (vi) Academic AST Institutions are prohibited from providing tutoring services on academic subjects in compulsory education during public holidays, weekends and school breaks; and (vii) Academic AST Institutions must follow the fee standards to be established by relevant authorities. The Opinion also provides that institutions providing after-school tutoring services on academic subjects in high schools (which do not fall within China's compulsory education system) shall take into consideration the Opinion when conducting activities.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

The Company will continue to comply with all applicable rules and regulations in providing educational services, including those rules and regulations to be adopted following the policy directives of the Opinion. The Company is carefully considering the provisions of the Opinion and assessing their implications for the Company's business. ***The Company expects the Opinion, related rules and regulations, and the compliance measures to be taken by the Company will have a material adverse impact on the Company's results of operations and prospect. The Company will proactively seek guidance from and cooperate with government authorities in connection with its efforts to comply with the Opinion and any related rules and regulations.***

(Emphasis added.)

51.     On this news, 17EdTech's ADS price fell $1.48 per ADS, or 26%, to close at $4.16 per ADS on July 26, 2021, on unusually heavy trading volume.

52.     On August 25, 2021, the Company issued a press release entitled "17 Education & Technology Group Inc. Provides Update on Regulatory Development" which announced, in relevant part, that:

17 Education & Technology Group Inc. (Nasdaq: YQ) ("17EdTech" or the "Company"), a leading education technology company in China with an "in-school + after-school" integrated model, announced that the Shanghai local government issued the "Measures to Further Alleviate the Burden of Homework and After-School Tutoring on Students in Compulsory Education" and answers to twelve questions related to such measures (collectively, the "Shanghai Measures") on August 24, 2021. The Shanghai Measures were adopted to implement the Opinions on Further Alleviating the Burden of Homework and After-School Tutoring on Students in Compulsory Education, published in July 2021 by the General Office of the CPC Central Committee and the General Office of the State Council of the PRC, and aim to, within one year, "(i) effectively control the volume of, and the amount of time it takes to complete, homework assigned to students during the compulsory education stage, (ii) ensure all compulsory education schools provide on-campus, after-school services, (iii) complete the rectification of business practices of online and offline providers of after-school tutoring services on academic

20

subjects in China's compulsory education system ("Academic AST"), (iv) effectively reduce the excessive burden upon students from school homework and after-school tutoring, the education expenditures from their families and the burden on their parents' energy."

With respect to homework assignment and after-school tutoring services, among other things, the Shanghai Measures contain the following provisions:

•       Schools are prohibited from assigning homework to first- and second-graders, assigning written homework that takes longer than 60 minutes on average to complete to third-, fourth- or fifth-graders, or assigning written homework that takes longer than 90 minutes on average to complete to students in junior high-school.

•       Previously registered online Academic AST providers will be subject to a new round of approval process.

•       After-school tutoring providers are strictly prohibited from providing Academic AST during any national holiday, weekend, winter and summer break period; Online Academic AST classes cannot be offered after 9:00 p.m. during weekdays, and each class session cannot last longer than 30 minutes, with mandatory recessions of not less than 10 minutes between classes.

•       Academic AST providers are prohibited from (i) offering classes over contents outside of or in advance of the school curriculum, (ii) offering classes based on any foreign curriculum, (iii) soliciting and recruiting school teachers by offering excessive compensation, or (iv) employing foreign personnel to carry out training activities from overseas. Non-Academic AST providers are prohibited from offering Academic AST classes.

•       Prices for Academic AST will need to follow the guidelines from the government.

•       *Academic AST providers are prohibited from financing by way of publicly listing its securities; listed companies may not invest in Academic AST providers through capital markets fundraising activities, and may not acquire assets of Academic AST providers*;

21

*and foreign capital is prohibited from controlling or participating in Academic AST providers.*

• Enhancing oversight of AST advertising, including restricting the channels for deploying AST advertisements.

• Institutions providing after-school tutoring services on academic subjects in high schools (which do not fall within China's compulsory education system) will be supervised with reference to the Shanghai Measures.

• Academic AST providers are strictly prohibited from recommending or inducing students to use consumer loan products to pay training fees.

***The Company's compliance with the Shanghai Measures will have a material adverse impact on its business, results of operations and financial condition. In compliance with the Shanghai Measures, the Company has stopped and will stop offering online Academic AST classes over weekends, national holidays and school break periods.***

(Emphasis added.)

