**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WONG HAPING and HE XIANGHONG, individually and on behalf of all others similarly situated,<br><br>                           Plaintiffs,<br><br>           v.<br><br>17 EDUCATION & TECHNOLOGY GROUP INC., ANDY CHANG LIU, MICHAEL CHAO DU, DUN XIAO, TUCK LYE KOH, QIN WEN, JIAWEI GAN, BING YUAN, COLLEEN A. DE VRIES, COGENCY GLOBAL INC., MORGAN STANLEY & CO. LLC, GOLDMAN SACHS (ASIA) L.L.C., BOFA SECURITIES, INC., CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED, and TIGER BROKERS (NZ) LIMITED,<br><br>                         Defendants. | Case No.  1:22-cv-09843-LAK-SDA<br><br><u>JURY TRIAL DEMANDED</u> |

**FIRST AMENDED CLASS ACTION COMPLAINT**
<u>**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u>

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................. 1

JURISDICTION AND VENUE ........................................................................................... 5

PARTIES ............................................................................................................................. 5

SUBSTANTIVE ALLEGATIONS ...................................................................................... 7

    A.   Overview of the Company and Its Business ...................................................... 7

    B.   PRC's Long-Standing Plan to Reform the After-School Tutoring Industry .................. 10

    C.   17 Education's IPO ............................................................................................ 15

    D.   Post-IPO Regulatory Developments in China .................................................. 18

    E.   17 Education's Registration of Additional Shares ............................................ 20

    F.   China's Long-Awaited After-School Tutoring Industry Reforms ..................... 21

THE MATERIALLY FALSE AND MISLEADING STATEMENTS ...................................... 24

    A.   The IPO Registration Statement ...................................................................... 24

    B.   The S-8 Registration Statement ....................................................................... 34

CLASS ACTION ALLEGATIONS ...................................................................................... 42

CAUSES OF ACTION ........................................................................................................ 43

PRAYER FOR RELIEF ....................................................................................................... 47

DEMAND FOR TRIAL JURY ............................................................................................ 47

Court-appointed lead plaintiffs Wong Haping and He Xianghong ("Lead Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, as for their First Amended Class Action Complaint against defendants 17 Education & Technology Group Inc. ("17 Education"), Andy Chang Liu, Michael Chao Du, Dun Xiao, Tuck Lye Koh, Qin Wen, Jiawei Gan, Bing Yuan, Colleen DeVries, Cogency Global Inc., Morgan Stanley & Co. LLC, Goldman Sachs (Asia) L.L.C., BofA Securities, Inc., China Renaissance Securities (Hong Kong) Limited, and Tiger Brokers (NZ) Limited (collectively, "Defendants"), allege the following on personal knowledge as to their own acts and on information and belief as to all else based upon the investigation by counsel, which has included, among other things, a review and analysis of regulatory filings made with the U.S. Securities and Exchange Commission ("SEC"), securities analyst research reports, press releases, news reports, and other publicly available information issued by, or about, 17 Education or the industry in which it operates. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a class action on behalf of all persons who purchased or otherwise acquired American depositary shares representing Class A ordinary shares of 17 Education ( "ADS") issued pursuant and/or traceable to the registration statement filed by 17 Education on Form F-1 (File No. 333-250079) (as amended, the "IPO Registration Statement") or the registration statement filed by 17 Education on Form S-8 (File No. File No. 333-255632) (the "S-8 Registration Statement") for violations of the Securities Act of 1933 (the "Securities Act").

2.    17 Education purports to be a leading education technology company in the People's Republic of China ("PRC" or "China") that provides a range of "in school" and "after-school" education services for students in kindergarten through the last year of high school ("K-

12"). Although 17 Education initially established itself as an in-school service provider, it launched an online after-school tutoring business in 2017, which rapidly grew to comprise ***93% of total net revenues*** as of September 30, 2020, as demand for those services in PRC skyrocketed.

3.    Seeking to capitalize on the recent success of its after-school tutoring business, 17 Education raised over $300 million from U.S. investors in early December 2020 by conducting an IPO of its ADS at $10.50 per ADS pursuant to the IPO Registration Statement. Several months later, 17 Education registered additional shares issuable in the form of ADS under its employee share incentive plans in the S-8 Registration Statement.

4.    However, the IPO Registration Statement and the S-8 Registration Statement were negligently prepared and failed to warn U.S. investors that relevant Chinese authorities were poised to make sweeping and long-awaited reforms to the after-school tutoring industry in 2021 to address the widespread public concern that businesses in this booming industry placed an "excessive" burden on students who already faced a heavy school workload (in what became known as a "double burden"), including by having public schools offer after-school tutoring services and, thus, compete with, if not supplant, private enterprise.

5.    This initiative was set in motion as far back as February 2019, when the PRC central government released an action plan for modernizing China's education system. That document specifically directed that, by no later than 2022, "[e]fforts will be made to reduce the excessive extracurricular burden of primary and secondary students" and "support primary and secondary schools to generally carry out after-school services," instead of privately-owned businesses.

6.    By the end of 2019, key leaders in China's Ministry of Education ("MOE")—the department responsible for overseeing public schools and after-school tutoring businesses, like 17 Education—announced that its existing regulations were insufficient to effectively reduce the

extracurricular burdens on primary and secondary school students and it planned make deeper reforms to the after-school industry to meet public expectations, in particular by enhancing the after-school services offered in schools throughout China's public school system.

7.      Those plans were put on hold as the COVID-19 pandemic swept across the country in early 2020, and national attention shifted to preventing the spread of the novel disease.

8.      But top officials made clear that the MOE planned to resume the industry clampdown in late 2020.  For example, on November 10, 2020, China's Minister of Education stated that the MOE would "regulate after-school training institutions, while increasing the supply of public education services" in the next phase of reform.  Soon thereafter, other senior officials explained that the MOE would "deepen" its regulation of the after-school tutoring industry in 2021 and, to that end, build out after-school education programs at public schools in China.

9.      Between the time of the IPO and the filing of the S-8 Registration Statement on April 30, 2021, the warnings became even more pronounced.  In January 2021, China's Education Minister declared that the MOE sought to "liberate students from after-school tutoring" in its forthcoming reforms.  In early March 2021, China's President, Xi Jinping, described the after-school tutoring industry as a "stubborn disease" and vowed that China would "resolutely reform all activities that infringe on [the people's] interests under the banner of education."  Later that month, a top MOE official confirmed that "double burden reduction" was a key task for the MOE in 2021 and reiterated its plan to establish after-school services in China's public schools.

10.     Despite this steady stream of repeated notifications, neither the IPO Registration Statement nor the S-8 Registration Statement warned investors that the PRC central government was preparing to fundamentally reform the market in which its largest business operated.  Indeed, both documents contained a lengthy recitation of existing regulations but failed to make ***any***

*mention* of the reform initiatives described above.  On the contrary, these two documents indicated that 17 Education planned to *continue growing* its K-12 after-school tutoring business.

11.    In mid-July 2021, the MOE announced that all primary and secondary schools across China would provide after-school services starting in the fall semester of 2021, including student tutoring.  Then, on July 24, 2021, less than eight months after 17 Education's IPO, China unveiled its long-awaited "double burden reduction" rules.  Among other things, those policies effectively chilled further operation in the sector by banning privately-owned businesses from making any profit on providing after-school tutoring services.

12.    These reforms were designed to reverse China's declining birth rate by alleviating the family costs associated with education, and thereby encourage couples to have more children, but they had a devastating impact on the companies that operated in the space, including 17 Education.  In a striking departure from the statements in the IPO Registration Statement and the S-8 Registration Statement, by the end of 2021, 17 Education *ceased offering all after-school tutoring services* in response to the "double burden reduction" regulations and related measures.

13.    17 Education's ADS has slumped persistently since its IPO.  With the ADS price down to $0.83 in November 2021, 17 Education changed the ratio of ADS to Class A ordinary to achieve "the same effect as a one-for-four reverse ADS split" and thereby increase the trading price of ADS by a multiple of four.  As of the filing of this Complaint, 17 Education's ADS trades at $1.81, representing a decline of more than 95% from its split-adjusted IPO price.

14.    As a result of Defendants' wrongful acts and omissions, there was a precipitous decline in the market value of the Company's securities, and Lead Plaintiffs and other members of the Class have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, codified at 15 U.S.C. § 77k and 15 U.S.C. § 77o.

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22(a) of the Securities Act, codified at 15 U.S.C. § 77v(a).

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 22(a) of the Securities Act, codified at 15 U.S.C. § 77v(a).  Among other things, the IPO took place in this judicial district, the duly authorized United States representative of 17 Education who signed the IPO Registration Statement and the S-8 Registration Statement is based in this judicial district, the Class A ordinary shares represented by the ADS issued by 17 Education pursuant to the IPO Registration Statement and the S-8 Registration Statement are held and administered by a depositary located in this judicial district, and the ADS are listed and trade on the Nasdaq Stock Market, a national securities exchange based in this judicial district.  In addition, the deposit agreement governing the ADS, a form of which is attached as Exhibit 4.3 to the IPO Registration Statement (the "Deposit Agreement"), designates this judicial district as the exclusive forum within the United States for the resolution of any complaint asserting a cause of action arising under the federal securities laws of the United States, including claims under the Securities Act.

18.     In connection with the acts, transactions, and omissions alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

19.     Lead Plaintiffs Wong Haping and He Xianghong purchased ADS pursuant and/or traceable to either the IPO Registration Statement or the S-8 Registration Statement, as set forth

in the certifications they previously filed with the Court (ECF No. 19-3), and were damaged thereby, as set forth herein.

20.    Defendant 17 Education is a holding company incorporated under the laws of the Cayman Islands which conducts operations in PRC through its subsidiaries and affiliates.  17 Education's ADS was issued in connection with its IPO and various employee incentive plans and has since traded on the Nasdaq Global Select Market under the symbol YQ.

21.    Defendant Andy Chang Liu ("Liu") is 17 Education's founder and served as its CEO and chairman of the Company's board of directors (the "Board") at the time of the IPO.

22.    Defendant Michael Chao Du ("Du") was 17 Education's CFO and served as a director on the Company's Board at the time of the IPO.

23.    Defendant Dun Xiao ("Xiao") is 17 Education's co-founder and served as a director on the Company's Board at the time of the IPO.

24.    Defendant Tuck Lye Koh ("Koh") served as a director on 17 Education's Board at the time of the IPO.

25.    Defendant Qin Wen ("Wen") was 17 Education's COO at the time of the IPO and became a director on the Company's Board automatically upon the effectiveness of the IPO Registration Statement.

26.    Defendant Jiawei Gan ("Gan") became a director on the Company's Board automatically upon the effectiveness of the IPO Registration Statement.

27.    Defendant Bing Yuan ("Yuan") became a director on the Company's Board automatically upon the effectiveness of the IPO Registration Statement.

28.    Defendant Cogency Global Inc. ("Cogency") is a Delaware corporation with its principal executive office in New York, New York and  was designated as 17 Education's duly

authorized United States representative for purposes of the IPO Registration Statement and the S-8 Registration Statement.

29.    Defendant Colleen A. De Vries ("De Vries") was Senior Vice President of Cogency and acted on its behalf in both the IPO Registration Statement and the S-8 Registration Statement .

30.    Defendants Morgan Stanley & Co. LLC ("Morgan Stanley"), Goldman Sachs (Asia) L.L.C. ("Goldman Sachs"), BofA Securities, Inc. ("BofA"), China Renaissance Securities (Hong Kong) Limited ("China Renaissance"), and Tiger Brokers (NZ) Limited ("Tiger Brokers") served as underwriters for 17 Education's IPO.  Morgan Stanley and Goldman Sachs acted as the lead representatives of the underwriting syndicate for the IPO.

31.    As used herein, Defendants Liu, Du, Xiao, Koh, Wen, Gan, and Yuan are referred to as the "Individual Defendants," Defendants Cogency and De Vries are referred to as the "Cogency Defendants," and Morgan Stanley, Goldman Sachs, BofA, China Renaissance, and Tiger Brokers are referred to as the "Underwriter Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.    Overview of the Company and Its Business

32.    Co-founded by Defendants Lui and Xiao in 2012, 17 Education purports to be a leading education technology company that provides technology-based K-12 education services in PRC for teachers, students, and parents.  The "17" in 17 Education is a play on the Chinese word for "together" (一起), reflecting the Company's belief that a students' full academic potential can be unlocked when teachers, students, and parents work together.

33.    17 Education is a holding company registered in the Cayman Islands that operates in China through several wholly owned subsidiaries.  To comply with PRC laws regarding foreign ownership, those subsidiaries, in turn, conduct 17 Education's business through several China-

based variable interest entities (each a "VIE") whose relationship with 17 Education's direct subsidiaries are defined by a series of contractual arrangements.

34.    At the time of the IPO, 17 Education's business was fashioned around an "in-school + after-school" integrated model, which offered a range of complementary in-school and after-school products.  The Company's portfolio of in-class products included a suite of digital tools that covered class preparation, course delivery, homework management, and academic assessment.  Based on insights gained from its in-class products, the Company launched an online after-school tutoring service for K-12 students in a large-class, dual-teacher format beginning in 2017.

35.    The market that 17 Education operates in is massive.  Consistent with its large population, China boasts the largest K-12 education system in the world.  As of December 31, 2019, the K-12 education system in PRC encompassed approximately 178 million students, including 105.6 million in primary school, 48.3 million in middle school, and 24.1 million in high school.  Approximately 88.8% of these students attended schools that were part of China's public education system and, consequently, fell within the jurisdiction of the MOE and local authorities.

36.    Furthermore, K-12 students in PRC face intense competitive pressure throughout their academic life due to the scarcity of high-quality upper-level educational resources in China.  Whereas primary and middle school education is compulsory, admissions to high schools and universities are primarily determined by performance on the *Zhongkao*, the standardized high school entrance exam, and the *Gaokao*, the standardized college entrance exam.  In 2019, approximately 10.3 million high school graduates attended the *Gaokao*, but only 41.8% of those graduates were admitted to universities, 11.1% of which were admitted to first-tier universities.

37.    As such, studies have estimated that over 75% of K-12 students attended after-school tutoring classes in 2016, and the figure has increased since then.

38.     In the years prior to 17 Education's IPO, the market for online education services in China experienced rapid growth, especially the market for online tutoring.  According to Frost & Sullivan, a U.S. market research and analysis consulting firm which prepared an industry report commissioned by 17 Education, the market for K-12 in-school classroom solutions grew from 15.9 million users in 2015 to 43.5 million users in 2019, representing a compound average growth rate (CAGR) of 28.6%, and China's online K-12 after-school tutoring market in terms of gross billings grew from RMB3.2 billion in 2015 to RMB67.0 billion in 2019, representing a CAGR of 114.7%.

39.     The onset of the COVID-19 pandemic in early 2020 further accelerated the demand for online education services in China as schools adopted alternative means of delivering education due to the widespread suspension of in-person schooling and students were encouraged to engage in more online education as they studied from home.

40.     By June 30, 2020, 17 Education had established itself as the clear market leader for in-school classroom solutions in China, with the number of average monthly active users exceeding that of the next four competitors combined and ranked fifth in China's online K-12 large-class, after-school tutoring market in terms of gross billing and paid course enrollments.

41.     However, due to the far larger market for after-school tutoring services, 17 Education's new online tutoring business quickly outstripped its portfolio of in-class products as overall demand for online education services grew.  While 17 Education's membership-based in-class products experienced modest growth between 2018 and September 30, 2020, paid course enrollments in its online tutoring services increased from 272,000 in 2018 to 726,000 in 2019, and 1,168,000 in the nine months ended September 30, 2020.  As such, 17 Education's after-school tutoring business accounted for 30.2% of total net revenues in 2018 but surged to 88.5% of total net revenues in 2019, and 93% of total net revenues in the nine months ended September 30, 2020.

**B.**    **PRC's Long-Standing Plan to Reform the After-School Tutoring Industry**

42.    As 17 Education's after-school tutoring business took off and propelled the Company to new heights, there was a steady drumbeat of announcements from the PRC central government which unambiguously declared that after-school tutoring was detrimental to the well-being of K-12 students and, as such, would be restricted through additional reform.

43.    China is a single-party state under the exclusive political control of the CCP. Informally referred to as China's "paramount leader," Xi Jinping serves as the head of party, state, and military, holding the titles of General Secretary of the CCP, President of the PRC, and Chairman of the Central Military Commission, respectively, making him the highest-ranking and most powerful political official in PRC's dual party-state system.

44.    As early as October 2017, Xi Jinping signaled that education reform was a core component of the CCP's national agenda.  To open the 19th National Congress of the CCP, a party body which meets only once every five years, Xi Jinping delivered an address to National Congress delegates on October 18, 2017, which outlined his vision for China's future.  In this address, Xi Jinping specifically identified developing China's education as a top national priority, stating that "[s]trenghening education is fundamental to our pursuit of national rejuvenation."

45.    Senior leaders of the State Council, the highest authority of the executive branch, and the CCP, including Xi Jinping, met for three days in December 2017 for the Central Economic Work Conference, the country's most important annual economic summit.  Although the meetings are closed, an official statement issued after the conclusion of the conference stated that China will take targeted measures to address "prominent problems in education," including the "heavy extracurricular burdens for primary and middle school students."

46.    On February 13, 2018, the MOE, the Ministry of Civil Affairs, the Ministry of Human Resources and Social Security, and the State Administration for Market Regulation

("SAMR") jointly promulgated a Circular on Alleviating After-School Burden on Primary and Secondary School Students and Implementing Inspections on After-school Training Institutions ("Circular 3"), which prohibited after-school tutoring businesses from providing training beyond the students' academic level or conducting exam-oriented training, and authorized government authorities to conduct a series of inspections on such institutions for compliance.

47.    Beginning in May 2018, the MOE and SAMR dispatched teams across China to begin the process of inspecting after-school tutoring programs for compliance with relevant regulations.

48.    On August 6, 2018, the State Council issued the Opinion on the Regulation of the Development of After-school Training Institutions ("State Circular 80"), pursuant to which after-school training institutions were prohibited from conducting training beyond the school syllabus, corresponding national curricular standards, or the progress of local schools.

49.    On November 20, 2018, the MOE, the SAMR, and the Ministry of Emergency Management jointly issued the Notice on Improving the Specific Governance and Rectification Mechanisms of After-school Education Institutions ("Circular 10"), which made online after-school tutoring programs subject to the same regulations as in-person tutoring programs.

50.    By early December 2018, the PRC central government had inspected over 400,000 after-school tutoring institutions and found that more than 270,000 (over 67.5%) failed to comply with applicable regulations, including, most notably, by teaching courses that were too advanced and placed children under too much pressure, causing unnecessary competition among students.

51.    According to statistics released by the MOE, nearly 99% of the institutions that failed their inspection rectified the underlying issues by December 31, 2018. But this was not the end of the efforts by regulatory authorities to reform the after-school tutoring industry in PRC.

52.     On September 10, 2018, Xi Jinping delivered a speech at a national education conference held by the CCP in which he shared his thoughts on how to accelerate the modernization of China's education system.  In this speech, Xi Jinping acknowledged the problem of "difficult and expensive admission" and resolved to "reduce the excessive extracurricular burden of primary and middle school students."

53.     By February 2019, powerful bodies within the PRC central government made clear that they planned to further curtail the activities of after-school education service providers.  On February 23, 2019, the Central Committee of the CCP, the party's highest body when the National Congress is not in plenary session, and the State Council released an action plan for modernizing China's education system through 2022 (the "Implementation Plan").  Among other things, the Implementation Plan expressly provided that "[e]fforts will be made to reduce the excessive extracurricular burden of primary and secondary students, and support primary and secondary schools to generally carry out after-school services," instead of private businesses.

54.     On March 12, 2019, China's Minister of Education, Chen Baosheng, explained during a press conference at the National People's Congress, the PRC's primary legislative body, that after-school training institutions "shifted" their practices in response to the regulations promulgated in 2018 and, thus, new strategies were needed to "solve the problem of excessive extracurricular burdens for primary and middle school students."  Chen Dongsheng, an official with the MOE, elaborated at a conference in April 2019 that the regulations in 2018 were only an initial "step" in the comprehensive effort to reduce excessive extracurricular burden on students.

55.     In early July 2019, six PRC government departments, including the MOE, issued the Implementation Opinions on Regulating Online After-School Training, effective July 12, 2019 (the "Online After-School Training Opinions").  The Online After School Training Opinions

imposed five new restrictions on online after-school training institutions in an effort to standardize online after-school tutoring programs, including limiting classes to 40 minutes and prohibiting classes after 9:00 p.m., and authorized the MOE to conduct an investigation of all such institutions for compliance with those requirements by the end of 2019.

56.    At a press conference held on July 9, 2019, to discuss the Online After-School Training Opinions, China's Vice-Minister of Education, Zheng Fuzhi, responded to a question by a reporter about the MOE's next steps to address the increase in extracurricular training.  He noted that burden reduction is "one of the hottest issues in basic education right now" and, moving forward, "the key is to resolutely put an end to . . . excessive training behaviors and prevent layer upon layer increase" with deeper regulation of after-school tutoring.  He added that "children work very hard at school and adding another layer outside of school increases the burden on them."

57.    On July 28, 2019, Sun Chunlan, Vice Premier of the State Council and a member of the powerful CCP Politburo, the decision-making body of the CCP, stressed during an MOE symposium that authorities should focus on addressing outstanding education problems "strongly voiced" by the people, such as "reducing the burden on primary and secondary school students."

58.    On November 5, 2019, Yu Weiyue, Deputy Director of the Basic Education Department of the MOE, informed the press that the next stage of burden reduction reforms will focus on the "problem" of excessive extracurricular burdens, and entail new measures to carry out additional "governance" of after-school tutoring programs and "improve the level of . . . after-school services" within China's public schools.

59.    In the following weeks, other MOE officials similarly warned that additional reforms were on the horizon.  On November 14, 2019, the Director of the MOE's Basic Education Department, Lv Yugang, held a press briefing at which he stated that "it is necessary to deepen the

13

governance of off-campus training institutions" to reduce the present burdens on primary and secondary school students. Then, at a conference in December 2019, Xu Pan, the Director of the After-School Education and Training Supervision Department at MOE—the department responsible for overseeing after-school tutoring services—pointed out that the regulation of private after-school training has made "staged progress" but "more efforts are required to meet the expectations of the public, to which China's education authorities have attached great importance."

60.     However, beginning in late January 2020, the PRC central government—including the MOE—shifted its attention to preventing the continued spread of COVID-19 at the pandemic swept across China, leaving many existing plans, including those described above, on hold.

61.     On September 22, 2020, President Xi Jinping presided over a cross-industry symposium, during which he proclaimed that PRC must fully implement the CCP's education policy during the next five-year period of economic and social development. At the fifth plenary session of the nineteenth Central Committee meeting on October 29, 2020, the Central Committee formally adopted a series of proposals for formulating that plan, known as the "14th Five-Year Plan," one of which was to "regulate after-school tutoring institutions."

62.     Top officials within the MOE made clear that they viewed the policy directive from the Central Committee as an opportunity to resume the after-school tutoring industry reforms. Commenting on the Central Committee's proposal on November 10, 2020, Chen Baosheng explained that the MOE must "regulate after-school tutoring institutions, while increasing the supply of public education services" in the next phase of reform. On December 2, 2020, Lv Yugang confirmed that the MOE planned to "[d]eepen the governance of off-campus training institutions, and effectively reduce the excessive extracurricular burden of students and the burden of family education expenditures" as a key task moving forward. Then, on December 3, 2020, Xu

Pan stated that "China will take further steps to . . . guide the development of after-school education" and added that schools must carry out after-school education programs themselves.

### C.    17 Education's IPO

63.    Joining a wave of other Chinese tech companies at the time, 17 Education sought to capitalize on its recent tutoring-fueled growth by going public in the United States.  However, as a foreign issuer, 17 Education elected to do so by establishing an ADS program for the shares it planned to issue in connection with the offering.  Generally speaking, ADS are equity instruments freely tradable on U.S.-based exchanges which represent shares of a foreign issuer that have been deposited with a commercial bank in the United States, known as a "depositary."

64.    On November 13, 2020, 17 Education filed with the SEC a registration statement on Form F-1 (File No. 333-250079) (the "Initial IPO Registration Statement") containing a preliminary prospectus relating to the potential IPO of an unspecified amount of ADS representing Class A ordinary shares of 17 Education to be deposited with The Bank of New York Mellon in New York, New York.  The Initial IPO Registration Statement identified the Underwriter Defendants as the underwriters for the IPO and stated that Defendants Wen, Gan, and Yuan have each accepted their appointment as a director on the Company's Board upon the effectiveness of the IPO Registration Statement.  The Initial IPO Registration Statement attached various exhibits, including consents from Defendants Wen, Gan, and Yuan pursuant to Rule 438 of the Securities Act (the "Consents"), in which each consented to the foregoing description of their appointment to the Company's Board.

65.    On November 27, 2020, 17 Education filed with the SEC an amendment to the Initial Registration Statement on Form F-1/A (the "Amended IPO Registration Statement," and together with the Initial IPO Registration Statement, the IPO Registration Statement), which contained additional detail regarding the offering size, ADS ratio, and other information.  Among

other things, the IPO Registration Statement (i) specified that every two ADS represent five Class A ordinary shares of 17 Education, and that the Company planned to offer up to 31,510,000 ADS, representing a total of 78,775,000 Class A ordinary shares of 17 Education, provided the underwriters exercise their "over-allotment" option to purchase additional ADS in full; and (ii) attached additional exhibits, including a form of the underwriting agreement between 17 Education and the lead representatives of the underwriters (the "Underwriting Agreement") as well as a form of the Deposit Agreement.  The IPO Registration Statement was signed by 17 Education, Defendants Liu, Du, Xiao, and Koh, and the Cogency Defendants.

66.    That same day, 17 Education filed a separate registration statement on Form F-6 (File No. 333-250994) (the "ADS Registration Statement") to register the ADS that will represent the Class A ordinary shares to be issued in connection with the IPO.

67.    On December 1, 2020, a mere two business days after filing the IPO Registration Statement, 17 Education sent a letter to the SEC formally requesting that the SEC accelerate the effectiveness of its IPO Registration Statement to 4:00 p.m. Eastern Time on December 3, 2020.

68.    As requested by 17 Education, the SEC declared the IPO Registration Statement and the ADS Registration Statement effective at 4:00 p.m. Eastern Time on December 3, 2020.

69.    On December 4, 2020, 17 Education filed a final prospectus pursuant to Rule 424(b)(4) deemed to be part of the IPO Registration Statement in accordance with Rule 430A of the Securities Act (the "Prospectus"), which provided final pricing information for the IPO.

70.    17 Education commenced its IPO on December 4, 2020, at which point the ADS began trading on the Nasdaq Global Select Market.  In connection with the IPO, 17 Education sold 31,510,000 ADS, representing 78,775,000 Class A ordinary shares of 17 Education at $10.50 per ADS, including ADS sold pursuant to the exercise of the Underwriter Defendants' over-allotment

option, raising over $300 million in net proceeds.  The Underwriter Defendants received underwriting discounts and commissions of approximately $17 million in connection with the IPO.

71.    Page i of the prospectus included in the IPO Registration Statement specifically warned investors that they should not consider any external information, including the reports of reform efforts described in ¶¶ 46-62, stating in full: "You should rely only on the information contained in this prospectus or in any free writing prospectus that we authorize to be distributed to you. We and the underwriters have not authorized anyone to provide you with any information other than that contained in this prospectus or in any free writing prospectus prepared by or on behalf of us or to which we have referred you, and neither we, nor the underwriters, take responsibility for any other information others may give you."

72.    As provided therein, the IPO Registration Statement disclosed that 17 Education's tutoring services are subject to a variety of PRC regulations.  Indeed, the IPO Registration Statement contained a lengthy summary of existing regulations formally promulgated by PRC authorities governing "After-school Tutoring and Educational Apps," including Circular 3, State Circular 80, Circular 10, and the Online After-School Training Opinions described in ¶¶ 46-51 and 55, and further cautioned that it was "uncertain whether and how PRC government authorities would further promulgate new laws and regulations applicable to online training institutions."  But the IPO Registration Statement failed to make *any mention* of the regulatory developments described in ¶¶ 52-54 and 56-62 or otherwise warn investors that the PRC central government was planning to fundamentally reform the market in which its largest business operated in 2021.  On the contrary, the IPO Registration Statement informed U.S. investors that 17 Education planned to "*further grow*" its tutoring business moving forward.  These statements materially misled U.S. investors by creating the false impression that there were no regulatory developments that threatened the

continued growth of 17 Education's business, much less its very existence.  In truth, there was a steady stream of actions and statements by the PRC central government directly to the contrary.

### D.    Post-IPO Regulatory Developments in China

73.    On January 7, 2021, China's Education Minister, Chen Baosheng, stated in a speech at a national education conference that the current state of the after-school tutoring market is an "urgent problem" and reiterated that "great efforts will be made to regulate and rectify after-school tutoring institutions" as soon as possible.  He further noted that the "goal" of these new reforms would be to "liberate students from after-school tutoring and liberate parents from sending students" to such classes.

74.    On January 29, 2021, the Office of the Education Supervision Committee of the State Council held a national conference on education supervision attended by senior MOE officials.  There, a number of provincial education departments voiced concern over the "double burden" imposed on students by after-school tutoring programs.  In response, the Committee directed local education authorities to "reduce the burden of students' homework and to reduce the burden of after-school training" as the number one task for education supervision in 2021 and included "double reduction" as an evaluation criteria for local education authorities in 2021.

75.    On February 4, 2021, the MOE released its work goals for 2021, one of which was to "deepen the governance of after-school training institutions."  Elaborating on this goal, the MOE expressly noted that it would "[i]mprove the level of after-school services in primary and secondary schools" and "effectively reduce the burden of students' heavy homework . . . and [the] family financial burdens" associated with after-school tutoring.  At a press conference on February 24, 2021, Lv Yugang reaffirmed that, during the spring semester of 2021, the MOE planned to "improve the level of after-school services" provided by schools, and "strictly regulate off-campus training institutions" so as to "reduce the heavy burden of after-school training for students."

76.     On March 6, 2021, President Xi Jinping attended a joint group meeting of the Chinese People's Political Consultative Conference (CPPCC).  Referring to the practices of after-school tutoring businesses as a "stubborn disease," President Jinping vowed that the PRC central government will "pay close attention to the issues that the people feel strongly about, and resolutely reform all activities that infringe on the people's interests under the banner of education."

77.     Consistent with President Jinping's mandate, draconian rules to limit private after-school tutoring were discussed at the CCP's ensuing annual parliamentary session.  On March 11, 2021, that body adopted China's 14th Five-Year Plan for near-term economic and social development.  Chapter 43 of that voluminous document expressly identified "regulate after-school training" as one of the PRC's near-term education reform goals.

78.     On March 19, 2021, 17 Education held its first conference call since going public to discuss its operating results for the year ended December 31, 2020.  Speaking on the topic of government policy, Defendant Lui explained that the PRC central government has generally been "supportive" of education technology and expressly referred to the Implementation Plan which, he noted, the State Council issued "in February 2019."  Despite this, he failed to warn investors that the Implementation Plan specifically directed authorities to shift after-school services away from private businesses, like 17 Education, in favor of primary and secondary schools by 2022.

79.     On the morning of March 31, 2021, the Information Office of the State Council held a press conference to introduce the implementation of the 14th Five-Year Plan, during which Lv Yugang confirmed that the MOE had included "double burden reduction" in its key tasks for 2021.  "This means," Mr. Yugang continued, "to take more effective measures to further increase the governance of after-school tutoring businesses" and "[a]t the same time, we must further strengthen the role of schools as the main place for education."

80.     Other major players in China's online education market were rattled by these regulatory developments.  Yuanfudao, the online tutoring giant backed by Singapore's Temasek Holdings, New York-based private equity firm Warburg Pincus, and internet giant Tencent, put a billion-dollar private fundraising round on hold in March 2021.  Similarly, several other major Chinese education technology companies, including VIPKid, Huohua Siwei and Zuoyebang, scrapped or postponed plans to go public in the United States amid the looming reforms.

### E.     17 Education's Registration of Additional Shares

81.     On April 30, 2021, 17 Education filed with the SEC the S-8 Registration Statement to register (i) approximately 100,501,172 Class A ordinary shares issuable upon the vesting or exercise of awards previously granted under its various share incentive plans, or reserved for future issuance under such plans; and (ii) an indeterminate number of additional shares which may be offered and issued to prevent dilution from, among other things, share splits.  The S-8 Registration Statement specifically noted that any of the Class A ordinary shares being registered therein may be represented by ADS upon deposit of such shares with the depositary.  The S-8 Registration Statement was signed by 17 Education, the Individual Defendants, and the Cogency Defendants.

82.     The S-8 Registration Statement became effective immediately upon filing in accordance with Rule 462 of Regulation C.  As of the filing of this Complaint, the S-8 Registration Statement is the only other registration statement filed by 17 Education to register Class A ordinary shares under the Securities Act other than the IPO Registration Statement.

83.     Among other things, the S-8 Registration Statement expressly incorporated the entirety of the annual report on Form 20-F for the fiscal year ended December 31, 2020, that 17 Education previously filed with the SEC on April 9, 2021 (the "2020 Annual Report").

84.     17 Education's 2020 Annual Report, and thus the S-8 Registration Statement, contained substantially the same regulatory disclosures as those in the IPO Registration Statement.

In other words, it continued to summarize the existing regulatory environment and potential risks relating thereto without making ***any mention*** of the regulatory developments described in 52-54 and 56-62 or otherwise warn investors that the PRC central government was planning to fundamentally reform the market in which its largest business operated in 2021. Even worse, it failed to make ***any mention*** of the more recent regulatory developments described in ¶¶ 73-79, including that "double burden reduction" was one of the MOE's key tasks for 2021, and that it sought to "liberate students from after-school tutoring" through those reforms.

### F.    China's Long-Awaited After-School Tutoring Industry Reforms

85.    On May 21, 2021, President Xi Jinping presided over a meeting of the Central Committee's Commission for Deeping Overall Reform, during which it deliberated and adopted the Opinions of Further Reducing the Burden of Homework and Off-Campus Tutoring for Students in the Compulsory Education Period (the "Opinions"), also known as the "double reduction policy." Xinhua, China's state-run news agency, reported that the Committee expressed concern about the burden imposed on primary and secondary school students by after-school tutoring programs and noted that the services they provide should, instead, be carried out by schools.

86.    Three days later, on May 24, 2021, 17 Education held a conference call to discuss its operating results for the quarter ended March 30, 2021, its first full calendar quarter as a public company. On the call, Defendants Liu and Du repeatedly represented that the Company was "closely monitoring" policy changes from the PRC central government and local authorities. Despite this, 17 Education failed to warn investors about any of the regulatory developments described in ¶¶ 44-62 and 73-79, or the formal adoption of the Opinions just days earlier, as reported by Xinhua.

87.    On June 7, 2021, just two weeks after presiding over the meeting at which the Opinions were adopted, President Xi Jinping stated during a visit to Qinghai province that schools

should be responsible for after-school services, rather than tutoring businesses, noting that "the education department [MOE] is correcting this phenomenon."

88.     On July 13, 2021, MOE announced that all compulsory education institutions in China will provide students with after-school services starting in the fall semester of 2021, including tutoring services.  Several days later, an MOE spokesperson explained that the measures were being promoted to support China's recent policy encouraging couples to have three children. Commenting on the change, a director at the 21st Century Education Research Institute explained that "after-school programs provided by schools can alleviate parents' anxiety about guiding their children's homework and reduce their demand for often expensive after-school tutoring courses."

89.     On July 23, 2021, an unverified copy of the Opinions began circulating online and several media outlets who reviewed it, including Reuters, reported that the proposed regulations would dramatically overhaul the after-school tutoring industry in PRC.

90.     Like other China-based tutoring companies, late on July 23, 2021, 17 Education issued a statement in response to the media reports which provided that "[t]he regulations have not been published" and "[i]t is the Company's policy not to comment on market speculations."

91.     On July 24, 2021, the Central Committee of the CCP and the State Council formally issued the Opinions.  As previewed in the media reports, the Opinions imposed sweeping restrictions on the entire after-school tutoring industry.  For example, the Opinions required all existing after-school tutoring businesses to be "uniformly registered as nonprofits," meaning they could no longer profit from providing tutoring services, and prohibited foreign investment in such businesses, including through contract-based VIE arrangements of the type used by 17 Education. One news article described the Opinions as the "death knell" to the after-school education industry

in PRC.  An industry insider interviewed in the same article stated that "[m]aking the sector nonprofit is just as good as eradicating [it]."

92.    On July 26, 2021, 17 Education issued a press release in response to the Opinions. The press release summarized several of Opinion's core components, and stated as follows:

> The Company will continue to comply with all applicable rules and regulations in providing educational services, including those rules and regulations to be adopted following the policy directives of the Opinion. The Company is carefully considering the provisions of the Opinion and assessing their implications for the Company's business. ***The Company expects the Opinion, related rules and regulations, and the compliance measures to be taken by the Company will have a material adverse impact on the Company's results of operations and prospect***.

93.    On August 24, 2021, the Shanghai local government issued the Measures to Further Alleviate the Burden of Homework and After-School Tutoring on Students in Compulsory Education (the "Shanghai Measures") to implement the policy directives in the Opinions.  Among other things, the Shanghai Measures subjected previously registered after-school tutoring businesses to new government approval, and strictly prohibited tutoring services during any national holiday or weekend, or during any winter or summer break from compulsory school.

94.    On August 25, 2021, 17 Education issued a press release in which it informed investors that it "will stop offering online [tutoring] classes over weekends, national holidays and school break periods" in accordance with the Shanghai Measures and confirmed that "***compliance with the Shanghai Measures will have a material adverse impact on its business***."

95.    On September 23, 2021, 17 Education issued a press release announcing its results for quarter ended June 30, 2021, the first such financial update since the issuance of the Opinions, in which it announced that it decided to cancel its corresponding conference call and withhold financial guidance "[d]ue to the uncertainty related to the recent regulatory and operating environment."  In addition, the Company disclosed that Defendant Xiao resigned as a director.

96.     By November 1, 2021, the closing price of 17 Education's ADS was $0.83, representing a staggering ***92.1% decline from the IPO price of $10.50 per ADS***.  In order to prop up its ADS price, on November 2, 2021, 17 Education announced that, effective November 17, 2021, the existing ADS ratio of two ADS to five Class A ordinary shares will change to one ADS to ten Class A ordinary shares.  According to 17 Education, the ADS ratio change would have "the same effect as a one-for-four reverse ADS split," and, thus, it asked each ADS holder to surrender every 4 existing ADS for one new ADS on the date the ratio change becomes effective.

97.     As structured by 17 Education, the ADS ratio change would increase the trading price of ADS immediately prior to the change by a multiple of four.  On November 16, 2021, the closing price of ADS was $0.82.  On November 17, 2021, the day the ADS ratio change went into effect, 17 Education's ADS closed at a trading price of $2.81.

98.     On December 6, 2021, 17 Education issued a "Business Update" in which it announced that, due to the Opinion and related implementation rules, "***the Company plans to cease offering tutoring services related to academic subjects to students from [K-12] in mainland China by the end of 2021***," and, instead, focus on in-school products, *i.e.* products which comprised a mere 7% of 17 Education's overall net revenue prior to the time of the IPO.  The updated noted that this "will have a substantial adverse impact on the Company's revenues for the fiscal year ending December 31, 2021, and subsequent periods."

99.     As of the filing of this Complaint, 17 Education's ADS trades at $1.81, representing a staggering decline of more than 95% from its split-adjusted IPO price.

## THE MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.     The IPO Registration Statement

100.     The IPO Registration Statement highlighted the strong growth and market demand for after-school tutoring companies operating in the PRC, like 17 Education, stating as follows:

The fierce competition for admission to top schools and universities in China has driven the vast demand for K-12 after-school tutoring services in China. The market has grown rapidly over the past few years, ***and this momentum is expected to continue in the near future***. . . . Total number of students of China's online K-12 after-school tutoring market grew from 2.9 million in 2015 to 30.3 million in 2019, representing a CAGR of 102.0%, ***and is expected to further increase to 95.7 million in 2024, representing a CAGR of 38.5% from 2019***. . . . China's online K-12 after-school tutoring market in terms of gross billings grew from RMB3.2 billion in 2015 to RMB67.0 billion in 2019, representing a CAGR of 114.7%, ***and is expected to further increase to RMB407.2 billion in 2024, representing a CAGR of 43.5% from 2019***.

101.    The IPO Registration Statement further declared that 17 Education would continue to grow its online K-12 after-school tutoring business: "We are dedicated to enabling all children across China to enjoy high-quality, personalized learning and realize their full potential with our 'in-school + after-school' integrated model. We intend to achieve this goal by pursuing the following strategies: . . . ***further grow our online K-12 after-school tutoring business***."

102.    In addition, the IPO Registration Statement highlighted that 17 Education had a large pool of prospective customers from which to generate new business.  In particular, the IPO Registration Statement asserted that "the trusted relationships we have developed with teachers, students and parents provide us with a large and familiar pool of prospective tutoring customers, as well as a community of supporters that provide organic word-of-mouth referrals."

103.    The statements referenced in ¶¶ 100-102 were materially false and misleading when made because, at the time they were made, (i) after-school tutoring services, including those provided by 17 Education, were considered by relevant Chinese authorities to impose an excessive extracurricular burden on primary and secondary school students; (ii) existing regulations did not sufficiently address the aforementioned burdens on primary and secondary school students; (iii) as a result, relevant Chinese authorities made clear that the PRC central government planned to issue new reforms in 2021 to further restrict the activities of after-school tutoring businesses, and bring the services they offer under the care of public education institutions; and (iv) accordingly, the

additional reforms that the PRC central government planned to make to the after-school tutoring industry in 2021 posed a material risk to any continued growth in the K-12 after-school tutoring market as well as 17 Education's online K-12 after-school tutoring business.

104.    The IPO Registration Statement also boasted that 17 Education's K-12 tutoring courses were tailored to the needs of students, stating in pertinent part as follows: "We offer a comprehensive library of tutoring courses covering all grades and major subject matters required in high school and college entrance exams. . . . *These courses cater to students' learning needs* based on a variety of factors, including among others, specific geographic location, version of textbook and level of difficulty."

105.    The statements referenced in ¶ 104 were materially false and misleading because, at the time they were made, (i) after-school tutoring services, including those provided by 17 Education, were considered by relevant Chinese authorities to impose an excessive extracurricular burden on primary and secondary school students; and (ii) relevant Chinese made clear that the foregoing burdens were so far beyond the needs of primary and secondary school students that the activities of after-school tutoring businesses, like 17 Education, required urgent reform.

106.    In addition, the IPO Registration Statement was materially incomplete and omitted facts necessary to make the statements made therein not misleading with respect to recent regulatory developments in China, in particular by failing to disclose the most significant regulatory developments affecting 17 Education's business and operations. For example, the IPO Registration Statement provided the following summary of the rules, regulations, and regulatory environment applicable to 17 Education's business without any mention of the regulatory developments described in ¶¶ 52-54 or 56-62:

**Regulation Relating to After-school Tutoring and Educational Apps**

On February 13, 2018, the MOE, the Ministry of Civil Affairs, the Ministry of Human Resources and Social Security and the SAMR jointly promulgated the Circular on Alleviating After-school Burden on Primary and Secondary School Students and Implementing Inspections on After-school Training Institutions, pursuant to which the government authorities will carry out a series of inspections on after-school training institutions and order those with material potential safety risks to suspend business for self-inspection and rectification and those without proper establishment licenses or school operating permits to apply for relevant qualifications and certificates under the guidance of competent government authorities. Moreover, after-school training institutions must file with the local education authorities and publicly present the classes, courses, target students, class hours and other information relating to their academic training courses (primarily including courses on Chinese and mathematics). After-school training institutions are prohibited from providing academic training services beyond the scope or above the level of school textbooks, or organizing any academic competitions (such as Olympiad competitions) or level tests for students of primary and secondary schools. In addition, primary and secondary schools may not reference the student's performance in the after-school training institutions as one of admission criteria.

On August 6, 2018, the General Office of the State Council issued the Opinion on the Regulation of the Development of After-school Training Institutions, or State Council Circular 80, which primarily regulates the after-school training institutions targeting students in elementary and middle schools. State Council Circular 80 reiterates prior guidance that after-school training institutions must obtain a private school operating permit, and further requires such institutions to meet certain minimum requirements. For example, after-school training institutions are required to (i) have a training premise that satisfies specific safety criteria, with an average area per student of no less than three square meters during the applicable training period; (ii) comply with relevant requirements relating to fire safety, environmental protection, hygiene, food operation and others; (iii) purchase personal safety insurance for their students to reduce safety risks; and (iv) avoid hiring any teachers who are working concurrently in primary or secondary schools, and ensure that teachers tutoring in academic subjects (such as Chinese, mathematics, English, physics, chemistry and biology) have the corresponding teacher qualification licenses. Teachers in primary and secondary schools cannot force or compel students to participate in tutoring provided by after-school training institutions, which is consistent with the principle of the PRC Compulsory Education Law that primary and secondary schools cannot promote or disguise products or services to students for their profit. In addition, after-school training institutions are prohibited from carrying out exam-oriented training, training that goes beyond the school syllabus, training in advance of the corresponding school schedule or any training activities associated with student admission, and they are not allowed to organize any level test, rank examination or competition on academic subjects for primary and secondary students. The training content of after-school training institutions cannot exceed the corresponding national curricular standards and training progress

shall not be more accelerated than the corresponding progress of local schools. According to State Council Circular 80, after-school training institutions are also required to disclose and file relevant information regarding the institution, including their training content, schedule, targeted students and school timetable to the relevant education authority, and their training classes may not end later than 8:30 p.m. each day or otherwise conflict with the teaching time of local primary and secondary schools. Course fees can only be collected for courses in three months or shorter installments. Moreover, State Council Circular 80 requests that competent local authorities formulate relevant local standards for after-school training institutions within their administrative area. If an overseas listed after-school training institution publicizes overseas any periodical report, or any interim report on material adverse effect on its operation, it must concurrently publish the information in Chinese on its official website (or on the disclosure platform for securities exchange information in the absence of an official website). With respect to online education service providers, State Council Circular 80 provides a principle that regulatory authorities of networking, culture, information technology, radio and television industries should cooperate with regulatory authorities of education in supervising online education in their relevant industry. . . . .

On November 20, 2018, the General Office of the MOE, the General Office of the SAMR and the General Office of the Ministry of Emergency Management jointly issued the Notice on Improving the Specific Governance and Rectification Mechanisms of After-school Education Institutions, which provides that provincial regulatory authorities of education should be responsible for being filed with the training institutions that use internet technology to provide online training and target primary and secondary school students. Provincial regulatory authorities of education should supervise the online after-school training institutions based on the policies regulating the offline after-school training institutions. In addition, online after-school training institutions are required to file the information of their courses, such as names, contents, target students, syllabi and schedules with the relevant provincial regulatory authorities of education and publish the name, photo, class schedule and certificate number of the teacher qualification license of each teacher on their websites.

. . .

The MOE and certain other PRC government authorities jointly promulgated the Implementation Opinions on Regulating Online After-school Training, or the Online After-school Training Opinions, as effective on July 12, 2019. The Online After-school Training Opinions is to regulate academic after-school training involving internet technology provided to students in primary and secondary schools. The Online After-School Training Opinions requires, among others, that online after-school training institutions should file with the competent provincial regulatory authorities of education prior to October 31, 2019 and such regulatory authorities of education, jointly with other provincial government authorities, should review the filings and qualifications of the online after-school training institutions.

With respect to the filing requirements, the Online After-school Training Opinions provides, among others, that (i) an online after-school training institution should file with the competent provincial regulatory authorities of education after it obtains the ICP License and the grade evaluation report for the graded protection of cybersecurity, and such filing should be completed prior to October 31, 2019 if such online after-school training institution has already conducted online after-school training; (ii) the materials need to be filed by the online after-school training institutions include, among others, the materials related to the institution (such as the information on their ICP Licenses and other relevant licenses), the management systems used for protection of personal information and cybersecurity, the training content and the training personnel; and (iii) the competent provincial regulatory authorities of education should promulgate local implementing rules on filing requirements, which should focus on training institutions, training content and training personnel.

The Online After-school Training Opinions further provides that the competent provincial regulatory authorities of education should, jointly with other provincial government authorities, review the filings and qualifications of the online after-school training institutions by the end of December 2019, focusing on the following matters: (i) the training content should not include online games or other content or links irrelevant with the training itself, and should not be beyond the scope of relevant national school syllabus. No illegal publications may be published, printed, reproduced or distributed, and no infringement or piracy activities may be conducted during the training. The training content and data should be stored for more than one year, among which the live streaming teaching videos should be stored for more than six months; (ii) each course should not be longer than 40 minutes and should be taken at intervals of not less than 10 minutes, and the training time should not conflict with the teaching time of primary and secondary schools. Each live-streaming course provided to students receiving compulsory education should not end later than 9:00 p.m., and no homework should be left for primary school students in Grade 1 and Grade 2. The online after-school training platforms should have eye protection and parental supervision functions; (iii) the online after-school training institutions should not hire any teachers who are currently working at primary or secondary schools. Training personnel of academic subjects are required to obtain necessary teacher qualification licenses. The online after-school training institutions' platforms and course interfaces should present the names, photos and teacher qualification licenses of training personnel, and the learning, working and teaching experiences of foreign training personnel; (iv) with the consent of students and their parents, the online after-school training institutions should verify the identification information of each student, and should not illegally sell or provide such information to third parties. User behavior log must be kept for more than one year; (v) the charge items and standard and refund policy should be specifically presented on the training platforms. The prepaid fees can only be used for education and training purposes, and cannot be used for other investment activities. If the prepaid fees are charged based on the number of classes, the prepaid fees are not allowed to be collected in a lump sum for more than 60 classes. If the prepaid fees are charged based on the length of the learning period, the prepaid fees

are not allowed to be collected for a learning period of more than three months; and (vi) the online after-school training institutions with incompliance or issues identified by the competent provincial regulatory authorities of education must complete the rectification by the end of June 2020, and would be subject to fines, administrative order to suspend operations or other administrative sanctions if they fail to complete the rectification in time.

107.    The statements referenced in ¶ 106 were materially false and misleading because, at the time they were made, (i) after-school tutoring services, including those provided by 17 Education, were considered by relevant Chinese authorities to impose an excessive extracurricular burden on primary and secondary school students; (ii) existing regulations, including those summarized in ¶ 106, did not sufficiently address the aforementioned burdens on primary and secondary school students; (iii) as a result, relevant Chinese authorities made clear that the PRC central government planned to issue new reforms in 2021 to further restrict the activities of after-school tutoring businesses and bring the services they offer under the care of public education institutions; and (iv) accordingly, the additional reforms that the PRC central government planned to make to the after-school tutoring industry in 2021 posed a material risk to a business that accounted for over 90% of 17 Education's net revenues.

108.    Separately, the IPO Registration Statement identified a variety of risk factors which "could" materially impact 17 Education's financial condition and results of operations in the event they occur, including the following:

> ***Uncertainties exist in relation to new legislation or proposed changes in the PRC regulatory requirements regarding online private education and smart in-school classroom solutions, which may materially and adversely affect our business, financial condition and results of operations.***
>
> The private education industry and smart in-school classroom solution industry in the PRC are subject to regulations in various aspects. Relevant rules and regulations are relatively new and evolving and could be changed to accommodate the development of the education, in particular, the online private education, markets and the further adoption of smart in-school classroom solutions from time to time.
>
> . . .

Given the foregoing, the interpretation and application of the existing laws and regulations and the newly promulgated implementation rules and interpretations, if any, that govern the online private education industry and the smart in-school classroom solution industry would create substantial uncertainties regarding the legality of our business operation, which create risks that we may be found to violate the existing laws and regulations and any newly promulgated implementation rules and interpretations. *It is also uncertain whether and how PRC government authorities would further promulgate new laws and regulations applicable to online training institutions and the smart in-school classroom solution industry, including those promulgated to apply more stringent social and ethical standards in the education sector in general*. There is no assurance that we can comply with any newly promulgated laws and regulations in a timely manner or at all, and any failure to comply may materially and adversely affect our business, financial condition and results of operations.

109.    Similarly, the IPO Registration Statement described another risk factor as follows:

*Changes in China's economic, political or social conditions or government policies could have a material adverse effect on our business and operations.*

All of our operations are conducted in China, and most of our assets are located in China. Accordingly, our business, financial condition, results of operations and prospects may be influenced to a significant degree by economic, political and social conditions in China generally. The PRC economy differs from the economies of most developed countries in many respects, including the level of development, growth rate, level of government involvement and control of foreign exchange and allocation of resources. The PRC government exercises significant control over China's economic growth through allocating resources, controlling payment of foreign currency-denominated obligations, setting monetary policy, and providing preferential treatment to particular industries or companies. In addition, the PRC government continues to play a significant role in regulating industry development by imposing relevant industrial policies. . . . *Any adverse changes in economic conditions in China, in the policies of the PRC government or in the laws and regulations in China could have a material adverse effect on the overall economic growth of China. Such developments could adversely affect our business and operating results*, lead to reduction in demand for our solutions and services and adversely affect our competitive position.

110.    The statements referenced in ¶¶ 108-109 were materially false and misleading because, at the time they were made, (i) after-school tutoring services, including those provided by 17 Education, were considered by relevant Chinese authorities to impose an excessive extracurricular burden on primary and secondary school students; (ii) existing regulations did not sufficiently address the aforementioned burdens on primary and secondary school students; (iii) as

a result, relevant Chinese authorities made clear that the PRC central government planned to issue new reforms in 2021 to further restrict the activities of after-school tutoring businesses and bring the services they offer under the care of public education institutions; and (iv) accordingly, far from being "uncertain" whether the PRC central government would promulgate any new regulations or change any of its policies applicable to online after-school K-12 tutoring services, top officials in the PRC government, including Xi Jinping and China's Education Minister, repeatedly confirmed that it would do just that in 2021 and, thereby, disrupt a business which accounted for over 90% of 17 Education's net revenue.

111.    The IPO Registration Statement was also materially false and misleading because the regulatory developments described in ¶¶ 52-54 and 56-62 were a known trend or uncertainty reasonably likely to have a material impact on 17 Education's revenues or income from continuing operations that was required to be disclosed therein under Item 303 of Regulation S-K but it was not.

112.    Regulation S-K applies to registration statements, such as the Form F-1 filed by 17 Education, "to the extent provided in the forms to be used for registration under the [Securities] Act." 17 C.F.R. § 229.10.  Form F-1 requires registrants to furnish the information required by Part I of Form 20-F.  Item 5(d) in Part I of Form 20-F, in turn, requires registrants to:

> [D]iscuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

According to the SEC, Item 5(d) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K". Commission Guidance Regarding MD&A of Fin. Condition & Results of Operation, Release No. 8350, 68 Fed. Reg. 75,056 (Dec. 19, 2003) (the "2003 Guidance").

113.    In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material trends or uncertainties. In particular, the interpretative guidance specifically states that when an SEC registrant knows of a known uncertainty that is reasonably likely to have a material effect on its future operating results exists, disclosure is required. The interpretative guidance states, in pertinent part, as follows:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.
>
> *          *          *
>
> ***Events that have already occurred or are anticipated often give rise to known uncertainties***. For example, a registrant may know that a material government contract is about to expire. The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed. More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed. The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. ***In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required***.

MD&A of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Guidance").  Notably, the 1989 Interpretive Guidance applies to Item 5(d) of Form 20-F, the disclosure requirement incorporated by reference into Form F-1. Form 20-F, Instruction 5 (stating that issuers should refer to the 1989 Interpretive Guidance).

114.    Thus, by failing to disclose the regulatory developments described in ¶¶ 52-54 and 56-62, the IPO Registration Statement failed to contain a complete and accurate discussion of all known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not

necessarily to be indicative of future operating results or financial condition, as required by Item 5(d) of Form 20-F and Item 303 of Regulation S-K.

**B.      The S-8 Registration Statement**

115.    As noted above, the S-8 Registration Statement expressly incorporated the entirety of 17 Education's previously filed 2020 Annual Report by reference.

116.    As in the IPO Registration Statement, the 2020 Annual Report highlighted that 17 Education had a large pool of prospective customers from which to generate new business.  In particular, the 2020 Annual Report asserted that "the trusted relationships we have developed with teachers, students and parents provide us with a large and familiar pool of prospective tutoring customers, as well as a community of supporters that provide organic word-of-mouth referrals."

117.    The statements referenced in ¶ 116 were materially false and misleading when made because, at the time they were made, (i) after-school tutoring services, including those provided by 17 Education, were considered by relevant Chinese authorities to impose an excessive extracurricular burden on primary and secondary school students; (ii) existing regulations did not sufficiently address the aforementioned burdens on primary and secondary school students; (iii) as a result, relevant Chinese authorities made clear that the PRC central government planned to issue new reforms in 2021 to further restrict the activities of after-school tutoring businesses, and bring the services they offer under the care of public education institutions; and (iv) accordingly, the additional reforms that the PRC central government planned to make to the after-school tutoring industry in 2021 posed a material risk to any continued growth in the K-12 after-school tutoring market as well as 17 Education's online K-12 after-school tutoring business.

118.    As in the IPO Registration Statement, the 2020 Annual Report also boasted that 17 Education's K-12 tutoring courses were tailored to the needs of students, stating in pertinent part as follows:  "We offer a comprehensive library of tutoring courses covering all grades and major

34

subject matters required in high school and college entrance exams. . . . *These courses cater to students' learning needs* based on a variety of factors, including among others, specific geographic location, version of textbook and level of difficulty."

119.    The statements referenced in ¶ 118 were materially false and misleading because, at the time they were made, (i) after-school tutoring services, including those provided by 17 Education, were considered by relevant Chinese authorities to impose an excessive extracurricular burden on primary and secondary school students; and (ii) relevant Chinese made clear that the foregoing burdens were so far beyond the needs of primary and secondary school students that the activities of after-school tutoring businesses, like 17 Education, required urgent reform.

120.    Like the IPO Registration Statement, the 2020 Annual Report was also materially incomplete and omitted facts necessary to make the statements made therein not misleading with respect to recent regulatory developments in China, in particular by failing to disclose the most significant regulatory developments affecting 17 Education's business and operations.   For example, the IPO Registration Statement provided the following summary of the rules, regulations, and regulatory environment applicable to 17 Education's business without any mention of the regulatory developments described in ¶¶ 52-54, 56-62, or 73-79:

**Regulation Relating to After-school Tutoring and Educational Apps**

On February 13, 2018, the MOE, the Ministry of Civil Affairs, the Ministry of Human Resources and Social Security and the SAMR jointly promulgated the Circular on Alleviating After-school Burden on Primary and Secondary School Students and Implementing Inspections on After-school Training Institutions, pursuant to which the government authorities will carry out a series of inspections on after-school training institutions and order those with material potential safety risks to suspend business for self-inspection and rectification and those without proper establishment licenses or school operating permits to apply for relevant qualifications and certificates under the guidance of competent government authorities. Moreover, after-school training institutions must file with the local education authorities and publicly present the classes, courses, target students, class hours and other information relating to their academic training courses (primarily including courses on Chinese and mathematics). After-school training institutions

are prohibited from providing academic training services beyond the scope or above the level of school textbooks, or organizing any academic competitions (such as Olympiad competitions) or level tests for students of primary and secondary schools. In addition, primary and secondary schools may not reference the student's performance in the after-school training institutions as one of admission criteria.

On August 6, 2018, the General Office of the State Council issued the Opinion on the Regulation of the Development of After-school Training Institutions, or State Council Circular 80, which primarily regulates the after-school training institutions targeting students in elementary and middle schools. State Council Circular 80 reiterates prior guidance that after-school training institutions must obtain a private school operating permit, and further requires such institutions to meet certain minimum requirements. For example, after-school training institutions are required to (i) have a training premise that satisfies specific safety criteria, with an average area per student of no less than three square meters during the applicable training period; (ii) comply with relevant requirements relating to fire safety, environmental protection, hygiene, food operation and others; (iii) purchase personal safety insurance for their students to reduce safety risks; and (iv) avoid hiring any teachers who are working concurrently in primary or secondary schools, and ensure that teachers tutoring in academic subjects (such as Chinese, mathematics, English, physics, chemistry and biology) have the corresponding teacher qualification licenses. Teachers in primary and secondary schools cannot force or compel students to participate in tutoring provided by after-school training institutions, which is consistent with the principle of the PRC Compulsory Education Law that primary and secondary schools cannot promote or disguise products or services to students for their profit. In addition, after-school training institutions are prohibited from carrying out exam-oriented training, training that goes beyond the school syllabus, training in advance of the corresponding school schedule or any training activities associated with student admission, and they are not allowed to organize any level test, rank examination or competition on academic subjects for primary and secondary students. The training content of after-school training institutions cannot exceed the corresponding national curricular standards and training progress shall not be more accelerated than the corresponding progress of local schools. According to State Council Circular 80, after-school training institutions are also required to disclose and file relevant information regarding the institution, including their training content, schedule, targeted students and school timetable to the relevant education authority, and their training classes may not end later than 8:30 p.m. each day or otherwise conflict with the teaching time of local primary and secondary schools. Course fees can only be collected for courses in three months or shorter installments. Moreover, State Council Circular 80 requests that competent local authorities formulate relevant local standards for after-school training institutions within their administrative area. If an overseas listed after-school training institution publicizes overseas any periodical report, or any interim report on material adverse effect on its operation, it must concurrently publish the information in Chinese on its official website (or on the disclosure platform for securities exchange information in the absence of an official website). With respect to online education service providers, State Council Circular 80 provides a principle

that regulatory authorities of networking, culture, information technology, radio and television industries should cooperate with regulatory authorities of education in supervising online education in their relevant industry. . . . . .

On November 20, 2018, the General Office of the MOE, the General Office of the SAMR and the General Office of the Ministry of Emergency Management jointly issued the Notice on Improving the Specific Governance and Rectification Mechanisms of After-school Education Institutions, which provides that provincial regulatory authorities of education should be responsible for being filed with the training institutions that use internet technology to provide online training and target primary and secondary school students. Provincial regulatory authorities of education should supervise the online after-school training institutions based on the policies regulating the offline after-school training institutions. In addition, online after-school training institutions are required to file the information of their courses, such as names, contents, target students, syllabi and schedules with the relevant provincial regulatory authorities of education and publish the name, photo, class schedule and certificate number of the teacher qualification license of each teacher on their websites.

. . .

The MOE and certain other PRC government authorities jointly promulgated the Implementation Opinions on Regulating Online After-school Training, or the Online After-school Training Opinions, as effective on July 12, 2019. The Online After-school Training Opinions is to regulate academic after-school training involving internet technology provided to students in primary and secondary schools. The Online After-School Training Opinions requires, among others, that online after-school training institutions should file with the competent provincial regulatory authorities of education and such regulatory authorities of education, jointly with other provincial government authorities, should review the filings and qualifications of the online after-school training institutions.

With respect to the filing requirements, the Online After-school Training Opinions provides, among others, that (i) an online after-school training institution should file with the competent provincial regulatory authorities of education after it obtains the ICP License and the grade evaluation report for the graded protection of cybersecurity; (ii) the materials need to be filed by the online after-school training institutions include, among others, the materials related to the institution (such as the information on their ICP Licenses and other relevant licenses), the management systems used for protection of personal information and cybersecurity, the training content and the training personnel; and (iii) the competent provincial regulatory authorities of education should promulgate local implementing rules on filing requirements, which should focus on training institutions, training content and training personnel.

The Online After-school Training Opinions further provides that the competent provincial regulatory authorities of education should, jointly with other provincial

37

government authorities, review the filings and qualifications of the online after-school training institutions, focusing on the following matters: (i) the training content should not include online games or other content or links irrelevant with the training itself, and should not be beyond the scope of relevant national school syllabus. No illegal publications may be published, printed, reproduced or distributed, and no infringement or piracy activities may be conducted during the training. The training content and data should be stored for more than one year, among which the live streaming teaching videos should be stored for more than six months; (ii) each course should not be longer than 40 minutes and should be taken at intervals of not less than 10 minutes, and the training time should not conflict with the teaching time of primary and secondary schools. Each live-streaming course provided to students receiving compulsory education should not end later than 9:00 p.m., and no homework should be left for primary school students in Grade 1 and Grade 2. The online after-school training platforms should have eye protection and parental supervision functions; (iii) the online after-school training institutions should not hire any teachers who are currently working at primary or secondary schools. Training personnel of academic subjects are required to obtain necessary teacher qualification licenses. The online after-school training institutions' platforms and course interfaces should present the names, photos and teacher qualification licenses of training personnel, and the learning, working and teaching experiences of foreign training personnel; (iv) with the consent of students and their parents, the online after-school training institutions should verify the identification information of each student, and should not illegally sell or provide such information to third parties. User behavior log must be kept for more than one year; (v) the charge items and standard and refund policy should be specifically presented on the training platforms. The prepaid fees can only be used for education and training purposes, and cannot be used for other investment activities. If the prepaid fees are charged based on the number of classes, the prepaid fees are not allowed to be collected in a lump sum for more than 60 classes. If the prepaid fees are charged based on the length of the learning period, the prepaid fees are not allowed to be collected for a learning period of more than three months; and (vi) the online after-school training institutions with incompliance or issues identified by the competent provincial regulatory authorities of education must complete the rectification, and would be subject to fines, administrative order to suspend operations or other administrative sanctions if they fail to complete the rectification in time.

121.    The statements referenced in ¶ 120 were materially false and misleading because, at the time they were made, (i) after-school tutoring services, including those provided by 17 Education, were considered by relevant Chinese authorities to impose an excessive extracurricular burden on primary and secondary school students; (ii) existing regulations, including those summarized in ¶ 120 did not sufficiently address the aforementioned burdens on primary and

secondary school students; (iii) as a result, relevant Chinese authorities made clear that the PRC central government planned to issue new reforms in 2021 to further restrict the activities of after-school tutoring businesses and bring the services they offer under the care of public education institutions; and (iv) accordingly, the additional reforms that the PRC central government planned to make to the after-school tutoring industry in 2021 posed a material risk to a business that accounted for over 90% of 17 Education's net revenues.

122.    Like the IPO Registration Statement, the 2020 Annual Report identified a variety of risk factors which "could" materially impact 17 Education's financial condition and results of operations in the event they occur, including the following:

> ***Uncertainties exist in relation to new legislation or proposed changes in the PRC regulatory requirements regarding online private education and smart in-school classroom solutions, which may materially and adversely affect our business, financial condition and results of operations.***
>
> The private education industry and smart in-school classroom solution industry in the PRC are subject to regulations in various aspects. Relevant rules and regulations are relatively new and evolving and could be changed to accommodate the development of the education, in particular, the online private education, markets and the further adoption of smart in-school classroom solutions from time to time.
>
> . . .
>
> Given the foregoing, the interpretation and application of the existing laws and regulations and the newly promulgated implementation rules and interpretations, if any, that govern the online private education industry and the smart in-school classroom solution industry would create substantial uncertainties regarding the legality of our business operation, which create risks that we may be found to violate the existing laws and regulations and any newly promulgated implementation rules and interpretations, including those laws and regulations under "Item 4. Information on the Company—B. Business Overview—Regulation Relating to After-School Tutoring and Educational Apps." ***It is also uncertain whether and how PRC government authorities would further promulgate new laws and regulations applicable to online training institutions and the smart in-school classroom solution industry, including those promulgated to apply more stringent social and ethical standards in the education sector in general***. There is no assurance that we can comply with any newly promulgated laws and regulations in a timely manner or at all, and any failure to comply may materially and adversely affect our business, financial condition and results of operations.

123.    Similarly, the 2020 Annual Report described another risk factor as follows:

***Changes in China's economic, political or social conditions or government policies could have a material adverse effect on our business and operations.***

All of our operations are conducted in China, and most of our assets are located in China. Accordingly, our business, financial condition, results of operations and prospects may be influenced to a significant degree by economic, political and social conditions in China generally. The PRC economy differs from the economies of most developed countries in many respects, including the level of development, growth rate, level of government involvement and control of foreign exchange and allocation of resources. The PRC government exercises significant control over China's economic growth through allocating resources, controlling payment of foreign currency-denominated obligations, setting monetary policy, and providing preferential treatment to particular industries or companies. In addition, the PRC government continues to play a significant role in regulating industry development by imposing relevant industrial policies. . . . ***Any adverse changes in economic conditions in China, in the policies of the PRC government or in the laws and regulations in China could have a material adverse effect on the overall economic growth of China. Such developments could adversely affect our business and operating results***, lead to reduction in demand for our solutions and services and adversely affect our competitive position.

124.    The statements referenced in ¶¶ 122-123 were materially false and misleading because, at the time they were made, (i) after-school K-12 tutoring services, including those provided by 17 Education, were considered by relevant Chinese authorities to impose an excessive burden on primary and secondary school students on top of an already heavy academic workload; (ii) existing regulations did not sufficiently address the aforementioned burdens on primary and secondary school students; (iii) as a result, relevant Chinese authorities made clear that the PRC central government planned to issue new reforms in 2021 to further restrict the activities of after-school tutoring businesses and bring the services they offer under the care of public education institutions; and (iv) accordingly, far from being "uncertain" whether the PRC central government would promulgate any new regulations or change any of its policies applicable to online after-school K-12 tutoring services, top officials in the PRC central government, including Xi Jinping

40

and China's Education Minister, repeatedly confirmed that it would do just that in 2021 and, thereby, disrupt a business which accounted for over 90% of 17 Education's net revenue.

125.    The 2020 Annual Report, which was incorporated by reference in 17 Education's S-8 Registration Statement, was also materially false and misleading because the regulatory developments described in ¶¶ 52-54, 56-62, or 73-79 were a known trend or uncertainty reasonably likely to have a material impact on 17 Education's revenues or income from continuing operations that was required to be disclosed therein under Item 303 of Regulation S-K but it was not.

126.    Item 5(d) in Part I of Form 20-F, the form used to file 17 Education's 2020 Annual Report, requires registrants to:

> [D]iscuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

According to the SEC, Item 5(d) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K". 2003 Guidance.

127.    Thus, by failing to disclose the regulatory developments described in ¶¶ 52-54, 56-62, or 73-79, the S-8 Registration Statement failed to contain a complete and accurate discussion of all known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition, as required by Item 5(d) of Form 20-F and Item 303 of Regulation S-K.

## CLASS ACTION ALLEGATIONS

128.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class.  Excluded from the Class are the Individual Defendants, members of their immediate families, 17 Education and its officers and directors at all relevant times, any entity in which an excluded party has or had a controlling interest or which is related to or affiliated with any excluded party, and their legal representatives, heirs, successors, or assigns of any such excluded party.

129.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, 17 Education's ADS actively traded on the Nasdaq Global Select Market.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by 17 Education or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in class actions arising under the federal securities laws.

130.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal laws complained of herein.

131.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

132.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

42

- whether the federal securities laws were violated by Defendants as alleged herein;

- whether statements made in the IPO Registration Statement and the S-8 Registration Statement misrepresented material facts about 17 Education's business, operations and financial results or otherwise omitted facts necessary to make the statements made therein not misleading;

- whether the Individual Defendants caused 17 Education to issue false or misleading statements;

- the extent of injuries suffered by the Class and the proper measure of damages.

133.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### Violations of Section 11 of the Securities Act
### (Against all Defendants)

134.    Lead Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

135.    This Count is brought under Section 11 of the Securities Act against Defendants.

136.    The IPO Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and/or omitted to state material facts required to be stated therein, as detailed above.

137.    The Defendants named herein were responsible for the contents and dissemination of the IPO Registration Statement.  17 Education was the registrant in the IPO Registration Statement.  The Individual Defendants and the Cogency Defendants participated in the drafting and dissemination of the IPO Registration Statement and Defendants Liu, Du, Xiao, and Koh and

the Cogency Defendants were the signatories thereto.  The Underwriter Defendants participated in the drafting and dissemination of the IPO Registration Statement and failed to perform adequate due diligence in connection with their roles as underwriters.

138.    As the issuer, 17 Education is strictly liable to Lead Plaintiffs and the Class for the misstatements and omissions contained in the IPO Registration Statement.  As signatories of the defective IPO Registration Statement, Defendants Liu, Du, Xiao, and Koh, the Cogency Defendants are strictly liable to Lead Plaintiffs and the Class for such misstatements and omissions.  As person who consented to being named in the defective IPO Registration Statement as being or about to become a director on 17 Education's Board, Defendants Wen, Gan, and Yuan are strictly liable to Lead Plaintiffs and the Class for such misstatements and omissions.  As underwriters for the ADS issued pursuant to the defective IPO Registration Statement, the Underwriter Defendants are strictly liable to Lead Plaintiffs and the Class for such misstatements and omissions.

139.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Registration Statement were true and without omissions of any material facts and were not misleading.

140.    By reasons of the conduct herein alleged, each Defendant named herein violated, and/or controlled a person who violated Section 11 of the Securities Act.

141.    Lead Plaintiffs and the Class acquired 17 Education's ADS pursuant and/or traceable to the IPO Registration Statement.

142.    Lead Plaintiffs and the Class have sustained substantial damages.  The value of 17 Education's ADS has declined substantially subsequent to the violations described herein.

**COUNT II**
**Violations of Section 11 of the Securities Act**
**(Against the Company, the Individual Defendants, and the Cogency Defendants)**

143.    Lead Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

144.    This Count is brought under Section 11 of the Securities Act against 17 Education, the Individual Defendants, and the Cogency Defendants.

145.    The S-8 Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and/or omitted to state material facts required to be stated therein, as detailed above.

146.    The Defendants named herein were responsible for the contents and dissemination of the IPO Registration Statement.   17 Education was the registrant in the S-8 Registration Statement.   The Individual Defendants and the Cogency Defendants participated in the drafting and dissemination of the S-8 Registration Statement and were the signatories thereto.

147.    As issuer, 17 Education is strictly liable to Lead Plaintiffs and the Class for the misstatements and omissions contained in the S-8 Registration Statement.   As signatories of the defective S-8 Registration Statement, the Individual Defendants and the Cogency Defendants are strictly liable to Lead Plaintiffs and the Class for such misstatements and omissions.

148.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the S-8 Registration Statement were true and without omissions of any material facts and were not misleading.

149.    By reasons of the conduct herein alleged, each Defendant named herein violated, and/or controlled a person who violated Section 11 of the Securities Act.

150.    Lead Plaintiffs and the Class acquired 17 Education's ADS pursuant and/or traceable to the S-8 Registration Statement.

151.    Lead Plaintiffs and the Class have sustained substantial damages.  The value of 17 Education's ADS has declined substantially subsequent to the violations described herein.

## COUNT III
### Violations of Section 15 of the Securities Act
### (Against the Individual Defendants)

152.    Lead Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

153.    This Count is brought under Section 15 of the Securities Act against the Individual Defendants.

154.    The Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of 17 Education within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause 17 Education to file the defective IPO Registration Statement and/or the defective S-8 Registration Statement.  In addition, upon completion of the IPO, Defendant Liu, 17 Education's founder and CEO, beneficially owned an amount of 17 Education's ordinary shares representing approximately 81.3% of the total voting power.  As a result, 17 Education qualified as a "controlled company" within the meaning of the Nasdaq Stock Market Rules.

155.    The Individual Defendants were privy to the material facts concealed from Lead Plaintiffs and the Class.

156.    By virtue of the conduct alleged herein, the Individual Defendants are secondarily liable for 17 Education's aforesaid wrongful conduct and are liable to Lead Plaintiffs and the Class for damages suffered thereby.  This secondary liability is in addition to their primary liability for their own Securities Act violations, as set forth in Count I and Count II.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A.       Declaring that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as class representatives;

B.       Awarding Plaintiffs and other members of the Class damages and interest;

C.       Awarding Plaintiffs and other members of the Class their reasonable costs and expenses, including attorneys' fees, expert fees, and other costs and disbursements; and

D.       Awarding such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL JURY

Lead Plaintiffs hereby demand a trial by jury.

Dated:  January 31, 2023                              Respectfully submitted,

                                                                   */s/ Justin D. D'Aloia*
                                                                   Jeremy A. Lieberman
                                                                   Justin D. D'Aloia
                                                                   POMERANTZ LLP
                                                                   600 Third Avenue
                                                                   New York, New York 10016
                                                                   Telephone: (212) 661-1100
                                                                   Facsimile: (212) 661-8665
                                                                   jalieberman@pomlaw.com
                                                                   jdaloia@pomlaw.com

                                                                   *Counsel for Lead Plaintiffs and the Class*

                                                                   Junbo Hao
                                                                   HAO LAW FIRM
                                                                   Room 3-401 NO. 2 Building
                                                                   No. 1 Shuangliubei Street
                                                                   100024 Beijing
                                                                   People's Republic of China
                                                                   Telephone: +86 137-1805-2888
                                                                   jhao@haolaw.cn

                                                                   *Additional Counsel for Lead Plaintiffs*