UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WONG HAPING and HE XIANGHONG,           :
individually and on behalf of all others        :
similarly situated,                                    :
                                                          :
                        Plaintiffs,                     :
                                                          :   22-cv-9843 (LAK) (SDA)
            v.                                           :
                                                          :   **Oral Argument Requested**
17 EDUCATION & TECHNOLOGY           :
GROUP INC., ANDY CHANG LIU,             :
MICHAEL CHAO DU, DUN XIAO, TUCK    :
LYE KOH, QIN WEN, JIAWEI GAN, BING  :
YUAN, COLLEEN A. DE VRIES,              :
COGENCY GLOBAL INC., MORGAN        :
STANLEY & CO. LLC, GOLDMAN SACHS :
(ASIA) L.L.C., BOFA SECURITIES, INC.,    :
CHINA RENAISSANCE SECURITIES        :
(HONG KONG) LIMITED, and TIGER        :
BROKERS (NZ) LIMITED,                      :
                                                          :
                        Defendants.                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THE MOTION TO DISMISS
THE FIRST AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS .......................................................................................................... 8

      A.      17 Education's Business ................................................................................... 8

      B.      The Pre-IPO Regulatory Environment ............................................................ 8

      C.      The Allegedly Omitted Public Comments ..................................................... 11

      D.      17 Education's IPO and Registration Statement ........................................... 13

      E.      Post-IPO Regulatory Developments ............................................................. 15

      F.      17 Education's S-8 Registration For Its Employee Share Compensation Plan ..... 16

      G.      In July 2021, Months After the IPO, China Bans For-Profit Tutoring ................. 17

      H.      The Aftermath of the July 2021 Ban .............................................................. 18

ARGUMENT .............................................................................................................................. 19

I.      PLAINTIFFS' CLAIMS ARE TIME-BARRED .......................................................... 19

II.      PLAINTIFFS FAIL TO ALLEGE ANY MATERIAL MISREPRESENTATION OR ACTIONABLE OMISSION ......................................................................................... 22

      A.      17 Education's Statements About Historical Growth, High Demand and Quality Services Were Accurate at the Time of the Registration Statements ....... 22

      B.      17 Education Accurately Disclosed the Relevant Risk of Regulation ................. 25

      C.      17 Education Was Not Required to Make Any Additional Disclosures ................ 29

          1.      No Additional Disclosure Was Required to Prevent the Registration Statements from Being Materially Misleading ..................... 29

          2.      No Additional Disclosure Was Required Under Item 303 ......................... 31

III.      PLAINTIFFS' CLAIMS FAIL DUE TO LACK OF LOSS CAUSATION ..................... 32

IV.      PLAINTIFFS LACK STANDING TO CHALLENGE THE S-8 REGISTRATION STATEMENT ............................................................................................................... 33

CONCLUSION .......................................................................................................................... 34

# TABLE OF AUTHORITIES

## CASES

*Amorosa v. AOL Time Warner Inc.*,
409 F. App'x 412 (2d Cir. 2011) ........................................................................33

*In re AmTrust Financial Services, Inc. Securities Litigation*,
No. 17-CV-1545 (LAK), 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019).....................22, 29

*Asay v. Pinduoduo Inc.*,
No. 20-1423, 2021 WL 3871269 (2d Cir. Aug. 31, 2021) ...................................................5

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)........................................................................................8

*Axar Master Fund, Ltd. v. Bedford*,
308 F. Supp. 3d 743 (S.D.N.Y. 2018)....................................................................31

*Banerjee v. Zhangmen Education Inc.*,
No. 21-CV-9634 (JPO), 2023 WL 2711279 (S.D.N.Y. Mar. 30, 2023).................4, 31, 32

*Bettis v. Aixtron SE*,
No. 16 Civ. 00025 (CM), 2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016).........................30

*Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*,
No. 07 CIV. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010)....................................33

*In re Britannia Bulk Holdings Inc. Securities Litigation*,
665 F. Supp. 2d 404 (S.D.N.Y. 2009).................................................................6, 33

*Chen v. X Financial*,
No. 19-CV-6908 (KAM)(SJB), 2022 WL 765417 (E.D.N.Y. Mar. 13, 2022).................20

*Delfonce v. Eltman Law, P.C.*,
No. 16 Civ. 6627 (AMD) (LB), 2017 WL 639249 (E.D.N.Y. Feb. 15, 2017), *aff'd*,
712 F. App'x 17 (2d Cir. 2017) ...............................................................................8

*DeMaria v. Andersen*,
318 F.3d 170 (2d Cir. 2003).................................................................................7, 34

*In re DraftKings Inc. Securities Litigation*,
No. 21 CIV. 5739 (PAE), 2023 WL 145591 (S.D.N.Y. Jan. 10, 2023) ......................30, 31

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336, 135 S.Ct. 1318 (2005)..............................................................................32

*Garber v. Legg Mason, Inc.*,
537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009)................20

*Garnett v. RLX Technology Inc.*,
No. 21 CIV. 5125 (PAE), 2022 WL 4632323
(S.D.N.Y. Sept. 30, 2022)......................................................23, 24, 25, 27, 28, 29, 30

*In re Greenlane Holdings, Inc. Securities Litigation*,
511 F. Supp. 3d 1283 (S.D. Fla. 2021) ...............................................................26

*Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002)................................................................................24

*Hou Liu v. Intercept Pharmaceuticals, Inc.*,
No. 17-CV-7371 (LAK), 2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) .........................28

*Hutchison v. Deutsche Bank Securities Inc.*,
647 F.3d 479 (2d Cir. 2011)................................................................................22

*Jiajia Luo v. Sogou, Inc.*,
465 F. Supp. 3d 393 (S.D.N.Y. 2020)..................................................................27

*In re Jumei International Holding Ltd. Securities Litigation*,
No. 14cv9826, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017)...................................................1

*In re Keyspan Corp. Securities Litigation*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..........................................................25, 30

*Kwalbrun v. Glenayre Technologies, Inc.*,
201 F.3d 431(table), 1999 WL 1212491 (2d Cir. 1999)...............................................4, 27

*Lorenzo v. BlueCity Holdings Ltd.*,
76 Misc. 3d 1226(A), 2022 N.Y. Slip Op. 51055(U) (Sup. Ct. N.Y. Cnty. 2022) ............26

*In re Magnum Hunter Resources Corp. Securities Litigation*,
616 F. App'x 442 (2d Cir. 2015) ...................................................................19, 21

*In re Merrill Lynch & Co. Research Reports Securities Litigation*,
272 F. Supp. 2d 243 (S.D.N.Y. 2003)..................................................................32

*Monroe County Employees' Retirement System v. YPF Sociedad Anonima*,
15 F. Supp. 3d 336 (S.D.N.Y. 2014)....................................................................21

*Mucha v. Volkswagen Aktiengesellschaft*,
540 F. Supp. 3d 269 (E.D.N.Y. 2021), *aff'd*, No. 21-1511-cv, 2022 WL 774877
(2d Cir. Mar. 15, 2022) ................................................................................6, 32

*NECA-IBEW Pension Trust Fund v. Lewis*,
607 F. App'x 79 (2d Cir. 2015) ..........................................................................19

*Nurlybayev v. ZTO Express (Cayman) Inc.*,
    No. 17 CV 6130-LTS-SN, 2021 WL 1226865 (S.D.N.Y. Mar. 31, 2021).........................19

*In re Progress Energy, Inc.*,
    371 F. Supp. 2d 548 (S.D.N.Y. 2005)...............................................................................30

*In re ProShares Trust Securities Litigation*,
    728 F.3d 96 (2d Cir. 2013)................................................................................................24

*In re Qudian Inc. Securities Litigation*,
    No. 17-CV-9741 (JMF), 2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019) .........................20

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..............................................................................................23

*Sandoz v. Waterdrop Inc.*,
    No. 21CV7683 (DLC), 2023 WL 1767526 (S.D.N.Y. Feb. 3, 2023), *appeal
    docketed*, No. 23-301 (Mar. 7, 2023)..................................................................25, 26, 30

*In re State Street Bank & Trust Co. Fixed Income Funds Investment Litigation*,
    774 F. Supp. 2d 584 (S.D.N.Y. 2011)..............................................................................33

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)........................................................................................24, 25

*In re Weight Watchers International, Inc. Securities Litigation*,
    No. 14-cv-1997 (LAK), 2016 WL 2757760 (S.D.N.Y. May 11, 2016) ...........................25

*Willard v. UP Fintech Holding Ltd.*,
    527 F. Supp. 3d 609 (S.D.N.Y. 2021)...............................................................................31

*Youngers v. Virtus Investment Partners Inc.*,
    195 F. Supp. 3d 499 (S.D.N.Y. 2016)...............................................................................21

**STATUTES**

15 U.S.C. § 77k(e) ...................................................................................................................32

15 U.S.C. § 77m.................................................................................................................2, 19

Defendants 17 Education & Technology Group Inc. ("17 Education" or the "Company"), Cogency Global Inc., and Colleen A. De Vries (together, "Defendants") respectfully submit this Memorandum of Law in support of their Motion to Dismiss the First Amended Class Action Complaint (ECF No. 37) (the "Amended Complaint" or "AC")[1] pursuant to Rules 8(a) and 12(b)(6) of the Federal Rules of Civil Procedure.[2]

## PRELIMINARY STATEMENT

With the benefit of hindsight, Plaintiffs fault 17 Education for not predicting that the Chinese government would outlaw the private tutoring business in China ***seven months after*** the Company's initial public offering ("IPO").  Plaintiffs do not allege that this ban was even proposed before the IPO or that anyone at the Company knew it was coming.  Moreover, Plaintiffs admit that the general risk of increased regulation was widely known.  Indeed, Plaintiffs allege that there was "widespread public concern that businesses in this booming industry placed an 'excessive' burden on students" (AC ¶ 4), and Plaintiffs concede that the Company's public filings "contained a lengthy recitation of existing regulations" (*id.* ¶ 10) and "further cautioned that it was 'uncertain whether and how PRC government authorities would further promulgate new laws and regulations applicable to online training institutions'" (*id.* ¶ 72).

---

[1]  A true and correct copy of the Amended Complaint is attached as Exhibit A to the Declaration of Robert A. Fumerton, dated March 31, 2023, exhibits to which are cited herein as "Ex. __."  Unless otherwise indicated, all citations, internal quotation marks, and internal alterations are omitted, and all emphases in quotations are added.

[2]  Defendants Andy Chang Liu, Michael Chao Du, Dun Xiao, Tuck Lye Koh, Qin Wen, Jiawei Gan, and Bing Yuan (collectively, the "Individual Defendants") have not been served.  However, the Court can still dismiss the Amended Complaint in its entirety for failure to state a claim.  *See, e.g.*, *In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 14cv9826, 2017 WL 95176, at *1 n.1, *6 (S.D.N.Y. Jan. 10, 2017).

Still, Plaintiffs claim that Defendants violated Sections 11 and 15 of the Securities Act of 1933 by (i) not cataloging public comments by various politicians and regulators at various meetings and conferences spanning years leading up to the offerings that were critical of the private education industry (*id.* ¶¶ 52-54, 56-62, 73-79); and (ii) "fail[ing] to warn U.S. investors that relevant Chinese authorities were poised to make sweeping and long-awaited reforms" (*id.* ¶ 4). Plaintiffs contend that these alleged omissions rendered false or misleading the Company's statements about its growth potential, as well as its disclosures of the existing regulatory regime and risk of additional regulation in the future. Plaintiffs challenge substantially similar statements in 17 Education's registration statement for its IPO on December 4, 2020 (the "IPO Registration Statement") and its annual report for the year ended December 31, 2020 (the "2020 Annual Report"), which was incorporated by reference into the registration statement for the Company's employee share compensation plan on April 30, 2021 (the "S-8 Registration Statement," and with the IPO Registration Statement, the "Registration Statements"). Plaintiffs also contend that various politicians' and regulators' remarks were "regulatory developments" that the Company had an independent duty to disclose under Item 303 of S.E.C. Regulation S-K. These claims all fail as a matter of law for multiple independent reasons.

**The claims are time-barred.** As a threshold matter, Plaintiffs' claims are untimely. Section 11 and 15 claims must be brought within a year after Plaintiffs discover or should have discovered the allegedly untrue statements or omissions. 15 U.S.C. § 77m. To the extent that Plaintiffs' claims are based on omissions of public comments by politicians and regulators, those comments allegedly were made between 2018 and 2020, meaning that Plaintiffs knew or should have known of their claims as soon as the December 4, 2020 IPO Registration Statement and April 30, 2021 S-8 Registration Statement were filed. Because Plaintiffs did not file their

2

complaint until July 19, 2022—well more than a year later—the claims are time-barred.  Any suggestion that the statute of limitations should be tolled until July 24, 2021—when the new regulations banning for-profit tutoring were officially issued—should be rejected.  Plaintiffs cannot have it both ways, simultaneously arguing that the comments by politicians and regulators should have caused the Company to predict the new regulations, but the same publicly available information should not have led Plaintiffs themselves to discover their purported claims.  Indeed, numerous prominent media sources—including Reuters, Bloomberg, The Wall Street Journal, and The Economist—reported on the potential for an industry-wide crackdown more than a year before this Action was filed.  Under Plaintiffs' own theory of the case, these developments should have put them on notice, even before the regulations were officially announced.

**Plaintiffs fail to allege any material misrepresentation or actionable omission.**

Plaintiffs first challenge various statements about the Company's growth potential, including its (i) disclosure of historical and future projected industry growth rates calculated by a third party; (ii) statement that one of the Company's strategies is to "further grow [its] online K-12 after-school tutoring business"; and (iii) boast that "the trusted relationships we have developed with teachers, students and parents provide us with a large and familiar pool of prospective tutoring customers."  (AC ¶¶ 100-02, 116.)  Plaintiffs do not contend any of these statements was false when made; indeed, they concede that the industry was "***booming***" (*id.* ¶ 4) and that demand for the Company's services had "***skyrocketed***" in the lead up to the IPO (*id.* ¶ 2).  Instead, Plaintiffs claim that the Company misleadingly omitted that the "government planned to issue new reforms in 2021 to further restrict the activities of after-school tutoring businesses, and bring the services they offer under the care of public education institutions," which "posed a material risk to any continued growth."  (*Id.* ¶¶ 103, 117.)  Even if that were true (and it is not), it would not render

3

misleading any of the challenged growth statements, many of which are inactionable puffery, forward-looking statements, or opinions.[3]

More fundamentally, Plaintiffs fail to allege any facts to support the central premise of their claim: that there was an undisclosed material risk of new regulations.  Plaintiffs do not allege any specific regulation in effect ***or even proposed*** at the time of the IPO that was not disclosed.  Rather, as noted above, Plaintiffs cobble together comments from Chinese politicians and regulators at various public appearances from 2018-2020 that lamented the academic pressures faced by Chinese students and parents, attributed the cause of the problem to the private tutoring industry, and pledged to identify solutions, including regulatory solutions, to alleviate those burdens.  (*Id.* ¶¶ 52-54, 56-62, 73-79.)  Plaintiffs do not allege that anyone at any of these meetings ever even suggested that the government ban the private tutoring industry altogether, as it did seven months after 17 Education's IPO.  "Companies subject to government regulation are not required to speculate or foresee coming regulation or its potential effect on the company." *Kwalbrun v. Glenayre Techs., Inc.*, 201 F.3d 431 (table), 1999 WL 1212491, at *2 (2d Cir. 1999).  Indeed, just yesterday Judge Oetken dismissed virtually identical securities claims brought against another Chinese after-school tutoring company that, as here, were premised on the company's alleged failure to predict and warn of the industry-wide ban in its IPO documents a month earlier.  *Banerjee v. Zhangmen Educ. Inc.*, No. 21-CV-9634 (JPO), 2023 WL 2711279, at *10 (S.D.N.Y. Mar. 30, 2023).

---

[3]    Plaintiffs similarly claim that the Company "boasted" that its "comprehensive library" of courses "cater[s] to students' learning needs based on a variety of factors, including among others, specific geographic location, version of textbook and level of difficulty."  (AC ¶¶ 104-05, 118-19.)  This, too, is both an inactionable statement of opinion and corporate puffery which is not rendered misleading even if certain regulators and politicians believed that the private tutoring industry as a whole resulted in too much of a burden on students and families.

For the same reason, Plaintiffs' challenge to the Company's regulatory risk warnings also fails. Plaintiffs admit that the Company provided "a lengthy summary of existing regulations formally promulgated by PRC authorities . . . and further cautioned that it was 'uncertain whether and how PRC government authorities would further promulgate new laws and regulations applicable to online training institutions.'" (AC ¶ 72; *see also id.* ¶¶ 106, 120 (describing existing regulations); *id.* ¶¶ 108, 109, 122, 123 (warning of the risk of additional regulations, which could materially and adversely affect the Company).) These warnings "suggest caution (rather than confidence)." *Asay v. Pinduoduo Inc.*, No. 20-1423, 2021 WL 3871269, at *3 (2d Cir. Aug. 31, 2021) (quoting *Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019)). No reasonable investor could have been misled into thinking the industry was safe from the risk of future adverse regulation.

Nevertheless, Plaintiffs contend that, "far from being 'uncertain' whether the PRC central government would promulgate any new regulations or change any of its policies applicable to online after-school K-12 tutoring services, top officials in the PRC government, including Xi Jinping and China's Education Minister, repeatedly confirmed that it would do just that in 2021 and, thereby, disrupt a business which accounted for over 90% of 17 Education's net revenue." (AC ¶¶ 110, 124.) But that sweeping assertion is not supported by the hodgepodge of generic public comments that Plaintiffs plead, as discussed above. Once again, Plaintiffs do not actually allege that, prior to the Company's IPO, any PRC government official proposed any specific new regulations or change in policies applicable to online after-school K-12 tutoring services, much less an outright ban on the industry.

Lastly, Plaintiffs' pure omission claim under Item 303 also fails. Item 303 requires disclosure of known trends or uncertainties that the issuer reasonably believes are likely to have

5

a material effect on the Company in the next year. (*id.* ¶¶ 112-13.) As relevant here, the Company complied with its obligations under Item 303 by disclosing the uncertainty that the government could impose new, currently unknown, regulations that could have a material adverse effect on the Company. (*See id.* ¶¶ 108, 109, 122, 123.) There is no merit to Plaintiffs' suggestion that Item 303 also required disclosure of every negative comment about the industry made by politicians or regulators for years leading up to the IPO. (*See id.* ¶¶ 111, 114, 125, 127.) Plaintiffs do not allege that anyone at the Company, even if they were generally aware of the nature of these public comments, interpreted or should have interpreted them to foretell a blanket ban on the whole industry. Absent specific factual allegations that the Company knew an industry-wide ban was coming (and there are none), Item 303 did not require any additional disclosure. *See Mucha v. Volkswagen Aktiengesellschaft*, 540 F. Supp. 3d 269, 298 (E.D.N.Y. 2021) ("Item 303 [is not] so broad as to require defendants to disclose speculative uncertainties . . . ."), *aff'd*, No. 21-1511-cv, 2022 WL 774877 (2d Cir. Mar. 15, 2022).

**Plaintiffs' claims are barred under the negative causation doctrine.** Plaintiffs' claims independently fail because their alleged losses were not caused by any alleged misstatement or omission in the Registration Statements. Although Plaintiffs need not allege loss causation to plead their prima facie case, where (as here) the absence of loss causation is apparent on the face of the complaint, dismissal is warranted even at the pleading stage. *See In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 418 (S.D.N.Y. 2009). Unlike in the typical federal securities case, Plaintiffs do not point to a sudden drop in 17 Education's American Depositary Shares ("ADS") price following some alleged corrective disclosure. Instead, they allege (correctly) that the ADS price "slumped persistently since its IPO." (AC ¶ 13.) In fact, it declined 78.10% to $2.30, from the IPO price of $10.50, ***before*** the industry-wide ban allegedly

leaked to the market on July 23, 2021.  (*See* Ex. W, Historic Stock Prices at 5.)  Moreover, even after the ban, both Plaintiffs continued to purchase thousands of additional ADS.  These undisputed facts sever any purported link between Plaintiffs' alleged losses and the alleged misstatements or omissions in the Registration Statements.

**Plaintiffs lack Securities Act standing to assert claims based on the S-8 Registration Statement.**  Plaintiffs claim to have purchased the Company's ADS, which were allegedly issued only pursuant to the IPO Registration Statement, not the S-8 Registration Statement.  (AC ¶¶ 17, 19, 70, 81.)  Unlike the IPO, which registered ADS to be sold to the public, the subsequent S-8 Registration Statement registered "Class A ordinary shares *issuable* upon the vesting or exercise of awards previously granted under [17 Education's] various share incentive plans, or reserved for future issuance under such plans[,]" and explained that such "Class A ordinary shares being registered therein *may* be represented by ADS *upon deposit* of such shares with the depositary."  (*Id.* ¶ 81.)  However, Plaintiffs do not allege that (i) any Class A ordinary shares were actually issued pursuant to the S-8 Registration Statement; (ii) such Class A ordinary shares were then deposited with 17 Education's depositary bank in exchange for ADS; or (iii) such ADS were then traded in the public market.  Thus, Plaintiffs fail to plead that there are *any* ADS in the public market that were issued pursuant or traceable to the S-8 Registration Statement, as required to plead Securities Act standing based on that offering.  *See DeMaria v. Andersen*, 318 F.3d 170, 178 (2d Cir. 2003) (only "purchasers who can trace their shares to an allegedly misleading registration statement" have standing).

For each of these separate and independent reasons, as demonstrated more fully below, the Amended Complaint should be dismissed in its entirety with prejudice.

**STATEMENT OF FACTS[4]**

A.    **17 Education's Business**

17 Education was founded in 2012 and, at the time of its IPO in December 2020, was a leading education technology company in China with an integrated in-school and after-school model.  (AC ¶ 2; Ex. B, IPO Registration Statement at 1, 8.)  The Company offers smart in-school classroom solutions, including data-driven teaching, learning, and assessment.  In 2017, the Company also began to provide online K-12 after-school tutoring courses, providing students with an after-school learning experience closely integrated with their in-school education.  (AC ¶ 34; Ex. D, 2020 Annual Report at 56.)  Leveraging the dual in-school and after-school integrated model, the Company's net revenues increased by 30.7% from 2018 to 2019, and further increased by 218.6% in 2020.  (Ex. D, 2020 Annual Report at 89.)  As of December 31, 2020, the Company had cumulatively serviced over one million verified teacher users, 56.9 million verified student users, and 49.4 million registered parent users, and its in-school classroom solutions were cumulatively used at over 70,000 K-12 schools in over 300 Chinese cities.  (*Id.* at 55.)

B.    **The Pre-IPO Regulatory Environment**

China has the largest K-12 education system in the world.  (AC ¶ 35; Ex. B, IPO Registration Statement at 122.)  As of December 31, 2019, China's K-12 system had 178 million students across over 226,000 schools.  (AC ¶ 35; Ex. B, IPO Registration Statement at 122.)  Studies estimated that over 75% of K-12 students attended after-school tutoring classes in 2016.

---

[4]    The facts set forth herein are drawn from the well-pled allegations in the Amended Complaint and "documents attached as exhibits or incorporated into the complaint by reference, matters of which judicial notice may be taken, [and] documents integral to the complaint."  *Delfonce v. Eltman L., P.C.*, No. 16 Civ. 6627 (AMD) (LB), 2017 WL 639249, at *2 (E.D.N.Y. Feb. 15, 2017), *aff'd*, 712 F. App'x 17 (2d Cir. 2017).  The Court may also consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

(AC ¶ 37.)  The number of students attending after-school tutoring classes increased significantly over the years.  According to U.S. market research and analysis consulting firm Frost & Sullivan, the total number of students in China's online K-12 after-school tutoring market grew from 2.9 million in 2015 to 30.3 million in 2019.  (Ex. B, IPO Registration Statement at 124; *see also* AC ¶ 38.)

At the time 17 Education launched its after-school tutoring business in 2017, there were no national laws or regulations governing China's massive after-school tutoring market.  It was not until 2018 that Chinese authorities began to consider how the private after-school tutoring industry should be regulated.  Far from foreshadowing the eventual post-IPO demise of the private after-school tutoring industry, the regulations issued prior to the IPO evinced the Chinese authorities' intent to create a regulatory system that would limit the academic burden on students while supporting and encouraging the growth of private after-school tutoring institutions, like 17 Education, that complied with relevant regulations.

On February 13, 2018, China's Ministry of Education ("MOE") and other authorities jointly promulgated Circular 3, which authorized the inspection of after-school tutoring premises and the suspension of those premises that posed "material potential safety risks," and required tutoring businesses to apply for licenses or permits.  (Ex. B, IPO Registration Statement at 153; AC ¶ 46.)  Circular 3 also promulgated a series of requirements applicable to private after-school tutoring businesses that, as Plaintiffs admit, were fully disclosed in the Registration Statements.  (AC ¶¶ 106, 120.)  These requirements included registering with local education authorities, publicizing course information, limiting the contents of after-school tutoring to "the level of school textbooks," and forbidding academic competitions, competency tests, and references to

9

students' after-school performance in school admissions criteria.  (*Id.*; Ex. B, IPO Registration

Statement at 153.)

On August 6, 2018, the General Office of the State Council—China's chief

administrative body—issued Circular 80, which reiterated the requirement for after-school

tutoring institutions to obtain the requisite operating permits and prohibited such institutions

from providing trainings that were exam-oriented, exceeded approved school syllabi in content

and progression, or were associated with school admissions.  (AC ¶ 48; Ex. B, IPO Registration

Statement at 153.)  Circular 80 also significantly increased the government's regulation of after-

school tutoring institutions by requiring businesses to file detailed information on their courses,

restricting their hours of operations, and limiting how after-school tuition fees could be collected.

(Ex B, IPO Registration Statement at 153.)  Circular 80 called for the development of "a ***long-***

***term*** mechanism for the ***well-regulated and orderly development of after-school tutoring***

***institutions***," and the productive "***collaboration between school education and after-school***

***education***."  (Ex. E, Circular 80, Art. I.1.)

Subsequent circulars were to the same effect.  On November 20, 2018, the MOE and

other authorities jointly issued Circular 10, which authorized provincial education authorities to

"supervise the online after-school training institutions based on the policies regulating the offline

after-school training institutions."  (Ex. B, IPO Registration Statement at 154; AC ¶ 49.)  In July

2019, the MOE and other authorities jointly issued the Online After-School Training Opinions,

which required provincial education authorities to review, by the end of December 2019, the

filings and qualifications of online after-school training institutions to ensure that courses did not

exceed 40 minutes, that after-school tutoring class schedules did not conflict with school

schedules, and that no schoolteachers were hired as private tutors.[5]  (Ex. B, IPO Registration Statement at 154-55; AC ¶ 55.)

None of these regulations suggested that the authorities were contemplating "having public schools . . . supplant private enterprise" or "fundamentally reform[ing] the market" as Plaintiffs claim.  (AC ¶¶ 4, 72.)  At most, these opinions and notices merely called for more stringent requirements—e.g., regarding the curriculum of private after-school tutoring—for the previously unregulated industry.  Indeed, the Chinese government's calls to create a "long-term mechanism for the well-regulated and orderly development of after-school tutoring institutions" and emphasis on encouraging "collaboration between school education and after-school education" necessarily implied that such businesses were expected to continue under the then still-developing regulatory regime.  (Ex. E, Circular 80, Art. I.1.)

C.      The Allegedly Omitted Public Comments

Plaintiffs admit that the above regulations were disclosed in a "lengthy summary" in the Company's Registration Statements.  (AC ¶ 72.)  And Plaintiffs do not (and cannot) allege that the Company violated any of the above regulations or failed any regulatory inspection.  Instead, the Amended Complaint faults the Company for failing to discuss in the Registration Statements various publicly available government speeches and comments, all of which were in line with the disclosed regulations prior to the IPO.  For example, the increase in regulation beginning in 2018 is consistent with President Xi Jinping's calls to "reduce the excessive extracurricular burden" on students during a speech delivered on September 10, 2018.  (*Id.* ¶ 52.)  Plaintiffs also point to a

---

[5]   Plaintiffs also reference other regulatory actions that are unrelated to the private after-school tutoring industry. For example, on February 23, 2019, the Chinese government released an action plan for modernizing China's public education system through 2022 (the "Implementation Plan").  (AC ¶ 53.)  Although the Implementation Plan stated that the government would "generally" support public schools carrying out after-school services, Plaintiffs cite no language (nor can they) indicating that this support was intended to entirely replace or eradicate private after-school tutoring. (*Id.*)  Rather, as Circular 80 made clear, the government at the time wanted to foster "collaboration between school education and after-school education."  (Ex. E, Circular 80 at Art. I.1.)

March 2019 speech by China's Minister of Education in which he noted a need for unspecified "new strategies" (*id.* ¶ 54), as "some offline training institutions ha[d] shifted their business online" to avoid tightening regulatory requirements. (Ex. F, Mar. 12, 2019 Chen Baosheng Speech, at 2.) The Minister's comments were in line with Circular 10 (issued a few months earlier), which authorized local officials to supervise online after-school tutoring businesses (Ex. B, IPO Registration Statement at 154; AC ¶ 49), and with the July 2019 Online After-School Training Opinions, which imposed further regulations on online tutoring businesses (Ex. B, IPO Registration Statement at 154-55; AC ¶ 55).

Similar public speeches by politicians noting the need to "put an end to . . . excessive training behaviors and prevent layer upon layer increase" (AC ¶ 56) and "reduc[e] the burden on primary and secondary school students" (*id.* ¶ 57) were likewise consistent with the above-described regulations, including Circular 3, which prohibits after-school tutoring businesses from offering curricula more advanced than those covered by school textbooks; Circular 80, which prohibits "exam-oriented training" and tutoring that goes beyond school syllabi; and the Online After-School Training Opinions, which further regulate what may be taught by after-school tutors and when. (Ex. B, IPO Registration Statement at 153-55.) Other public statements indicating that additional reform measures were being considered (AC ¶¶ 58-62) were in line with the Company's disclosures (*infra* Statement of Facts §§ B-C).

None of the speeches referenced in the Amended Complaint indicated that authorities planned to eradicate or fundamentally change the private after-school tutoring industry. (*See* AC ¶¶ 52-62.) Indeed, in the days and weeks leading up to the IPO, officials made clear that future reforms would merely impose further restrictions on curriculum, homework, and teaching—similar to those imposed prior to the IPO—and that authorities would work with the private

12

after-school tutoring industry to reduce the burden on students.  For example, on November 10, 2020—about three weeks before the IPO—the Minister of Education stated that it must "***support and standardize the development of private education***, [] regulate after-school tutoring institutions, inspire the motivation of all parties while increasing services provided by public education." (*See id.* ¶ 62; Ex. G, Nov. 10, 2020 Chen Baosheng Speech, at 3.)  On December 2, 2020—two days before the IPO—another MOE official stated that the MOE was planning to "[d]eepen the governance of off-campus training institutions." (AC ¶ 62.)  Finally, on December 4, 2020—the day of the IPO—yet another MOE official stated that public schools, "on the one hand, [] need to improve the quality of education and should widely carry out after-school services . . . .  ***On the other hand, the government should strengthen the supervisions on after-school tutoring institutions . . . to regularly carry out inspections and checks***." (*See id.*; Ex. H, Dec. 4, 2020 Xu Pan Speech, at 1.)  In short, the speeches cited in the Amended Complaint made clear that improving public education would not result in excluding private after-school tutoring.

### D.     17 Education's IPO and Registration Statement

On December 4, 2020, 17 Education launched its IPO on the NASDAQ, pricing its shares at $10.50 per ADS and raising over $300 million in net proceeds.  (AC ¶ 70.)

In compliance with its disclosure obligations, 17 Education disclosed risks specifically related to China's after-school tutoring industry, including, as described above, all relevant regulations issued prior to the IPO.  (Ex. B, IPO Registration Statement at 153-56; Ex. D, 2020 Annual Report at 69-72.)  The Company noted that the "education industry in China [is] highly regulated by the PRC government," and "***the interpretation and implementation of current PRC laws and regulations are still evolving, and new laws and regulations may also be promulgated***." (Ex. B, IPO Registration Statement at 27; Ex. D, 2020 Annual Report at 13; *see also* AC ¶¶ 108-09.)

13

17 Education also specifically warned investors about the risks associated with both existing and new legislation or regulations:

> ***Uncertainties exist in relation to new legislation or proposed changes in the PRC regulatory requirements regarding online private education and smart in-school classroom solutions, which may materially and adversely affect our business, financial condition and results of operations***. . . . [T]he interpretation and application of the existing laws and regulations and the newly promulgated implementation rules and interpretations, if any, that govern the online private education industry and the smart in-school classroom solution industry would create ***substantial uncertainties regarding the legality of our business operation***, which create risks that we may be found to violate the existing laws and regulations and any newly promulgated implementation rules and interpretations.
>
> ***It is also uncertain whether and how PRC government authorities would further promulgate new laws and regulations applicable to online training institutions*** and the smart in-school classroom solution industry, including those promulgated to apply more stringent social and ethical standards in the education sector in general. ***There is no assurance that we can comply with any newly promulgated laws and regulations in a timely manner or at all, and any failure to comply may materially and adversely affect our business, financial condition and results of operations.***

(Ex. B, IPO Registration Statement at 25-27 (first emphasis in original); Ex. D, 2020 Annual Report at 10-12 (same); AC ¶ 108.)

17 Education also disclosed that its business was designed to help students meet the "excessive burden" imposed by the Chinese educational system (AC ¶ 4), and warned of the potential impact on its business if China's emphasis on extensive education were to change or fall out of public favor in the future:

> In China, school admissions rely heavily on examination results, and students' performance in these exams is critical to their education and future employment prospects. It is therefore common for students to take after-school tutoring classes to improve their test performance, and ***the success of our business to a large extent depends on the continued use of entrance exams or tests by schools in their admissions. However, such heavy emphasis on examination scores may decline or fall out of favor with educational institutions or government authorities in China.***

(Ex. B, IPO Registration Statement at 36-37; Ex. D, 2020 Annual Report at 21-22.)

14

###### E.      Post-IPO Regulatory Developments

Following the Company's IPO, uncertainty remained regarding the extent to which Chinese authorities would further regulate the private after-school tutoring industry.  On March 11, 2021, China issued its "14th Five-Year Plan (2021-2025) for Economic and Social Development and 2035 Long-Term Objectives Outline," which reiterated that one of the government's goals would be to "regulate after-school training."  (AC ¶ 77.)  However, the Complaint does not allege that the Plan specified how the industry would be regulated and when additional regulations would be forthcoming.[6]  (*See id.*)  The Amended Complaint also points to aspirational public statements by Chinese public officials calling for further regulation and highlighting the need to "reduce the burden" on students and "improve the level of after-school services in primary and secondary schools."  (*Id.* ¶¶ 73-80.)  Again, none of these statements even hinted that the private after-school tutoring industry would be effectively eradicated.  (*Id.*)

Indeed, contrary to Plaintiffs' claims, the actions and statements of Chinese authorities in the weeks and months after the IPO indicated that the private after-school tutoring industry would continue to operate alongside public schools, while being subject to more stringent regulations governing curriculum, homework, advertising, and licensing, among other topics— similar to the regulations issued prior to the IPO.  For example, on February 4, 2021, the MOE released 40 regulatory objectives for 2021, one of which was "deepen[ing] the governance of after-school training institutions."  (*Id.* ¶ 75.)  The MOE specifically noted that it aimed to "effectively reduce the burden of students' heavy homework . . . and [] family financial burdens."  (*Id.*)  If anything, these "goals" indicated that the MOE intended to issue further regulations similar to those promulgated prior to the IPO.

---

[6]    Although the initial proposal for the 14th Five-Year Plan was adopted on November 3, 2020, the proposal's objective to "regulate after-school training" was not formally adopted until after the IPO.

15

Other post-IPO public statements cited in the Amended Complaint are in accord.  For example, on January 7, 2021, the Minister of Education stated that "the goal is to reduce the burden on students" from after-school academic-subject trainings by "***propos[ing] requirements regarding training schools' conditions, training contents, teaching materials and lesson plans, tuition fees management, advertising methods, and teachers' qualifications***."  (Ex. I, Jan. 7, 2021 Chen Baosheng Speech, at 7; AC ¶ 73.)  On March 31, 2021, another MOE official stated that the MOE would "adhere to law-based governance . . . and strictly implement the requirements of relevant national laws and regulations, ***strictly review training institutions' licenses and filings, strengthen the supervision of training content, innovate fee management methods, standardize training behaviors and seriously investigate and deal with illegal training behaviors***."  (*See* AC ¶ 79; Ex. J, Mar. 31, 2021 Lv Yugang Speech, at 1.)  None of these statements so much as suggested, much less announced as a matter of public policy, that after-school services would be "shift[ed]" "away from private businesses . . . in favor of primary and secondary schools by 2022" as Plaintiffs claim.  (AC ¶ 78.)

### F.    17 Education's S-8 Registration for Its Employee Share Compensation Plan

With the prospect of greater regulatory clarity, 17 Education remained optimistic about its future growth.  The Company greatly expanded the scale of its online after-school tutoring services by hiring over 1,500 tutors in 2020 and Q1 2021, in anticipation of an expected increase in student enrollments.  (Ex. D, 2020 Annual Report at 97; Ex. K, May 25, 2021 Form 6-K at 3.)  The Company's net revenues from online K-12 tutoring services for Q1 2021 also skyrocketed to RMB 463.0 million—representing a year-over-year increase of 118%—which accounted for 97.6% of total net revenues in Q1 2021.  (Ex. K, May 25, 2021 Form 6-K at 3.)

On April 30, 2021, the Company filed the S-8 Registration Statement to register Class A ordinary shares that were to be issued under its employee share incentive plans.  (AC ¶ 81; Ex.

16

C, S-8 Registration Statement.)  The S-8 Registration Statement did **not** register any new ADS to be issued to public investors, such as Plaintiffs.  (*See* Ex. C, S-8 Registration Statement.)  Rather, it explained that the "Class A ordinary shares being registered therein **may** be represented by ADS **upon deposit** of such shares with the depositary."  (*Id.* at 1; AC ¶ 81.)  The Amended Complaint does not allege that any Class A ordinary shares were issued pursuant to the S-8 Registration Statement and deposited in exchange for ADS that were then traded in the public market.

### G.    In July 2021, Months After the IPO, China Bans For-Profit Tutoring

On May 21, 2021—after both Registration Statements at issue—a meeting of the Central Committee's Commission for Deepening Overall Reform privately "deliberated and adopted" certain "Opinions of Further Reducing the Burden of Homework and Off-Campus Training for Students in the Compulsory Education Period."  (AC ¶ 85.)  Even weeks after this meeting, the regulatory environment remained uncertain, as demonstrated by the news articles Plaintiffs cite.  (*See, e.g.*, *id.*)  Observers continued to speculate about what, if any, regulations would be issued in the wake of the meeting, including potential "bans on online courses for kids six years old or younger," "restrictions on homework and mandatary licensing for all teachers," or "a moratorium on weekend classes."  (Ex. L, *Beijing's Concerns About Overworked Students Upend the Plans of China's Edtech Startups*, Fortune, 3 (May 31, 2021, 3:52 AM).[7])

On July 24, 2021, **seven months after the IPO**, the General Office of the Chinese Communist Party's Central Committee and the General Office of the State Council issued the much anticipated Opinions, which, among other things, banned for-profit tutoring in core school subjects (the "July 2021 Ban").  (AC ¶ 91.)  The announcement sent "shockwaves" through the

---

[7]    https://fortune.com/2021/05/31/china-edtech-private-tutoring-ipo-delay-crackdown-student-overwork.

17

private education sector.  (Ex. M, Samuel Shen et al., *China Bars For-Profit Tutoring in Core School Subjects*, Reuters, 2 (July 23, 2021, 2:39 PM).[8])  The July 2021 Ban, for the first time, required that "existing subject after-school tutoring institutions . . .  be uniformly registered as ***non-profit*** institutions" and prohibited them from "be[ing] listed to raise financing" and "engaging in capitalized operations."  (AC ¶ 91; Ex. N, July 2021 Ban, Art. IV.13.) Commentators called the Opinions a "death knell" that amounted to "eradicating" the entire after-school education industry in China.  (AC ¶ 91.)

### H.    The Aftermath of the July 2021 Ban

Shortly thereafter, on July 26, 2021, 17 Education issued a press release noting that the July 2021 Ban would have a material adverse impact on its business:

> The Company will continue to comply with all applicable rules and regulations in providing educational services, including those rules and regulations to be adopted following the policy directives of the Opinion.  The Company is carefully considering the provisions of the Opinion and assessing their implications for the Company's business.  ***The Company expects the Opinion, related rules and regulations, and the compliance measures to be taken by the Company will have a material adverse impact on the Company's results of operations and prospect.***

(*Id.* ¶ 92.)

On December 6, 2021, the Company announced that it would "cease offering tutoring services related to academic subjects to students from [K-12] in mainland China by the end of 2021," but would continue to explore opportunities in educational products and services that were not related to K-12 academic after-school tutoring services in accordance with relevant rules and regulations.  (*Id.* ¶ 98.)

---

[8]    https://www.reuters.com/world/china/china-bars-for-profit-tutoring-core-school-subjects-document-2021-07-23.

**ARGUMENT**

**I.    PLAINTIFFS' CLAIMS ARE TIME-BARRED**

Section 11 and Section 15 claims must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m.  This limitations period begins to run upon the occurrence of events that "would have led a reasonably diligent plaintiff to have discovered the facts underlying his claim." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x 442, 447 (2d Cir. 2015).  "[A] statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *NECA-IBEW Pension Tr. Fund v. Lewis*, 607 F. App'x 79, 81 (2d Cir. 2015).

Here, Plaintiffs claim that the Registration Statements should have disclosed various comments about the private tutoring industry by politicians and regulators (*see* AC ¶¶ 52-54, 56-62, 73-79) and, based on these comments, the Company should have predicted that the government would eventually ban the industry.  However, these comments were allegedly made between September 2018 and March 2021, well over a year before this Action was filed.  (*See id.*)  Thus, Plaintiffs knew or should have known of their claims as soon as the December 4, 2020 IPO Registration Statement and April 30, 2021 S-8 Registration Statement were filed.  Because this action was not commenced until July 19, 2022—far more than a year later—the claims are time-barred.  *See Nurlybayev v. ZTO Express (Cayman) Inc.*, No. 17 CV 6130-LTS-SN, 2021 WL 1226865, at *4 (S.D.N.Y. Mar. 31, 2021) (where "more than one year elapsed between the publication of the information" and plaintiffs' lawsuit, Securities Act claim was time-barred).[9]

---

[9]    Plaintiffs concede that the comments at issue were public, alleging they were made at various national conferences, press briefings and other speeches. (*See* AC ¶¶ 52-54, 56-62, 73-79.)  Indeed, the very fact that Plaintiffs plead these comments demonstrates that that they were reasonably available to U.S. investors.

Any suggestion that the statute of limitations should be tolled until the July 2021 Ban is meritless.  Plaintiffs cannot have it both ways by arguing that they could not have discovered that the Company's disclosures were allegedly inadequate, but that the Company should have been clairvoyant.  (*See* AC ¶ 4 (alleging the Registration Statements were "negligently prepared").)  If the various public comments that Plaintiffs cite should have allowed the Company to predict and disclose the July 2021 Ban, those same public comments, under Plaintiffs' own reasoning, also should have put Plaintiffs on notice of their claims here.  *See Chen v. X Fin.*, No. 19-CV-6908 (KAM) (SJB), 2022 WL 765417, at *7 (E.D.N.Y. Mar. 13, 2022).

Finally, to the extent that Plaintiffs concede that the Company could not have predicted the July 2021 Ban, but contend that the Registration Statements should have warned that some (unspecified) new regulation was forthcoming, that claim, too, is untimely.  Plaintiffs allege that, at the time of the offerings, new regulations were "long-awaited" because of the already "widespread public concern" about the after-school tutoring industry.  (AC ¶ 4.)  Plaintiffs allege a flurry of activity from late May to early July of 2021—again, more than a year before this Action—including the MOE's announcement that "all compulsory education institutions in China will provide students with after-school services starting in the fall semester of 2021, including tutoring services."  (*Id.* ¶ 88; *see generally id.* ¶¶ 85-88.)  In addition to Plaintiffs' own allegations, numerous articles in prominent U.S. and international media sources openly speculated about what was to come[10]:

- For example, on June 9, 2021, Bloomberg reported that "[t]here's been speculation that a law or regulation specifically for tutoring could be coming" and that "[t]he

---

[10]    The Court may take judicial notice of such articles on a motion to dismiss for the fact of their publication and to assess what was in the "mix of public information."  *In re Qudian Inc. Sec. Litig.*, No. 17-CV-9741 (JMF), 2019 WL 4735376, at *6 (S.D.N.Y. Sept. 27, 2019); *see also Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 & n.4 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009).

worst-case scenario for the industry" would be a ban on private tutoring "on weekends and holidays, their prime hours."[11]

- On June 16, 2021, Reuters reported that "China is poised to unveil a much tougher than anticipated crackdown on the country's $120 billion private tutoring industry," including "a trial ban on both online and offline tutoring."[12] According to a source described as "a person close to regulators drafting the new rules," "[t]he new rules would be stricter than expected."[13]

- On June 24, 2021, The Wall Street Journal reported that China was planning "new laws and tighter regulations aimed at private education companies that offer tutoring services" and President Xi "this month called on officials to draw up regulations on the [private education] sector."[14]

- On June 24, 2021, The Economist reported that "[t]here is widespread speculation, including in state media, that the new rules . . . may, for example, prohibit classes after a certain time in the evening, during the summer holidays or at weekends."[15]

Insofar as Plaintiffs contend that the Registration Statements should have included similarly ominous speculation months earlier, this prominent media coverage "would have led a reasonably diligent plaintiff to have discovered the facts underlying his claim" more than a year before this action was filed on July 19, 2022. *In re Magnum Hunter*, 616 F. App'x at 447; *accord Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 521 (S.D.N.Y. 2016); *Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 351-52 (S.D.N.Y. 2014).

---

[11] (Ex. O, Allen K. Wan et al., *Why China is Cracking Down on Education-Tech Firms*, Bloomberg News, 3 (June 9, 2021, 12:00 PM), https://www.bloomberg.com/news/articles/2021-06-09/why-china-s-cracking-down-now-on-education-tech-firms-quicktake.)

[12] (Ex. P, Julie Zhu, *China to Unveil Tough New Rules for Private Tutoring Sector*, Reuters, 1-2 (June 16, 2021, 9:08 PM), https://www.reuters.com/world/china/exclusive-china-unveil-tough-new-rules-private-tutoring-sector-sources-2021-06-16.)

[13] (*Id.* at 2.)

[14] (Ex. Q, Keith Zhai, *China Takes Aim at Educational Costs as It Seeks to Reverse Birthrate Decline*, Wall St. J., 1, 3 (June 24, 2021, 7:51 AM), https://www.wsj.com/articles/china-takes-aim-at-educational-costs-as-it-seeks-to-reverse-birthrate-decline-11624535498.)

[15] (Ex. R, Elizabeth Wozobski, *China Is Clamping Down on Cram Schools*, Economist, 1 (June 24, 2021), https://www.economist.com/china/2021/06/24/china-is-clamping-down-on-cram-schools.)

## II.    PLAINTIFFS FAIL TO ALLEGE ANY MATERIAL MISREPRESENTATION OR ACTIONABLE OMISSION

To state a claim under Section 11 of the Securities Act, Plaintiffs must allege that the Registration Statements either contained "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-CV-1545 (LAK), 2019 WL 4257110, at *11 (S.D.N.Y. Sept. 9, 2019) (Kaplan, J.). Plaintiffs fail to allege any such misstatement or omission.[16]

### A.    17 Education's Statements About Historical Growth, High Demand and Quality Services Were Accurate at the Time of the Registration Statements

Plaintiffs first contend that the Registration Statements were misleadingly optimistic about the Company's future by (1) highlighting the recent growth in the after-school tutoring business that was "expected to continue in the near future," according to an industry report from an independent research firm; (2) stating that one of its strategies going forward was its "inten[t] to further grow [its] online K-12 after-school tutoring business"; (3) claiming it had a "large and familiar pool of prospective tutoring customers" due to its "trusted relationships" with students, teachers, and parents; and (4) opining that the Company's course offerings "cater to students' learning needs." (AC ¶¶ 100-05, 116-19; *see* Ex. B, IPO Registration Statement at 3-4, 139; Ex. D, 2020 Annual Report at 56, 59.) Plaintiffs' claims fail for multiple reasons.

First, Plaintiffs do not even claim that any of the challenged statements was false when made. To the contrary, Plaintiffs concede that the after-school tutoring market was huge, and 17

---

[16]    Because Plaintiffs fail to plead a primary violation of Section 11, their control person claims under Section 15 "necessarily fail[]" as well. *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011).

Education's business was thriving at the time the Registration Statements were filed.  (*See, e.g.*, AC ¶¶ 2 (demand for the Company's services had "***skyrocketed***" leading up to the IPO), 4 (the industry was "***booming***"), 35 ("The market 17 Education operates in is ***massive***."), 37 ("***over 75% of K-12 students attended*** after-school tutoring classes"), 38 (prior to the IPO, "the market for online education services in China experienced ***rapid growth***"), 39 (COVID-19 "***further accelerated the demand***"), 40 (17 Education was "the ***clear market leader***").)

Second, many of the challenged statements are inactionable puffery (e.g., the Company's "trusted relationships" help generate new customers, and its courses "cater" to students' needs). "[E]xpressions of puffery and corporate optimism do not give rise to securities violations." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  Public companies "are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." *Id.*  The Company was entitled to be optimistic about its prospects and had every reason to be.  Indeed, the underlying premise of Plaintiffs' entire case is that 17 Education's business was ***too successful*** and demand was ***too high***, thereby ultimately prompting a draconian regulatory backlash.

Third, insofar as the challenged statements are forward-looking—such as future growth projections and intended strategies going forward—they are inactionable under the bespeaks caution doctrine.  Forward-looking statements are not false or misleading if they are "accompanied by sufficient cautionary language" that "pertain[s] to the specific risk that was realized." *Garnett v. RLX Tech. Inc.*, No. 21 Civ. 5125 (PAE), 2022 WL 4632323, at *15 (S.D.N.Y. Sept. 30, 2022).  As Plaintiffs admit, the Registration Statements contain extensive qualifications, caveats, and warnings about future uncertainties and the challenges facing the

23

Company, including, specifically, the risk of more stringent regulations of uncertain scope.  (AC ¶¶ 108-09, 122-23; *see also infra*, Argument § II.B.)  "[I]n discussing the possible impact . . . of further regulation," the Company did not "fail to disclose material objective factual matters, or bur[y] those matters beneath information, or treat[] them cavalierly."  *RLX*, 2022 WL 4632323, at *25.  To the contrary, it explicitly warned that future regulation could "cause [its] actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements."  (Ex. B, IPO Registration Statement at 75; Ex. D, 2020 Annual Report at 3.)  Looking at the full context of the Registration Statements, no reasonable investor could have thought that 17 Education's financial results would be unaffected by future regulations of the private tutoring industry.  *See In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 106 (2d Cir. 2013) (the alleged misstatements, "placed in context, would not lead a reasonable investor into thinking that [the securities] were safe . . . investments"); *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (similar).[17]

Lastly, many of the challenged statements are inactionable opinions.  An opinion is actionable only if (1) the speaker did not hold the professed belief, (2) the supporting facts supplied were untrue, or (3) the speaker "omit[ted] information whose omission ma[de] the statement misleading to a reasonable investor."  *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86, 194, 135 S.Ct. 1318, 1327, 1332 (2015)).  Implicit in 17 Education's forward-

---

[17]  Plaintiffs ignore important context even in the challenged statements themselves.  For example, they imply that 17 Education made overly optimistic growth projections for the future, but omit that the Company actually only reported projections made by a third-party research firm.  (*Compare* Ex. B, IPO Registration Statement at 4 ("The fierce competition for admission to top schools and universities in China has driven the vast demand for K-12 after-school tutoring services in China, ***according to the Frost & Sullivan Report***.  The market has grown rapidly over the past few years, and this momentum is expected to continue in the near future, ***according to the Frost & Sullivan Report***.") *with* AC ¶ 100 (omitting the emphasized qualifications).)

looking statements are its opinions about the needs of students, the value of its services, and the likely direction of the market. *See In re Weight Watchers Int'l, Inc. Sec. Litig.*, No. 14-cv-1997 (LAK), 2016 WL 2757760, at *2, *4 (S.D.N.Y. May 11, 2016) (the "essence" of defendant's claim is its "opinion, whether stated explicitly or implied, that its intended differentiation of its own product" would offset competitive pressures). Plaintiffs do not allege that the Company's beliefs were not sincerely held or that the facts underlying its opinions were false. Instead, Plaintiffs allege only that the Company's optimistic opinions conflicted with some gloomier opinions expressed by certain politicians and regulators. (*See* AC ¶¶ 105, 119.) But investors "understand that opinions sometimes rest on a weighing of competing facts," and an opinion statement is "not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Tongue*, 816 F.3d at 210; *see also id.* at 212 (affirming dismissal of securities claims based on defendant's estimation that its drug had a 90% chance of approval because defendants "need not have disclosed FDA feedback merely because it tended to cut against their projections").

### B.    17 Education Accurately Disclosed the Relevant Risk of Regulation

Next, Plaintiffs challenge the Registration Statements' risk warnings themselves, claiming they were misleadingly incomplete. To the contrary, the Company disclosed all applicable regulations at the time and warned of the precise risk that later materialized—new regulations that could have a material adverse effect on the Company. It is well settled that "dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed." *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003); *see, e.g.*, *RLX*, 2022 WL 4632323, at *25 (dismissing Section 11 claim where registration statement "fairly alerted potential investors that the regulatory outlook for RLX's e-cigarette business in China was uncertain and carried risks to profitability"); *Sandoz v.*

25

*Waterdrop Inc.*, No. 21cv7683 (DLC), 2023 WL 1767526, at *10 (S.D.N.Y. Feb. 3, 2023) (dismissing Section 11 claim where "[t]he Registration Statement repeatedly advises investors of the risks to [the company's] business posed by the Chinese regulatory regime"), *appeal docketed*, No. 23-301 (Mar. 7, 2023); *Lorenzo v. BlueCity Holdings Ltd.,* 76 Misc. 3d 1226(A), 2022 N.Y. Slip Op. 51055(U), at *2 (Sup. Ct. N.Y. Cnty. 2022) (dismissing Section 11 claim where plaintiffs failed to allege "what specifically was known at the time of the IPO about the not-yet-implemented proposed regulations which was not disclosed or which otherwise made the risk disclosures about the potential Chinese regulations in the Offering Documents inadequate").

Here, Plaintiffs concede that the Registration Statements provided "a lengthy summary of existing regulations formally promulgated by PRC authorities.'" (AC ¶ 72; *see also id.* ¶¶ 106, 120 (describing disclosure of existing regulations).)[18]  The Company even disclosed specific *draft* regulations that had been pending final approval for several years.  (Ex. B, IPO Registration Statement at 25, 152-53; Ex. D, 2020 Annual Report at 10-12.)  Plaintiffs do not even allege that any proposed regulations were not disclosed, which makes this case even weaker than others that have been dismissed.  *See In re Greenlane Holdings, Inc. Sec. Litig.*, 511 F. Supp. 3d 1283, 1308 (S.D. Fla. 2021) (even where specific regulations are proposed and pending, "their passage was not inexorable—not nearly certain enough—to constitute a material omission").

Plaintiffs also acknowledge that the Registration Statements "further cautioned that it was 'uncertain whether and how PRC government authorities would further promulgate new laws

---

[18]   These existing regulations included rules on the duration and scheduling of tutoring classes, methods for collecting tuition fees, licenses for instructors, educational apps, course materials, tests, academic competitions, size of classrooms, tutor eligibility requirements, insurance, curriculum contents, registration and filing requirements, verification of student identities, and record retention requirements, among others. (*See* Ex. B, IPO Registration Statement at 152-56; Ex. D, 2020 Annual Report at 68-72.)

and regulations applicable to online training institutions.'"  (AC ¶ 72; *see also id.* ¶¶ 108, 109, 122, 123 (warning of the risk of additional regulations, which could materially and adversely affect the Company).)  Among other things, the Registration Statements warned that the regulatory regime for the private education industry was "relatively new and evolving" and "could be changed to accommodate the development of the education, in particular, the online private education."  (Ex. B, IPO Registration Statement at 25; Ex. D, 2020 Annual Report at 10.)  They also cautioned multiple times that there were "[u]ncertainties . . . in relation to *new legislation or proposed changes in the PRC regulatory requirements* . . . which may materially and adversely affect our business, financial condition and results of operations."  (Ex. B, IPO Registration Statement at 6, 25, 95; Ex. D, 2020 Annual Report at 10, 89.)  The Registration Statements even highlighted the possibility of new restrictions with which the Company could not comply: "There is no assurance that we can comply with any newly promulgated laws and regulations in a timely manner *or at all* . . . ."  (Ex. B, IPO Registration Statement at 27; Ex. D, 2020 Annual Report at 12.)

These disclosures foreclose Plaintiffs' claim based on the Company's alleged failure (or inability) to predict the precise manner in which the disclosed risk would materialize months later.  *See Kwalbrun*, 1999 WL 1212491, at *2.  The Second Circuit has unequivocally held that "[c]ompanies subject to government regulation are not required to speculate or foresee coming regulation or its potential effect on the company."  *Id.*; *see also Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 411 (S.D.N.Y. 2020) ("The Securities Act requires candor in disclosures, not clairvoyance.").  Judge Engelmayer recently applied this principle in *Garnett v. RLX Technology Inc.* to dismiss securities claims premised on allegations virtually identical to those here.  2022 WL 4632323.  There, as here, plaintiffs brought securities claims against a Chinese company

27

after new post-IPO regulations crippled its business.  *Id.* at *1, *17.  Like here, plaintiffs there asserted that "at the time of the IPO, . . . Chinese regulatory entities were already crafting national standards" and the company's registration statement "failed to disclose the likelihood of forthcoming enhanced regulations."  *Id.*  The court rejected these claims, holding that defendant's disclosures (which are indistinguishable from 17 Education's here) were "above legal reproach":

> In the end, drawing all reasonable inferences in plaintiffs' favor, the [Complaint]'s factual allegations depict an environment in which the regulation of e-cigarettes in China had gradually tightened and could well continue over time to tighten.  But these allegations do not plausibly support the central fact that the [Complaint]'s claims the Offering Materials failed to disclose: that laws that put regulation of e-cigarettes on par with tobacco products were inevitable—"imminent" and "a *fait accompli*."  *Id.* ¶¶ 71, 76.  Accordingly, the [Complaint]'s claim that RLX should have disclosed the inevitability of regulations treating e-cigarettes as traditional tobacco products fails.  And, as detailed above, with that claim put aside, the Offering Materials were above legal reproach.  They disclosed and in detail— without material omission or misrepresentation—both the existing regulatory environment with respect to e-cigarettes and the possibility that "government authorities in China may impose more stringent laws, regulations and policies to regulate e-vapor products and the e-vapor industry."  Offering Materials at 20.  No more disclosure about potential regulatory developments was required.

*Id.* at *20.  As in *RLX*, 17 Education "fairly alerted potential investors that the regulatory outlook for the [private tutoring] business in China was uncertain and carried risks to profitability," and Plaintiffs "fail[] to plausibly plead the necessary premise to their claims: that, at the time of the IPO, any market player [knew] that China would [later ban for-profit tutoring]."  *See id.* at *19, *25.  Accordingly, Plaintiffs' challenge to the Company's risk warnings fails.[19]

---

[19]   It also was not misleading for the Registration Statements' risk warnings to be phrased as hypotheticals, since Plaintiffs do not allege any regulations were already negatively affecting the Company's performance when the disclosures were made.  *See Hou Liu v. Intercept Pharms., Inc.*, No. 17-cv-7371 (LAK), 2020 WL 1489831, at *12 (S.D.N.Y. Mar. 26, 2020) (Kaplan, J.) ("If, when the statements were made, [the risk] had affected [the company's] earnings negatively, then the statement would have been misleading.  But there are no such allegations.").

28

### C.       17 Education Was Not Required to Make Any Additional Disclosures

Finally, despite the extensive and accurate disclosures discussed above, Plaintiffs

complain that the Registration Statements did not also include the supposed "regulatory

developments" as described in ¶¶ 52-54, 56-62 and/or 73-79 of the Amended Complaint.  (AC

¶¶ 106, 120.)  But such disclosure is required only if (i) necessary to prevent other disclosures

from being materially misleading; or (ii) mandated by an affirmative disclosure statute or

regulation.  *AmTrust Fin. Servs.*, 2019 WL 4257110, at *11.  Plaintiffs' alleged omissions do not

fall into either category.

### 1.       No Additional Disclosure Was Required to Prevent the Registration Statements from Being Materially Misleading

As an initial matter, the alleged omissions that Plaintiffs label "regulatory developments"

are nothing more than public comments by various politicians and regulators at conferences and

other venues spanning multiple years.  (*See* Ex. S, Summary Chart of AC ¶¶ 52-54, 56-62, 73-

79.)  These remarks discussed in general terms (i) the importance of reducing the extracurricular

burdens on students; (ii) public schools' aspirations to strengthen their own after-school

programs; and (iii) the goal of further regulating private after-school tutoring programs.  (*See id.*)

Plaintiffs do not allege that any of these speeches proposed any specific new regulations, let

alone an outright ban on the private for-profit tutoring industry.  Rather, the alleged omitted

comments merely "describ[ed], in broad terms, ideas then under consideration and that they were

preliminary and precatory."  *RLX*, 2022 WL 4632323, at *19.  Nothing in the Registration

Statements was rendered misleading by the absence of such regulatory ruminations.

Indeed, the alleged omissions were already in the total mix of information as public

statements, as evidenced by the fact that Plaintiffs cite them in the Amended Complaint.  *See*

*RLX*, 2022 WL 4632323, at *23 ("Statements by Chinese government authorities regarding their

regulatory aspirations . . . were, by nature, public information."); *Waterdrop*, 2023 WL 1767526, at *11 ("Of course, information about the government regulations [in China] was publicly available to investors."). This is also reflected in the ample pre-IPO media coverage.[20] *See RLX*, 2022 WL 4632323, at *23 (pre-IPO English-language articles "absolutely captured the broader point that intensified national-level regulation of such products might be nigh"). 17 Education had no "duty to disclose information that is equally available, widely reported, or so basic that any investor could be expected to know it." *Bettis v. Aixtron SE*, No. 16 Civ. 00025 (CM), 2016 WL 7468194, at *10 (S.D.N.Y. Dec. 20, 2016); *see also In re Keyspan*, 383 F. Supp. 2d at 377.

In any event, the alleged omissions were immaterial. Once the Company disclosed the relevant risks of ever more stringent and unpredictable regulations, cataloging every comment on the subject by every politician or regulator would not have significantly altered the total mix of information. To the contrary, companies should ***not*** "bury the shareholders in an avalanche of trivial information." *In re DraftKings Inc. Sec. Litig.*, No. 21 Civ. 5739 (PAE), 2023 WL 145591, at *16 (S.D.N.Y. Jan. 10, 2023) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49, 96 S.Ct. 2126, 2132 (1976)). "The federal securities laws simply do not require the excruciatingly lengthy and complicated disclosure that would result if every indicia of the modern regulatory state needed to be compiled, catalogued, and explained to potential investors." *In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 553 (S.D.N.Y. 2005).

---

[20]   (*See, e.g.*, Ex. T, *China Sounds the Alarm Over Its Stressed-Out Schoolchildren*, Economist (Aug. 18, 2018), https://www.economist.com/china/2018/08/18/china-sounds-the-alarm-over-its-stressed-out-schoolchildren; Ex. U, Huizhong Wu, *In Echo of Mao Era, China's Schools in Book-Cleansing Drive*, Reuters (July 9, 2020, 8:04 AM), https://www.reuters.com/article/us-china-books-insight/in-echo-of-mao-era-chinas-schools-in-book-cleansing-drive-idUSKBN24A1R5 ("China is so determined to keep a tight control of the education of young people."); Ex. V, Valerie Strauss, *China's 10 New and Surprising School Reform Rules*, Wash. Post (Oct. 30, 2013, 2:41 PM), https://www.washingtonpost.com/news/answer-sheet/wp/2013/10/30/chinas-10-new-school-reform-rules-reduce-standardized-testing-homework.)

When faced with this exact question, Judge Oetken recently dismissed a Section 11 case over a company's alleged misrepresentations and inadequate disclosures about the very same July 2021 Ban. *Zhangmen*, 2023 WL 2711279, at \*10. Even though the Zhangmen's IPO was conducted on ***June 8, 2021*** – just over a month before the July 24, 2021 Ban went into effect – the court found that, even at that late date months after 17 Education's offerings, "the various replies and other sorts of communiques with Chinese regulators, based on what [p]laintiff chose to include in the [a]mended [c]omplaint, merely show 'an indication' among them 'toward heightened regulation, but left unclear the timing and form of such regulations–or whether, within the Chinese national government, the [Commission's] preferred approach would even carry the day.'" *Id.* (quoting *RLX*, 2022 WL 4632323, at \*19) (final alteration in original). Because Zhangmen – like 17 Education here – *did* warn about the exact risk of "potential regulatory developments," "no more disclosure . . . was required." *Id.*

### 2.    No Additional Disclosure Was Required Under Item 303

Lastly, the Company was under no affirmative duty to disclose more. Plaintiffs point to Item 303 of S.E.C. Regulation S-K, which requires disclosure of "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues." *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 758 (S.D.N.Y. 2018) (Kaplan, J.) (quoting 17 C.F.R. § 229.303(a)(3)(ii)). But Item 303 "does not call for disclosure of ***any*** 'trend' or 'uncertainty,'" only those that are both (1) "presently known to management" and (2) "reasonably likely to have material effects on the [issuer]'s financial condition or results of operations." *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619 (S.D.N.Y. 2021) (emphasis added). Plaintiffs fail on both counts.

Plaintiffs do not allege who, if anyone, at 17 Education was aware of the specific comments that Plaintiffs contend should have been disclosed. *See DraftKings*, 2023 WL

31

145591, at \*38 (plaintiffs fail to plead the "requisite state of mind" for Item 303 without pleading "***actual*** knowledge" (emphasis in original)).  Even assuming the Company was aware of these various statements, Plaintiffs do not allege facts showing that 17 Education's management believed it was "reasonably likely" that the omitted comments would have a material effect on the Company.  (*See* AC ¶¶ 114, 127.)  The "reasonably likely standard" requires "a fairly substantial probability that the known risk at issue will materialize and have a material impact— if not a more-likely-than-not standard, then something not too much below that." *UP Fintech Holding*, 527 F. Supp. 3d at 619.  Yet Plaintiffs allege nothing about what anyone at 17 Education believed about the likelihood that there would be new regulation, when it would come, what it would require, or what impact it would have on the Company's business.  The Registration Statements accurately disclosed that future regulations could materially affect its business.  (Ex. B, IPO Registration Statement at 6, 25, 95; Ex. D, 2020 Annual Report at 10, 89.)  Anything more would have been pure speculation, and Item 303 is not "so broad as to require defendants to disclose speculative uncertainties." *Mucha*, 540 F. Supp. 3d at 298.[21]

## III.    PLAINTIFFS' CLAIMS FAIL DUE TO LACK OF LOSS CAUSATION

Separate from the above failures, Plaintiffs' claims should also be dismissed because their alleged losses were not and could not have been caused by any misstatements or omissions in the Registration Statements.  *See* 15 U.S.C. § 77k(e).  The securities laws do not "provide investors with broad insurance against market losses"; rather, they "protect [investors] against those economic losses that misrepresentations actually cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345, 125 S. Ct. 1627, 1633 (2005).  While loss causation is not an element of

---

[21]    Plaintiffs also allege no additional facts that are unique to their Item 303 claim.  (*See* AC ¶¶ 114, 127.)  Courts have "dismissed residual Item 303 claims where . . . they are mere 'redundant' restatements of otherwise-failed Section 11 complaints due to the clear overlap in standards," as they are here. *Zhangmen*, 2023 WL 2711279, at \*13.

Plaintiffs' claims, the absence of loss causation is an affirmative defense that warrants dismissal if it is "apparent from the face of the complaint." *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 417 (2d Cir. 2011); *see, e.g.*, *Britannia Bulk Holdings*, 665 F. Supp. 2d at 419; *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 590 (S.D.N.Y. 2011); *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, No. 07 Civ. 10528, 2010 WL 148617, at *11 (S.D.N.Y. Jan. 14, 2010).

Here, Plaintiffs expressly allege that the Company's "ADS [price] has slumped persistently since its IPO." (AC ¶ 13.) In fact, the ADS price had already fallen 78.10% from the IPO price of $10.50 to just $2.30 ***before*** the July 2021 Ban was allegedly leaked to the public on July 23, 2021. (*See id.* ¶ 70; Ex. W, Historic Stock Prices at 5.) Under the Securities Act, "the price decline before disclosure may not be charged to defendants." *In re Merrill Lynch & Co. Research Reports Secs. Litig.*, 272 F. Supp. 2d 243, 254 (S.D.N.Y. 2003). As a matter of law, 17 Education cannot be held responsible for the significant drop in its stock price that occurred prior to any alleged corrective disclosures. *See Britannia Bulk Holdings*, 665 F. Supp. 2d at 419; *Blackmoss Invs.*, 2010 WL 148617, at *11. Further, the July 2021 Ban was a new regulation; it did not reveal any prior misrepresentation or omission in 17 Education's Registration Statements months earlier. Even after the ban, both Plaintiffs continued to purchase thousands of additional ADS, as alleged in their lead plaintiff certifications. (*See* ECF No. 16-3 at 4, 8.) These undisputed facts sever any purported link between Plaintiffs' alleged losses and the alleged misstatements or omissions in the Registration Statements.

## IV.    PLAINTIFFS LACK STANDING TO CHALLENGE THE S-8 REGISTRATION STATEMENT

Finally, in addition to the reasons above, Plaintiffs' claims based on the S-8 Registration Statement separately fail for lack of standing. Only "purchasers who can trace their shares to an

allegedly misleading registration statement" have standing to sue under the Securities Act. *DeMaria*, 318 F.3d at 178. Plaintiffs claim to have purchased the Company's ADS, but only allege that ADS were issued pursuant to the IPO Registration Statement, not the S-8 Registration Statement. (AC ¶¶ 17, 19, 70, 81.) According to Plaintiffs, "ADS are equity instruments freely tradable on U.S.-based exchanges which represent shares of a foreign issuer [here, Class A ordinary shares] that have been deposited with a commercial bank in the United States, known as a 'depositary.'" (*Id.* ¶ 63.) Unlike the IPO, which registered ADS to be sold to the public, the subsequent offering pursuant to the S-8 Registration Statement registered "Class A ordinary shares *issuable* upon the vesting or exercise of awards previously granted under [17 Education's] various share incentive plans, or reserved for future issuance under such plans." (*Id.* ¶ 81.) While the S-8 Registration Statement explained that the "Class A ordinary shares being registered therein *may* be represented by ADS *upon deposit* of such shares with the depositary" (*id.*; Ex. C, S-8 Registration Statement at 1), Plaintiffs do not allege that (i) any Class A ordinary shares were actually issued pursuant to the S-8 Registration Statement; (ii) such Class A ordinary shares were then deposited with 17 Education's depositary bank in exchange for ADS; and (iii) such ADS were then traded in the public market. In other words, Plaintiffs fail to plead that there are *any* ADS in the public market (where Plaintiffs traded) that were issued pursuant or traceable to the S-8 Registration Statement, as required to allege standing to assert a Securities Act claim based on that offering. *See DeMaria*, 318 F.3d at 178. Without standing, Plaintiffs' claims based on the S-8 Registration Statement should be dismissed.

## CONCLUSION

For these reasons, the Amended Complaint should be dismissed in its entirety with prejudice.

34

Dated: New York, New York
      March 31, 2023

                                        Respectfully submitted,

                                        /s/ Robert A. Fumerton
                                        SKADDEN, ARPS, SLATE,
                                          MEAGHER & FLOM LLP
                                        Scott D. Musoff
                                        Robert A. Fumerton
                                        Michael C. Griffin
                                        One Manhattan West
                                        New York, New York 10001
                                        Phone:   (212) 735-3000
                                        Fax:      (212) 735-2000
                                        scott.musoff@skadden.com
                                        robert.fumerton@skadden.com
                                        michael.griffin@skadden.com

                                        *Attorneys for Defendants 17 Education &*
                                        *Technology Group Inc., Cogency Global Inc.,*
                                        *and Colleen A. De Vries*

35