53.    On this news, 17EdTech's ADS price fell 5% per ADS to close at $4.48 per ADS on August 25, 2021.

54.    Finally, on June 9, 2022, after market hours, the Company issued a press release entitled "17 Education & Technology Group Inc. Announces First Quarter 2022 Unaudited Financial Results" which announced, in relevant part, that:

Mr. Michael Chao Du, Director and Chief Financial Officer of 17EdTech commented, "We are pleased to report our solid performance in the first quarter of 2022. Our net revenues reached RMB233.4 million, 11.1% higher than the top-end of our prior guidance. It is also worth mentioning that the results reflected progress we made in implementing our new business strategies and ***did not include any revenue from the legacy online K-12 tutoring services, which ceased by the end of 2021 in compliance with the relevant PRC government regulations***. …"

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## First Quarter 2022 Unaudited Financial Results
### *Net Revenues*
Net revenues for the first quarter of 2022 were RMB233.4 million (US$36.8 million), ***representing a year-over-year decrease of 50.8% from RMB474.2 million in the first quarter of 2021, mainly due to the cessation of the Company's online K-12 tutoring services by the end of 2021 in order to be compliant with the latest PRC regulations, which prohibit the provision of tutoring services relating to academic subjects to K-12 students***.

\*        \*        \*

## Business Outlook
Based on our current estimates, total net revenues for the second quarter of 2022 are expected to be between RMB100 million and RMB120 million. The estimated total net revenues for the second quarter of 2022 are derived entirely from the ongoing businesses after the Company's business transformation and, as mentioned above, ***do not include revenues from the legacy online K-12 tutoring services***. This estimated range represents a significant increase year-over-year when ***compared with the relatively small base of the net revenue generated from non-online K-12 tutoring services for the second quarter of 2021***.

(Emphasis added.)

55.     On this news, 17EdTech's ADS price fell $.065 per ADS, or 21%, to close at $2.40 per ADS on June 10, 2022.

56.     Since the IPO, and as a result of the disclosure of material adverse facts omitted from the Company's Registration Statement, 17EdTech's ADS price has fallen significantly below its IPO price, damaging Plaintiff and Class members. As of July 13, 2022, 17EdTech's ADSs closed at $1.54 per ADS, ***representing an 85% decline from the $10.50 IPO price***.

57.     Additionally, due to the materially deficient Registration Statement, Defendants have also violated their independent, affirmative duty to provide

adequate disclosures about adverse conditions, risk and uncertainties. Item 303 of SEC Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii) requires that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations.

58.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action as a class action on behalf of all those who purchased the Company's securities pursuant and/or traceable to the Registration Statement (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

60.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

61.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

24

62.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

63.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the Securities Act;

(b)    whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and to what extent the members of the Class have sustained damages and the proper measure of damages.

64.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of Section 11 of the Securities Act
### Against All Defendants

65.    Plaintiff incorporates all the foregoing by reference.

66.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

67.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

25

68.     Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

69.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

70.     By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

71.     Plaintiff acquired the Company's securities pursuant to the Registration Statement.

72.     At the time of their purchases of 17EdTech securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

73.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act

### Against All Defendants

74.     Plaintiff incorporates all the foregoing by reference.

75.     By means of the defective Prospectus, Defendants promoted, solicited, and sold 17EdTech securities to Plaintiff and other members of the Class.

76.     The Prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the Class who purchased the

26

Company's securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

77.    Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired 17EdTech securities.

78.    By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2). As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased 17EdTech securities pursuant to the Prospectus sustained substantial damages in connection with their purchases of the shares. Accordingly, Plaintiff and the other members of the Class who hold the securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

79.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

## COUNT III

### Violations of Section 15 of the Securities Act

### Against the Company and the Individual Defendants

80.    Plaintiff incorporates all the foregoing by reference.

27

81.    This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against all Defendants except the Underwriter Defendants.

82.    The Individual Defendants were controlling persons of 17EdTech by virtue of their positions as directors and/or senior officers of the Company. The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of the Company. The Company controlled the Individual Defendants and all of 17EdTech employees.

83.    The Company and the Individual Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

84.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1
2
    (c)    awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

3
4
    (d)    awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

5
### **JURY TRIAL DEMANDED**

6
Plaintiff hereby demands a trial by jury.

7

8
Dated: July 19, 2022             **THE ROSEN LAW FIRM, P.A.**

9

10
/s/Laurence M. Rosen

11
Laurence M. Rosen (SBN 219683)

12
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071

13
Telephone: (213) 785-2610
Facsimile: (213) 226-4684

14
Email: lrosen@rosenlegal.com

15

16
*Counsel for Plaintiff*

17
18
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS