**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WONG HAPING and HE XIANGHONG, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>17 EDUCATION & TECHNOLOGY GROUP INC., ANDY CHANG LIU, MICHAEL CHAO DU, DUN XIAO, TUCK LYE KOH, QIN WEN, JIAWEI GAN, BING YUAN, COLLEEN A. DE VRIES, COGENCY GLOBAL INC., MORGAN STANLEY & CO. LLC, GOLDMAN SACHS (ASIA) L.L.C., BOFA SECURITIES, INC., CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED, and TIGER BROKERS (NZ) LIMITED,<br><br>      Defendants. | Case No.  1:22-cv-09843-LAK-SDA |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO**
**DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .........................................................................................................4

    A.    The Company and Its Business.................................................................................4

    B.    China's Early Measures to Regulate the After-School Tutoring Industry...............5

    C.    China's Renewed Plan to Overhaul the After-School Tutoring Industry ................7

    D.    The Misleading IPO Registration Statement ...........................................................8

    E.    Regulatory Developments After the IPO..................................................................9

    F.    The Misleading S-8 Registration Statement ..........................................................10

    G.    China's Long-Awaiting After-School Tutoring Reforms.......................................11

LEGAL STANDARD................................................................................................................13

ARGUMENT.............................................................................................................................13

I.    THE AC ADEQUATELY PLEADS MATERIAL OMISSIONS....................................14

    A.    Defendants Were Required to Disclose the Omitted Material Under Item
        303..........................................................................................................................14

    B.    Defendants Made Material Misstatements..............................................................20

        1.    Defendants Misled Investors About the Regulatory Landscape for
            After-School Tutoring Services in China ..................................................21

        2.    Defendants Misled Investors About 17 Education's Existing
            Customer Base and Bespoke Services .......................................................24

        3.    Defendants Misled Investors Regarding Planned Growth for 17
            Education's After-School Tutoring Business ...........................................26

II.    THE PREMATURE AFFIRMATIVE DEFENSES RAISED IN THE MOTION
     DO NOT DEFEAT LEAD PLAINTIFFS' CLAIMS.......................................................28

    A.    Lead Plaintiffs' Claims Are Timely.......................................................................29

    B.    Defendants' Negative Causation Argument Is Meritless........................................31

**TABLE OF AUTHORITIES**

**Page**

III.    LEAD PLAINTIFFS HAVE STANDING TO BRING THE CLAIMS ASSERTED ......................................................................................................33

IV.    THE AC ADEQUATELY PLEADS A CONTROL PERSON CLAIM ...........................35

CONCLUSION ...........................................................................................................................35

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Alpha Capital Anstalt v. New Generation Biofuels, Inc.*,
    2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014)...................................................................24

*Amorosa v. AOL Time Warner, Inc.*,
    409 F. App'x 412 (2d Cir. 2011) ......................................................................................32

*Banerjee v. Zhangmen Educ. Inc.*,
    2023 WL 2711279 (S.D.N.Y. Mar. 30, 2023) .............................................................17, 23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..........................................................................................................13

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
    665 F. Supp. 2d 404 (S.D.N.Y. 2009).................................................................................33

*Buttry v. Gen. Signal Corp.*,
    68 F.3d 1488 (2d Cir. 1995)..............................................................................................30

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014)..............................................................................................33

*Carroll v. Trump*,
    590 F. Supp. 3d 575 (S.D.N.Y. 2022) ...............................................................................28

*Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin.*,
    620 F.3d 146 (2d Cir. 2010)..............................................................................................13

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020).................................................................................22

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
    129 F. Supp. 3d 48 (S.D.N.Y. 2015).....................................................................20, 27, 35

*In re CPI Card Grp. Inc. Sec. Litig.*,
    2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) ...............................................................16, 17

*Credit Suisse First Boston Corp. v. ARM Fin. Grp., Inc.*,
    2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ......................................................................22

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003)..............................................................................................34

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012).................................................................................23

*Dolphin & Bradbury, Inc. v. SEC*,
    512 F.3d 634 (D.C. Cir. 2008) .................................................................................22

*In re DraftKings Inc. Securities Litigation*,
    2023 WL 145591 (S.D.N.Y. Jan. 10, 2023) ............................................................17

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013).................................................22, 24, 31, 33

*FHFA v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017)......................................................................................29

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009).......................................................................................31

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000).....................................................................................24

*Garnett v. RLX Tech. Inc.*,
    2022 WL 4632323 (S.D.N.Y. Sept. 30, 2022)....................................................23, 26

*In re Greenlane Holdings, Inc. Sec. Litig.*,
    511 F. Supp. 3d 1283 (S.D. Fl. 2021) ....................................................................23

*In re Henry Schein, Inc. Sec. Litig.*,
    2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ......................................................25

*Herman & Maclean v. Huddleston*,
    459 U.S. 375 (1983).................................................................................................13

*Hou Liu v. Intercept Pharm., Inc.*,
    2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) .......................................................24

*Ia. Public Emps.' Ret. Sys. v. MF Global, Ltd.*,
    620 F.3d 137 (2d Cir. 2010).....................................................................................28

*IKB Int'l S.A. v. Bank of Am.*,
    2014 WL 1377801 (S.D.N.Y. Mar. 31, 2014) .......................................................13

*In re IndyMac Mortgage-Backed Sec. Litig.*,
    718 F. Supp. 2d 495 (S.D.N.Y. 2010)......................................................................19

*Kwalbrun v. Glenayre Techs., Inc.*,
    201 F.3d 431 (2d Cir. 1999).....................................................................................23

*In re Lehman Bros. Sec. & ERISA Litig.*,
    131 F. Supp. 3d 241 (S.D.N.Y. 2015) .....................................................................31

*In re Lehman Bros. Sec. & ERISA Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011)..................................................................................33, 35

*Levine v. AtriCure, Inc.*,
    508 F. Supp. 2d 268 (S.D.N.Y. 2007)..................................................................................31, 32

*Levine v. AtriCure, Inc.*,
    594 F. Supp. 2d 471 (S.D.N.Y. 2009)........................................................................................31

*Litwin v. Blackstone Grp. L.P.*,
    634 F.3d 706 (2d Cir. 2011)..................................................................................14, 15, 19, 20

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)......................................................................................................35

*Lorenzo v. BlueCity Holdings Ltd.*,
    76 Misc. 3d 1226(A) (Sup. Ct. N.Y. Cty. 2022)......................................................................23

*McKenna v. Wright*,
    386 F.3d 432 (2d Cir. 2004)................................................................................................28, 29

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)......................................................................................................20

*In re MF Global Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)......................................................................................28

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
    2022 WL 17815767 (2d Cir. Dec. 20, 2022) .....................................................................18, 19

*Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014)........................................................................................31

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
    709 F.3d 109 (2d Cr. 2013)............................................................................................... *passim*

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012)......................................................................................................34

*Nurlybayev v. ZTO Express (Cayman) Inc.*,
    2021 WL 1226865 (S.D.N.Y. Mar. 31, 2021) .........................................................................31

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)..................................................................................................................27

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
    595 F.3d 86 (2d Cir. 2010)..................................................................................................19, 20

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
297 F.3d 1182 (11th Cir. 2002) ......................................................................................15

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012)......................................................................................15, 17

*Philogene v. Duckett*,
2018 WL 3946447 (S.D.N.Y. Aug. 16, 2018) ...............................................................29

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2009)...........................................................................................22

*Rudani v. Ideanomics, Inc.*,
2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020)................................................................28

*Sandoz v. Waterdrop Inc.*,
2023 WL 1767526 (S.D.N.Y. Feb. 3, 2023)...................................................................23

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011).............................................................................27

*SEC v. Bank of Am. Corp.*,
677 F. Supp. 2d 717 (S.D.N.Y. 2010).............................................................................24

*Set Capital LLC v. Credit Suisse Grp. AG*,
996 F.3d 64 (2d Cir. 2021)..............................................................................................13

*In re SKAT Tax Refund Scheme Litig.*,
2021 WL 2689908 (S.D.N.Y. June 30, 2021) ................................................................29

*Slayton v. Am. Exp. Co.*,
604 F.3d 758 (2d Cir. 2010)............................................................................................28

*In re State St. Bank & Trust Co. Fixed Income Funds Inv Litig.*,
774 F. Supp. 2d 584 (S.D.N.Y. 2011).............................................................................33

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015)........................................................................................ *passim*

*In re Vale S.A. Sec. Litig.*,
2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ................................................................33

*In re Vivendi Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016).............................................................................................21

*In re Vivendi Univ., S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011)..............................................................................25

*Wang v. Cloopen Grp. Holdings Ltd.*,
    --- F. Supp. 3d ---, 2023 WL 2534599 (S.D.N.Y. Mar. 16, 2023)....................................25, 26

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
    2016 WL 2757760 (S.D.N.Y. May 11, 2016)  .......................................................................27

*In re WRT Energy Sec. Litig.*,
    2005 WL 2088406 (S.D.N.Y. Aug. 30, 2005)........................................................................32

*Xiang v. Inovalon Holdings, Inc.*,
    254 F. Supp. 3d 635 (S.D.N.Y 2017)................................................................................31, 33

*Youngers v. Virtus Inv. Partners Inc.*,
    195 F. Supp. 3d 499 (S.D.N.Y. 2016)...................................................................................31

**Statutes**

15 U.S.C. §77k.................................................................................................................. *passim*

15 U.S.C. § 77m...................................................................................................................29

15 U.S.C. § 77o...............................................................................................................13, 35

15 U.S.C. §78u-5 ................................................................................................................28

**Regulations**

17 C.F.R. § 229.303 .......................................................................................................14, 15

**Rules**

Fed. R. Civ. P. 8................................................................................................................ *passim*

Fed. R. Civ. P. 9....................................................................................................................14

Fed. R. Civ. P. 12..............................................................................................................24, 28

Fed. R. Civ. P. 15..................................................................................................................35

Fed. R. Civ. P. 23..............................................................................................................4, 34

**Other Authorities**

Securities Act Release No. 6835, Exchange Act Release No. 26,831, 43 SEC
    Docket 1330 (May 18, 1989).........................................................................................15, 18

5 Wright & Miller, Fed. Prac. & Proc. Civil § 1277 (2023)........................................................29

Lead plaintiffs Wong Haping and He Xianghong ("Lead Plaintiffs") respectfully submit this memorandum of law in opposition to the motion to dismiss filed by Defendants 17 Education & Technology Group Inc. ("17 Education" or the "Company"), Cogency Global Inc. ("Cogency"), and Colleen De Vries (together with Cogency, the "Cogency Defendants") (ECF No. 61) (the "Motion") and the joinder therein filed by Defendants Morgan Stanley & Co. LLC, Goldman Sachs (Asia) L.L.C., BofA Securities, Inc., China Renaissance Securities (Hong Kong) Limited, and Tiger Brokers (NZ) Limited (collectively, the "Underwriter Defendants") (ECF No. 64).

## **PRELIMINARY STATEMENT**

Lead Plaintiffs assert simple and well-pled claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), which have the most lenient pleading standard under the federal securities laws. Scienter, reliance, and loss causation need not be shown, and the requirement of a false or misleading statement or omission in a registration statement need only be alleged under the notice pleading standard set forth in Rule 8(a) of the Federal Rules of Civil Procedure (the "Rules").

The First Amended Class Action Complaint (ECF No. 37) (the "AC") easily satisfies that standard. As alleged, 17 Education is a technology company that provided a range of "in class" and "after-school" education services in the People's Republic of China ("PRC" or "China"), which experienced a surge in demand for its online tutoring courses during the COVID-19 pandemic. In December 2020, it held an opportunistic initial public offering ("IPO") in the United States in which it sold over $300 million in American depositary shares representing its Class A ordinary shares (the "ADS") pursuant to a registration statement on Form F-1 (as amended, the "Registration Statement"). In April 2021, it then registered additional shares issuable in the form of ADS under its employee share incentive plans on Form S-8 (the "S-8 Registration Statement," and together with the IPO Registration Statement, the "Registration Statements"). As set forth in the AC, the Registration Statements failed to disclose that, as of the IPO, the PRC central government determined that its

existing rules did not sufficiently regulate the "burdens" placed on students by after-school tutoring programs and it therefore planned to issue more stringent reforms in the near future, just as it had done in the past after making similar announcements, including, most notably, measures to make after-school tutoring available at public schools across China.  Rather than warn potential investors about this alarming development or the risks it posed to 17 Education's tutoring business—which, by the time of the IPO, accounted for *over 90% of its revenues*—the Registration Statements simply summarized the existing rules and stated that it was *uncertain* whether the PRC central government would issue new rules that could adversely affect its business.  Worse still, the Registration Statements boasted that 17 Education had a "large and familiar pool of prospective customers" and/or that it intended to continue growing its online tutoring business.

The truth was not disclosed until it was too late.  In July 2021, a mere seven months after 17 Education's IPO, China's Ministry of Education ("MOE"), the body responsible for overseeing after-school tutoring courses, announced that all public schools would provide after-school tutoring starting in the fall semester of 2021, and the PRC central government issued drastic new rules which effectively outlawed after-school tutoring courses to be operated by private companies.  On July 26, 2021, 17 Education revealed for the first time that these reforms would, unsurprisingly, have a material adverse impact on its business.  By the end of 2021, 17 Education ceased offering online tutoring services in mainland China. 17 Education's ADS entered the market in December 2020 at $10.50 per share, buoyed by the misstatements and omissions in the IPO Registration Statement. As of the filing of the AC on January 31, 2023, 17 Education's ADS traded *95% below its IPO price*.

Unable to deny the steady drumbeat of repeated statements by the MOE and other PRC officials before the Registration Statements became effective, Defendants deflect and downplay in the memorandum of law filed in support of the Motion (ECF No. 63) (the "MTD").  For example,

- 2 -

Defendants reimagine the AC's allegations as attacking 17 Education for failing to predict future regulations even though they are plainly grounded in policy statements *previously made* by relevant government officials.  They also mischaracterize the repeated announcements by those officials as a "hodgepodge of generic public comments" even though the officials stated in words of certainty that deeper reforms were on the horizon and identified at least one that posed an obvious threat to the continued trajectory of 17 Education's online tutoring business. Properly viewed without Defendants' spin, there is no doubt that the AC adequately pleads that the information admittedly omitted from the Registration Statements constituted a known trend or uncertainty required to be disclosed under Item 303 of SEC Regulation S-K or was otherwise necessary to make several of the statements made in those filings—including, for example, the statements about the continued growth of the online tutoring business—not misleading.  *See* Part I, *infra*.

Recognizing as much, Defendants raise several premature affirmative defenses in an attempt to shore up the Motion, including that (i) the claims are time-barred by the statute of limitations; and (ii) negative causation forecloses any recovery.  But it is black letter law that to prevail on an affirmative defense on a pre-answer motion, the defense must be apparent on the face of the pleading *and* there are *no set of facts* that can negate the defense and entitle the plaintiff to relief.  The two purported affirmative defenses invoked by Defendants are based on a selective reading of the AC's allegations which are either undercut or, at a minimum, called into question by a host of other facts pled therein.  *See* Part II, *infra*.

Defendants also submit that Lead Plaintiffs lack standing to challenge statements made in the S-8 Registration statement because they cannot "trace" the ADS they purchased to any of the shares registered therein.  In so arguing, Defendants concede that Lead Plaintiffs have standing to sue for misstatements and omissions in the IPO Registration Statement, having purchased ADS before any

other shares tradeable as ADS were registered by the Company in the S-8 Registration Statement. Accordingly, the proper question is not whether Lead Plaintiffs have statutory standing, *i.e.*, whether they can trace shares to the S-8 Registration Statement, but rather whether they can assert claims on behalf of others who purchased the *same* security by the *same* company pursuant to a registration statement containing *identical* omissions and misstatements under Rule 23.  The answer to that question is clearly "yes."  *See* Part III, *infra*.

Finally, Defendants do not seriously deny Plaintiffs' control person claim.  *See* Part IV, *infra*. For these reasons, and all those that follow, the Motion should be denied in its entirety.

## STATEMENT OF FACTS

### A.     The Company and Its Business

17 Education is a technology company that provides a range of digital "in-school" and "after-school" products to K-12 teachers and students in China, including online after-school tutoring courses.  (AC ¶¶ 32-34.)  Although initially conceived as a provider of digital tools for in-school curriculum management, the Company launched an online after-school tutoring service for K-12 students in 2017.  (AC ¶ 34.)  By the end of 2018, 17 Education's online tutoring business accounted for approximately 30.2% of its total net revenues. (AC¶ 41.)

Between 2018 and 2020, the market for online education services in China experienced rapid growth, especially the market for online tutoring.  (AC ¶ 38.)  The demand for online education services in China accelerated even more with the onset of the COVID-19 pandemic in early 2020 as students were encouraged to engage in more online education as they studied from home.  (AC ¶ 39.)  Due to the far larger customer base for online tutoring than in-class products, 17 Education's online tutoring business quickly outstripped the size, and importance, of its portfolio of in-class products as overall demand grew.  (AC ¶ 41.)  By September 30, 2020, 17 Education's online tutoring business had grown to comprise approximately *93% of its total net revenue*. (AC ¶ 41.)

To capitalize on the explosive growth of its after-school tutoring business, 17 Education decided to sell shares of its Class A common stock in the United States in the form of ADS.  (AC ¶ 63.)  The Company sold over 31 million ADS, representing over 78 million newly-issued Class A ordinary shares, at $10.50 per ADS in an IPO which commenced on December 4, 2020, pursuant to a registration statement filed on Form F-1 (the "IPO Registration Statement") declared effective by the SEC at the close of trading on December 3, 2020.  (AC ¶¶ 64-65, 68, 70.)  The IPO raised over $300 million in net proceeds.  (AC ¶ 70.)

**B.      China's Early Measures to Regulate the After-School Tutoring Industry**

Due to the scarcity of upper-level education resources in China, students face intense pressure to succeed throughout their academic life.  (AC ¶ 36.)  Consequently, over 75% of K-12 students used some form of after-school tutoring to gain a leg up over their peers in the competition to secure admission to one of China's limited upper-level education institutions.  (AC ¶ 36-37.)

Long before 17 Education's IPO, powerful bodies within the PRC government declared that the excessive workload imposed by after-school tutoring programs had become detrimental to the well-being of K-12 students and, accordingly, their activities required regulation and oversight.  (AC ¶ 42.)  For example, in December 2017, China's President and paramount leader, Xi Jinping, and senior leaders of the State Council, the highest authority of the PRC's executive branch, identified the "heavy extracurricular burdens for primary and middle school students" as a "prominent problem[] in education" and vowed to take targeted measures to address it.  (AC ¶ 45.)

Soon thereafter, the PRC central government issued a series of reforms designed to standardize the activities of businesses in the burgeoning industry.  On February 13, 2018, several agencies, including the MOE, jointly promulgated a circular on alleviating after-school burdens on primary and secondary students ("Circular 3"), which prohibited after-school tutoring programs from providing training beyond the student's academic level or conducting exam-oriented training, and

authorized relevant authorities to conduct inspections to ensure compliance. (AC ¶ 46.) On August 6, 2018, the State Council issued the opinion on the regulation of the development of after-school tutoring programs ("State Circular 80"), which clarified that after-school tutoring businesses were prohibited from conducting training beyond the corresponding school syllabus or corresponding national curricular standards. (AC ¶ 48.) Then, on November 20, 2018, several agencies jointly issued a notice on improving the specific governance and rectification mechanisms of after-school tutoring programs ("Circular 10"), which made online after-school tutoring programs subject to the same regulations as brick-and-mortar tutoring programs. (AC ¶49.)

By February 2019, the PRC central government made clear that it planned to take additional steps to combat perceived abuses by after-school tutoring programs. On February 23, 2019, the State Council and the Central Committee of the Chinese Communist Party ("CCP"), the party's highest body when the National Congress is not in plenary session, released an implementation plan for modernizing China's education system through 2022 (the "Implementation Plan"), which, among other things, declared that "efforts will be made to reduce the excessive extracurricular burden of primary and secondary students and support primary and secondary schools to generally carry out after-school services," rather than private enterprise. (AC ¶ 53.)

Senior MOE officials also made clear that additional reforms were necessary to adequately alleviate extracurricular burdens that K-12 students continued to face. For example, on March 12, 2019, the Minister of Education, Chen Baosheng, explained that after-school tutoring businesses "shifted" their practices in response to the reforms in 2018 and, as such, new measures were necessary to "solve the problem of excessive extracurricular burdens for primary and middle school students." (AC ¶ 54.) A month later, another MOE official stated that the 2018 reforms were only an initial "step" in the comprehensive effort to reduce extracurricular burdens. (AC ¶ 54.)

As previewed by the MOE, six government bodies, including the MOE, issued opinions on regulating online after-school training in July 2019 (the "Online After-School Training Opinions"). (AC ¶ 55.)  The Online After-School Training Opinions placed further restrictions on online tutoring courses, including limiting classes to 40 minutes and prohibiting classes after 9:00 p.m.  (AC ¶ 55.)

Defendants surmise that none of these nascent regulations "foreshadow[ed] the eventual post-IPO demise of the private after-school tutoring industry."  (MTD 9.)  That non sequitur distracts from the fact that these developments showed that relevant authorities carried out their calls for more reform when they deemed the existing regulatory regime insufficient.

### C.    China's Renewed Plan to Overhaul the After-School Tutoring Industry

By the time of 17 Education's IPO, the PRC central government believed that its existing regulations did not sufficiently address the extracurricular burdens of students, and was poised to make further reforms which would fundamentally reshape the after-school tutoring market.

Beginning at the end of 2019, the MOE announced that its existing regulations did not sufficiently address the extracurricular burdens on K-12 students and it planned to make deeper reforms.  In November 2019, a senior MOE official informed media that excessive extracurricular burden remained a "problem" and, consistent with the Implementation Plan, the MOE was preparing new measures for the next stage of reform to "improve the level of . . . after-school services" at China's public schools. (AC ¶ 58.)  Then, in December 2019, the head of the MOE department responsible for overseeing after-school tutoring services explained that the regulation of after-school tutoring courses made "staged progress" but stressed that "more efforts are required" to effectively alleviate the burdens that students in such courses faced.  (AC ¶ 59.)

These plans were put on hold as the COVID-19 pandemic swept across the country in early 2020 and national attention shifted to preventing the spread of the disease, including at schools throughout China's education system. (AC ¶ 60.)

- 7 -

However, top officials made clear that the MOE planned to resume the industry clampdown in late 2020.  For example, on November 10, 2020, China's Minister of Education stated that the MOE would "regulate after-school training institutions, while increasing the supply of public education services" in the next phase of reform.  (AC ¶ 62.)  On December 2, 2020, another senior official confirmed that the MOE planned to "[d]eepen the governance of off-campus training institutions, and effectively reduce the excessive extracurricular burden of students and the burden of family education expenditures."  (AC ¶ 62.)  The following day, the MOE official responsible for overseeing after-school tutoring stated that China "will" take new measures in the near future to build out after-school education programs at public schools in China.  (AC ¶ 62.)

Defendants focus on other excerpts from these public statements and bury this barrage of consistent directives in a single sentence in their brief which asserts that government officials made "[o]ther public statements indicating that additional reform measures were being considered" which were "in line" with their previous regulations.  (MTD 12-13.)  That does violence to these admitted omissions.  Furthermore, the notable effort to highlight that none of these announcements expressly stated that authorities planned to "eradicate" private after-school tutoring (MTD 12) is little more than a ploy to distract from the fact that officials made abundantly clear in these announcements that they planned to make after-school tutoring available at public schools across China.

### D.    The Misleading IPO Registration Statement

Despite the steady stream of repeated announcements, the IPO Registration Statement painted a rosy picture of the Company's prospects without warning investors that relevant authorities were preparing to fundamentally reform the market in which its largest business operated.

The IPO Registration Statement provided that 17 Education's tutoring services were subject to a variety of PRC regulations, and contained a lengthy summary of existing regulations formally promulgated by PRC authorities governing "After-school Tutoring and Educational Apps," including

Circular 3, State Circular 80, Circular 10, and the Online After-School Training Opinions. (AC ¶¶ 72, 106.) But rather than warn investors about the MOE's planned reforms, the IPO Registration Statement declared that it "*uncertain* whether and how PRC government authorities would further promulgate new laws and regulations applicable to online training institutions" without making *any mention* of the planned reforms described above or warn that, as stated, they would significantly alter the landscape of the market for its largest businesses. (AC ¶¶ 108-09.) To the contrary, that filing touted that 17 Education planned to *continue growing* its K-12 after-school tutoring business. It also informed investors that, unlike competitors that were seemingly the target of the MOE's ire, its courses "*cater to students' learning needs*." (AC ¶ 104.)

These statements led investors to believe that, while it was always possible for regulations to change, there were no planned or anticipated regulatory threats to the Company's business—certainly not its largest and most important online tutoring business. In reality, at that time, (i) after-school tutoring services, including those provided by 17 Education, were considered by relevant Chinese authorities to impose "excessive" burdens on K-12 students; (ii) Chinese authorities had concluded that existing regulations, including Circular 3, State Circular 80, Circular 10, and the Online After-School Training Opinions, did not sufficiently address those burdens; (iii) relevant Chinese authorities planned to issue new reforms in 2021 to further restrict the activities of after-school tutoring businesses, and bring the services they offer under the care of public education institutions; and, as such, (iv) those reforms were reasonably likely to disrupt a business that accounted for over 90% of 17 Education's business.

### E. Regulatory Developments After the IPO

After 17 Education's IPO, the warnings by the PRC central government became even more pronounced. In January 2021, China's Education Minister characterized the abuses by after-school tutoring firms as an "urgent problem" and declared that the MOE sought to "liberate students from

- 9 -

after-school tutoring" in its forthcoming reforms.  (AC ¶ 73.)  On February 4, 2021, the MOE announced that one of its work goals for 2021 was to "deepen the governance of after-school training institutions."  (AC ¶ 75.)  The official release by the MOE expressly stated that, to carry out this goal, it would "[i]mprove the level of after-school services in primary and secondary schools" and "effectively reduce the burden of students' heavy homework . . . and [the] family financial burdens" associated with after-school tutoring.  (AC ¶ 75.)

Then, in early March 2021, China's President, Xi Jinping, described the after-school tutoring industry as a "stubborn disease" and vowed that China would "resolutely reform all activities that infringe on [the people's] interests under the banner of education."  (AC ¶ 76.)  Later that month, a top MOE official confirmed that "double burden reduction" was a key task for the MOE in 2021 and reiterated its plan to "strengthen the role of schools as the main place for education."  (AC ¶ 79.)

Defendants use the same tactic to sweep these updates under the rug, proclaiming in a single sentence that there were "aspirational comments by Chinese public officials calling for further regulation" in the months after the IPO without acknowledging, much less addressing, any of the specific statements summarized above. (MTD 15.)

### F.    The Misleading S-8 Registration Statement

On April 30, 2021, 17 Education filed another registration statement on Form S-8 (the "S-8 Registration Statement) to register over 100,000,000 shares of its Class A ordinary shares issuable upon the vesting or exercise of awards previously granted under its various share incentive plans, or reserved for future issuance under such plans.  (AC ¶ 81.)  The S-8 Registration Statement specifically noted that the Class A ordinary shares being registered therein may be represented by ADS upon their deposit with the relevant institution.  (AC ¶ 81.)  The S-8 Registration Statement was the only other registration statement filed by 17 Education to register Class A ordinary shares under the Securities Act other than the IPO Registration Statement.  (AC ¶ 82.)

The S-8 Registration Statement expressly incorporated the entirety of 17 Education's annual report on Form 20-F for the fiscal year ended December 31, 2020, previously filed with the SEC on April 9, 2021.  (AC ¶ 83.)  That document contained substantially the same regulatory disclosures as those in the IPO Registration Statement.  In other words, it continued to summarize the existing regulatory environment and potential risks relating thereto without making *any mention* of the regulatory developments described above or otherwise warn investors that that "double burden reduction" was one of the MOE's key tasks for 2021, and that it sought to "liberate students from after-school tutoring" through its reforms.  (AC ¶¶ 84, 120, 122-23.)

### G.        China's Long-Awaiting After-School Tutoring Reforms

Relevant authorities did exactly what they previously told the public they planned to do.  On May 21, 2021, President Xi Jinping presided over a meeting of the Central Committee's Commission for Deeping Overall Reform, during which it deliberated and adopted the Opinions of Further Reducing the Burden of Homework and Off-Campus Tutoring for Students in the Compulsory Education Period (the "Opinions").  (AC ¶ 87.)  Consistent with its previous public statements, on July 13, 2021, the MOE announced that all compulsory education institutions in China would provide students with after-school tutoring services starting in the fall semester of 2021.  (AC ¶ 88.)

On July 23, 2021, an unverified copy of the Opinions began circulating online.  (AC ¶ 89.)  Several media outlets which reviewed that document reported that the proposed regulations would dramatically overhaul the after-school tutoring industry.  (AC ¶ 89.)  For its part, 17 Education stated that "[t]he regulations have not been published" and "[i]t is the Company's policy not to comment on market speculations."  (AC ¶ 90.)

On July 24, 2021, bodies at the highest levels in the PRC central government, including the Central Committee of the CCP and the State Council, formally issued the Opinions.  (AC ¶ 91.)  The

- 11 -

Opinions imposed a number of draconian restrictions, including, most notably, that all existing after-school tutoring businesses must be "uniformly registered as nonprofits," meaning they could no longer profit from providing tutoring services (the "July 2021 Ban"). (AC ¶ 91.) Industry insiders described the July 2021 Ban as the "death knell" to the after-school education industry in PRC and stated that "[m]aking the sector nonprofit is just as good as eradicating [it]." (AC ¶ 91.)

On July 26, 2021, 17 Education issued a press release in response to the Opinions. (AC ¶ 92.) The release stated that it was "carefully considering the provisions of the Opinions and assessing their implications for the Company's business" but revealed for the first time that the reforms set out in the Opinions "*will have a material adverse impact on the Company's results of operations and prospect.*" (AC ¶ 92.) On August 25, 2021, 17 Education issued another press release in which it informed investors that it "will stop offering online [tutoring] classes over weekends, national holidays and school break periods," in accordance with the Opinions and reiterated that "*compliance . . .will have a material adverse impact on its business.*" (AC ¶ 94.)

By November 1, 2021, 17 Education's ADS **declined 92.1% from its IPO price** of $10.50 per ADS to close at just $0.83. (AC ¶ 96.) The Company announced that it decided to effect a change to its ADS ratio, which would increase its stock price by a multiple of four. (AC ¶¶ 96-97.)

On December 6, 2021, 17 Education announced that, due to the Opinions, it would "*cease offering tutoring services related to academic subjects to students from [K-12] in mainland China by the end of 2021,*" and, instead, focus on the in-school products which comprised a mere 7% of 17 Education's overall net revenue immediately prior to the IPO. (AC ¶ 98.)

Following this announcement, 17 Education's stock price continued to tumble and has not recovered. As of the filing of the AC, it traded at less than 95% of its IPO price. (AC ¶ 99.)

- 12 -

## LEGAL STANDARD

On a motion to dismiss, the Court must accept all well-pled facts as true and draw all reasonable inferences in the plaintiff's favor.  *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 120 (2d Cr. 2013).  To satisfy Rule 8(a), the complaint need only allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Dismissal is appropriate "only if the plaintiff fails to provide factual allegations sufficient to raise a right to relief above the speculative level."  *Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010).  The issue is not whether the plaintiff is likely to prove the facts alleged, but rather whether those facts, accepted as true, state a plausible claim.  *See N.J. Carpenters*, 709 F.3d at 125.

## ARGUMENT

Issuers generally must register securities under the Securities Act before they can be sold in a public offering.  Section 11 establishes liability for certain parties involved in such offerings for any registration statements that contain "an true statement of a material fact or omitted . . . a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  Section 15 imposes liability for anyone who "controls" such a party.  15 U.S.C. § 77o(a).

Section 11 imposes "a stringent standard of liability."  *Herman & Maclean v. Huddleston*, 459 U.S. 375, 381 (1983).  Unlike Section 10(b) of the Securities Exchange Act of 1934, a party asserting a Section 11 claim "need not allege scienter, reliance, or loss causation."  *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 84 (2d Cir. 2021).  Instead, it is only necessary to plead that a registration statement (1) contained a material misrepresentation; **or** (2) omitted facts required to be disclosed by law; **or** (3) omitted facts necessary to make what was disclosed not misleading.  *Id.*  As such, liability is "virtually absolute," even for "innocent[]" misstatements.  *IKB Int'l S.A. v. Bank of Am.*, 2014 WL 1377801, at *12 n.8 (S.D.N.Y. Mar. 31, 2014) (Kaplan, J.).  And because allegations

- 13 -

of fraud are not necessary to state a claim, the heightened pleading requirements of Rule 9(b) do not apply. In other words, such claims are subject to basic notice pleading under Rule 8. *See Litwin v. Blackstone Grp. L.P.*, 634 F.3d 706 (2d Cir. 2011); *see also N.J. Carpenters*, 709 F.3d at 120 (same).

The AC plainly meets this standard. Recognizing the strict nature of the claims asserted, Defendants raise an assortment of arguments in an attempt to avert liability, including that (1) the AC fails to plead material misstatements or omissions; (2) Plaintiffs' claims are time-barred; (3) negative causation bars any recovery; and (4) Lead Plaintiffs lack standing to challenge the S-8 Registration Statement. As explained below, each argument fails.

## I.    THE AC ADEQUATELY PLEADS MATERIAL OMISSIONS

There is, and can be, no dispute that the Registration Statements failed to disclose that, when each was filed, the Chinese government planned to make deeper reforms to the after-school tutoring industry in the near future to alleviate the "excessive" burdens imposed on students by businesses in that space, including by providing tutoring services at public schools in China. An omission of fact, like this, is actionable when there is a duty to disclose it. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). A duty to disclose can arise either from (i) a "statute or regulation requiring disclosure" or (ii) if disclosure is necessary to make the statements that were made not "inaccurate, incomplete, or misleading." *Id.* As explained below, both are present here.

### A.    Defendants Were Required to Disclose the Omitted Material Under Item 303

Putting aside, for the moment, whether any of the statements made in the IPO Registration Statement and S-8 Registration Statement were false or misleading—an issue that is addressed *infra* Part I.B—Defendants were affirmatively obligated to disclose the danger posed by the imminent reforms described above under Item 303 of Regulation S-K, codified at 17 C.F.R. § 229.303.

The SEC Forms used for, or incorporated in, 17 Education's Registration Statements required it to disclose the information called for by Item 303. (AC ¶¶ 112, 126.) As of the IPO, Item 303

- 14 -

required registrants to "[d]escribe any known trends or uncertainties . . . that [it] reasonably expects will have a material . . . unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii) (2020).  Based on interpretive guidance issued by the SEC in 1989, the Second Circuit has repeatedly held that disclosure is required under Item 303 "where a trend . . . event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations."  *Stratte-McClure*, 776 F.3d at 101 (citing Securities Act Release No. 6835, Exchange Act Release No. 26,831, 43 SEC Docket 1330 (May 18, 1989) ("1989 Guidance")).  It is now well-established that the failure to make this disclosure in a registration statement is actionable under Section 11.  *See, e.g.*, *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); *Litwin*, 634 F.3d at 716.

Effective February 10, 2021, *i.e.,* before the filing of the S-8 Registration Statement, the SEC reorganized and amended Item 303 to clarify that disclosure is required if any known trends or uncertainties "are reasonably likely to have," as opposed to *will* have, a material impact on registrant's financial results, consistent with its 1989 Guidance.  17 C.F.R. § 229.303(b)(2)(ii) (2021).  The amendments also codified the SEC's view that the purpose of Item 303 is to "allow investors to view the registrant from management's perspective" and, therefore, requires the disclosure of "material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results."  17 C.F.R. § 229.303(a) (2021).  The "obvious focus" of Item 303 is "preventing the latest reported results from misleading potential investors, thereby promoting a more accurate picture of the registrant's future prospects."  *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1192 (11th Cir. 2002).

By no later than December 2019, several MOE leaders announced that existing regulations—including those described in 17 Education's Registration Statements—did not sufficiently combat the excessive burdens imposed on students by extracurricular tutoring programs and therefore additional reform was necessary to correct the "problem." (AC ¶¶ 57-58.)  These efforts were sidelined as COVID-19 swept across China in 2020.  (AC ¶ 60.)  But after President Xi Jinping and the Central Committee formally endorsed enhancing the regulation of after-school tutoring programs in late 2020, numerous MOE officials declared in the weeks and days leading up to 17 Education's IPO that the MOE planned to resume the reform efforts first announced in late 2019, and one of the ways it planned to control the extracurricular burdens on students was *to supply after-school education services at public schools in China*.  (AC ¶ 61-62.)

Between the time of the IPO and the S-8 Registration Statement, these same messages became even more pronounced.  (AC ¶¶ 73-79.)  In January 2021, China's Education Minister declared that abuses by after-school tutoring firms was an "urgent problem" that required immediate reform.  (AC ¶ 74.)  Then, on February 4, 2021, the MOE specifically stated that its work goals for 2021 included both (1) increasing the after-school services at public schools in China; and (2) decreasing the extracurricular workload of students who receive after-school tutoring.  (AC ¶ 75.)  Even President Xi Jinping castigated after-school tutoring firms as a "stubborn disease" and resolved to reform the industry in March 2021.  (AC ¶ 76.)  If that were not enough, a top MOE official confirmed later that month that "double burden reduction" was a key task for the MOE in 2021 and reiterated its plan to "strengthen the role of schools as the main place for education."  (AC ¶ 79.)

Unable to deny these facts, Defendants first contend that the AC does not allege that any of the announcements were "known" by anyone at 17 Education.  (MTD 31.)  But this *ipse dixit*

overlooks several facts from which it can be inferred under the forgiving standard of Rule 8(a). *In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, at *4 (S.D.N.Y. Oct. 30, 2017) (Kaplan, J.) (inferring knowledge of Item 303 trend from several facts, "taken as a whole"); *see also Banerjee v. Zhangmen Educ. Inc.*, 2023 WL 2711279, at *13 (S.D.N.Y. Mar. 30, 2023) (Item 303 imposes a "soft" knowledge element that is "not a robust scienter standard"). Roughly 93% of 17 Education's revenues derived from its after-school tutoring business, which the IPO Registration Statement acknowledged was "subject to a variety of PRC regulations" promulgated by the MOE. (AC ¶¶ 41, 72.) 17 Education's "significant exposure" to changes in that regulatory regime decrease the plausibility that management was unaware of the announcements by key MOE officials, including China's Minister of Education and the head of the MOE department responsible for overseeing after-school tutoring. *Stratte-McClure*, 776 F.3d at 104. Furthermore, Defendant Lui spoke about the evolution of government policy over the past two years on 17 Education's first investor call in March 2021, and repeatedly represented on the next call in May 2021 that it was "closely monitoring" policy changes by the PRC central government. (AC ¶¶ 78, 86.) These "admission[s]" further demonstrate that the MOE's statements were, unsurprisingly, tracked internally. *CPI Card Grp.*, 2017 WL 4941597, at *4.[1]

Next, Defendants maintain that these regulatory changes were not "reasonably likely" to impact 17 Education's operations because there is no indication "that there would be new regulation, when it would come, what it would require, or what impact it would have on the Company's business." (MTD 32.) This misunderstands the law and the facts. Legally, it is of no consequence that the MOE spoke about its planned reforms prior to formally adopting new regulations to implement those plans. Item 303 expressly extends to "uncertainties," such as potential regulatory

---

[1] The sole authority cited by Defendants, *In re DraftKings Inc. Securities Litigation*, 2023 WL 145591, at *16 (S.D.N.Y. Jan. 10, 2023) (cited at MTD 31-32), is inapposite. There, the plaintiff was unable to plead that the company "knew" of a trend because it failed to allege *any* trend during the operative class period. *Id.* at *38. That is simply not the case here.

changes. *See Panther Partners*, 681 F.3d at 120 (heightened "uncertainty . . . generated by an increasing flow of highly negative information from key customers" triggered Item 303 disclosure). In fact, the SEC's 1989 Guidance includes an example in which "regulations have been proposed which, *if promulgated*, would require the expenditure by the Company of approximately $30 million" and directs management to make two assessments:

> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

1989 Guidance at *6 (emphasis added). The SEC's guidance further instructs that these assessments must be "objectively reasonable." *Id.* Citing this very example, the Second Circuit recently confirmed that proposed regulatory changes can sustain an Item 303 clam "even if Defendants could not determine with certainty that [the proposed regulatory change] would be implemented." *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, 2022 WL 17815767, at *3 (2d Cir. Dec. 20, 2022).

Factually, it does not follow—as Defendants appear to believe—that the regulatory statements lacked substantive detail merely because none previewed that the MOE would "eradicate" after-school tutoring in July 2021. (MTD 12, 15.) As of the IPO, senior MOE officials repeatedly confirmed that one way they planned to regulate the extracurricular demands on students was by bringing after-school tutoring under the control of public schools. (AC ¶¶ 58, 62.) Those same officials also made clear that the MOE not just *could* issue such reforms, but that it "planned to" and "will" do so in the next phase of reform. (AC ¶ 62.) These statements must also be read in light of the prior directive from the CCP to shift after-school services away from private enterprise

- 18 -

by no later than 2022. (AC ¶ 53.) Indeed, subsequent statements confirmed that this was an "urgent problem" that the MOE planned to address *in 2021*. (AC ¶¶ 73-75.) In addition, the MOE had a history of issuing stricter regulations when officials previously stated their intention to take measures to address excess burden. (AC ¶¶ 45-49, 54-55.) As in *Moab Partners*, it would not be "objectively reasonable" to conclude that the MOE's stated plans were unlikely to occur. 2022 WL 17815767, at *3. Accordingly, 17 Education was "required to evaluate [its] consequences on the assumption that it would come to fruition." *Id.*

On that point, there is no room for debate that the planned regulatory change could be anything short of material. The touchstone for materiality is if "there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92-93 (2d Cir. 2010). But because that is a "fact-specific" inquiry, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *N.J. Carpenters*, 709 F.3d at 126; *see also In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 501 (S.D.N.Y. 2010) (Kaplan, J.) (same). Here, after-school tutoring accounted for *93% of 17 Education's revenue* in the period immediately before the IPO. (AC ¶ 41.) Because that business was such a "significant" part of 17 Education's operations, "a reasonable investor would almost certainly want to know information related to that segment" which could negatively impact "its future revenues." *Litwin*, 634 F.3d at 720. At a minimum, the MOE's stated plan would either place public schools in direct competition with 17 Education or, worse, supplant it. (AC ¶ 4.) That is more than enough to "meet the relatively minimal burden" of adequately alleging materiality under Rule 8(a). *Litwin*, 634 F.3d at 718.

This would not, as Defendants appear to believe, require them to disclose "every negative comment about the industry made by politicians or regulators." (MTD 6, 30.)  As the Second Circuit explained in *Litwin*, 634 F.3d at 722-23, companies are under no obligation to disclose facts unless they are both "material" and subject to a "duty to disclose" under Item 303.  Plainly, not *every* statement by PRC authorities concerning the education industry will be material or, for that matter, constitute a trend or uncertainty reasonably likely to impact future results.  These two limitations "provide sufficient protection against the opening-of-the-floodgates argument." *Id.* at 723.

Nor, for the avoidance of doubt, is 17 Education insulated from Item 303's disclosure obligation because the omitted facts were already "publicly available." (MTD 11.)  At its core, Item 303 requires the disclosure of "whether, and to what extent, the particular known trend, event, or uncertainty might have been reasonably expected to materially affect" future revenues and "this potential future *impact* was certainly not public knowledge." *Litwin*, 634 F.3d at 718-19 (emphasis in original).  In fact, because it is mandatory, "a reasonable investor would interpret the absence of an Item 303 disclosure to imply the nonexistence of known trends or uncertainties" which pose a threat to future revenues. *Stratte-McClure*, 776 F.3d at 102 (citation omitted).

### B.    Defendants Made Material Misstatements

In addition to a statute or rule requiring disclosure, the law imposes a duty to disclose facts that are necessary to make the statements that were made "not misleading." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014).  This flows from the principle that "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Id.*  As is often said, the veracity of a statement is "measured not by its literal truth, but by its ability to accurately inform rather than mislead," which depends on "context and manner of presentation." *Smith Barney*, 595 F.3d at 92; *see also City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 67 (S.D.N.Y. 2015) (Kaplan, J.) (same).  Thus, even statements which are literally true can mislead "by virtue of

what they omit to disclose." *In re Vivendi Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).

The Registration Statements here did not tell the whole truth and were materially inaccurate. As explained below, the admitted failure to inform investors about the PRC central government's forthcoming reforms made several positive statements in its Registration Statements misleading, including those about (1) the regulatory landscape for after-school tutoring and potential changes thereto; (2) its existing customer base and bespoke product offerings; and (3) its planned growth. Each is alleged with sufficient detail to satisfy the short and plain statement standard of Rule 8(a).

### 1.    Defendants Misled Investors About the Regulatory Landscape for After-School Tutoring Services in China

In both Registration Statements, 17 Education included a lengthy summary of existing PRC regulations applicable to after-school tutoring services.  (AC ¶¶ 106, 120.)  It also represented that it was "*uncertain* whether and how PRC government authorities would further promulgate new laws and regulations applicable to online training institutions" and stated that "any adverse changes . . . in the policies of the PRC government or in the laws and regulations in China *could*," hypothetically, "adversely affect our business."  (AC ¶¶ 108-09, 122-23.)  As alleged, these statements were highly misleading because they presented adverse changes to that regulatory regime as a theoretical possibility when, in fact, relevant authorities repeatedly confirmed that they would issue new reforms in 2021 to further restrict the activities of after-school tutoring businesses and provide the services they offer at public schools.  (AC ¶¶ 107, 110, 121, 124.)  Defendants maintain that these disclosures shield them from liability because they accurately disclosed all applicable regulations and warned of the risk that later materialized.  (MTD 25.)  Defendants are mistaken.

To begin, Defendants confuse the issues by claiming that the AC seeks redress for the "nondisclosure of information that was actually disclosed."  (MTD 25.)  Lead Plaintiffs do not fault Defendants for failing to disclose the PRC's existing regulations, or the truism that those regulations

- 21 -

could change.  As explained above, the AC challenges these statements for failing to disclose not just that the MOE *could* tighten its existing regulations but that it *planned to do so* in the immediate future.  Defendants do not deny that 17 Education failed to disclose this, nor could they.

Merely warning that existing regulations *could* change does not relieve the Company of its duty to disclose this fact.  It is settled that "cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."  *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2009).  Indeed, it is misleading to phrase risks as a "hypothetical" if those risks "have already come to pass."  *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 409 (S.D.N.Y. 2020); *see also In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013) (warning "the untoward may occur when the event is contingent is prudent" but stating "it is only possible . . . when they have already occurred is deceit").

Defendants appear to believe that 17 Education did not face any such risk because the MOE did not propose any specific reforms and, instead, only offered a "hodgepodge of generic public comments." (MTD 4-5, 29.)  That is obvious attempt to minimize the plain meaning of the repeated statements by the MOE.  Based on the repeated specific assertions by the MOE prior to the IPO, it was "reasonably likely" that PRC authorities would soon promulgate new reforms to combat perceived abuses by after-school tutoring firms for all the reasons described *supra* Part I.A.  Thus, the hypotheticals described above failed to disclose information "critical to appreciating the magnitude of the risks described."  *Credit Suisse First Boston Corp. v. ARM Fin. Grp., Inc.*, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001); *see also Facebook*, 986 F. Supp. 2d at 516 (S.D.N.Y. 2013) (cautionary statement is misleading if "risks are . . . significantly greater or more certain than those portrayed in the prospectus").  It is of no moment that MOE had not yet issued those reforms. *See Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008) (there is a "critical

- 22 -

distinction between disclosing the risk a future event *might* occur" and that a key customer "*actually planned*" to take that action); *see also Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 647 (S.D.N.Y. 2012) (hypothetical risk did not disclose that current "outlook for [the] assets was gloomy").[2] A reasonable investor would fairly read the disclosure that PRC authorities "could" issue stricter regulations to mean that it was not actively preparing to do so.

To be sure, companies subject to government regulation cannot be expected to predict "coming regulation or its potential effect." *Kwalbrun v. Glenayre Techs., Inc.*, 201 F.3d 431 (2d Cir. 1999) (table). But the claims here, contrary to Defendants' repeated assertions (MTD 4, 5, 6, 12, 19, 29), require no such clairvoyance. They are, instead, rooted in the facts repeatedly and expressly communicated by the MOE before 17 Education's IPO set forth above, including that it planned to issue more stringent reforms *in 2021*, and one such measure was to *offer tutoring at public schools*.

Those facts set this case apart from those relied on by Defendants. For example, in *Garnett v. RLX Technology Inc.*, 2022 WL 4632323, at *19 (S.D.N.Y. Sept. 30, 2022), the PRC authorities merely "describe[d], in broad terms, ideas then under consideration" without announcing any "firm intention" to proceed in any specific manner. In addition, the plaintiff there proceeded on the theory that the reform that the authorities subsequently issued were a "*foregone conclusion*" at the time of those ruminations. *Id.* at *25 (emphasis added). Similarly, the outcome in *Zhangmen Education*, 2023 WL 2711279, at *10, was expressly "based on what plaintiff chose to include in the amended complaint" regarding the "communiques with Chinese regulators." Unlike the AC, the facts alleged in *Zhangmen* "left unclear the timing and form of [the proposed] regulations." *Id.*[3]

---

[2] The holding Defendants cite from *In re Greenlane Holdings, Inc. Sec. Litig.*, 511 F. Supp. 3d 1283 (S.D. Fl. 2021) (MTD 26), is limited to its facts. That case was premised on proposed *ordinances* concerning a social topic whose "passage" before city officials was far from certain. *Id.* Here, the MOE had a track record of carrying out its warnings.

[3] Defendants' remaining authority (MTD 25-26) is equally inapposite. *See Sandoz v. Waterdrop Inc.*, 2023 WL 1767526, at *10 (S.D.N.Y. Feb. 3, 2023) (IPO materials expressly disclosed risk of future regulatory investigations that were allegedly omitted); *Lorenzo v. BlueCity Holdings Ltd.*, 76 Misc. 3d 1226(A) (Sup. Ct. N.Y. Cty. 2022) (plaintiffs "fail to allege . . . what specifically was known at the time of the IPO" regarding regulations issued four months later).

Finally, it is no excuse that the MOE's statements were already "publicly available" and, thus, part of the "total mix of information," as Defendants claim. (MTD 29.) "Truth on the market" is an "intensely fact-specific" defense rarely appropriate for resolution on a motion to dismiss. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). The information must be "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Id.*; *see also Hou Liu v. Intercept Pharm., Inc.*, 2020 WL 1489831, at *6 (S.D.N.Y. Mar. 26, 2020) (Kaplan, J.) (same). And "the mere presence of sporadic news reports," much less foreign language news reports available exclusively via PRC sources, "should not be considered to be part of the total mix of information that would clarify or place in proper context" the alleged misstatements. *N.J. Carpenters*, 709 F.3d at 127 & n.12; *see also Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, 2014 WL 6466994, at *9 (S.D.N.Y. Nov. 18, 2014) (whether documents issued by foreign government were reasonably accessible to investors "cannot be resolved as a matter of law" on Rule 12(b)(6) motion).

This is particularly true with respect to the IPO Registration Statement. In it, 17 Education told investors that they should *not rely on any information outside of its four corners*, including, necessarily, the various reports of reform efforts by the MOE. (AC ¶ 71.) Given that "the [company] itself warned investors not to rely on the media, it would be unreasonable for a shareholder to consider the media pronouncements to be part of the relevant mix of information." *SEC v. Bank of Am. Corp.*, 677 F. Supp. 2d 717, 719 (S.D.N.Y. 2010); *see also Facebook*, 986 F. Supp. 2d at 522 (explaining that "a reasonable investor will not be charged to regard press reports as a reliable source of information after having read [a similar disclosure]").

### 2. Defendants Misled Investors About 17 Education's Existing Customer Base and Bespoke Services

17 Education also represented in the Registration Statements that its "library of tutoring

courses . . . cater to students' learnings needs" and "the trusted relationships we have developed with [customers]" to date "provide us with a large and familiar pool of prospective tutoring customers." (AC ¶¶ 102, 104, 116, 118.)  These statements were misleading because, at that time, Chinese authorities deemed the burdens placed on students by after-school tutoring businesses as so far beyond their needs that additional reform was necessary, and it planned to rectify the problem by having public schools provide after-school services to those students, including 17 Education's customers.  (AC ¶¶ 103, 105, 117, 119.)  Defendants raise only two conclusory arguments to support their claim that these allegations fail to state a claim, neither of which holds water.

First, Defendants assert, without citing any case law, that referring to the "trusted relationships" 17 Education built with customers and how it "cater[s] to students' learnings needs" is inactionable puffery.  (MTD 23.)  Puffery is a statement "so vague, broad, and non-specific that a reasonable investor would not rely on it" and, thus, "immaterial as a matter of law."  *In re Vivendi Univ., S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 572 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016). Neither fits that description.  Whether 17 Education "catered" to its students' learning needs was not mere optimism, but an assurance of fact made in the context of an industry which faced a series of regulatory clampdowns that restricted course content in an effort to standardize the burdens on students.  (AC ¶¶ 45-48, 55.)  Reinforcing the conclusion that this assertion was not puffery, the statement "identified specific sources" that allowed 17 Education to meet its "customers' needs."  *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *16 (E.D.N.Y. Sept. 27, 2019).  Further, Defendants misplace their focus on "trusted relationships" in the second statement.  Lead Plaintiffs do not take issue with the characterization of customer relationships, but rather the claim that they provided a "large pool" for more business.  *See Wang v. Cloopen Grp. Holdings Ltd.*, --- F. Supp. 3d ---, 2023 WL 2534599, at *9, 11 (S.D.N.Y. Mar. 16, 2023) (statement in IPO materials that Chinese

- 25 -

company had a "loyal customer base" for generating more business was not puffery).  Indeed, this statement "could reasonably be read as conveying a legitimate expectation of stability." *Id.* at *9.[4]

Relying on *RLX*, Defendants also appear to argue, in the alternative, that there was no duty to disclose based on the sweeping assertion that "nothing" in the Registration Statements was rendered misleading by the failure to disclose the MOE's "regulatory ruminations."  (MTD 29.)  But regardless of whether new regulations were set in stone, the MOE made it abundantly clear prior to the IPO that new reforms—in whatever form they took—were needed because after-school tutoring businesses continued to place burdens on students that were "excessive."  (AC ¶¶ 57-59, 62.) Between the IPO and the S-8 Registration Statement, the MOE continued to maintain that deeper regulation was necessary in 2021 to "reduce the heavy burden of after-school training for students." (AC ¶ 75.)  In any case, as explained above, the steady stream of pronouncements by the MOE were a far cry from those in *RLX*, which "describe[ed] in broad terms, ideas then under consideration." 2022 WL 4632323, at *19.  Here, the MOE declared in words of certainty that it planned to roll out reforms in 2021 that would fundamentally reshape the industry in which 17 Education operates.

### 3. Defendants Misled Investors Regarding Planned Growth for 17 Education's After-School Tutoring Business

Finally, the IPO Registration Statement stated that (i) the K-12 after-school tutoring market has grown rapidly in recent years, and that "this momentum is expected to continue" through at least 2024; and (ii) "we intend to . . . further grow our online K-12 after-school tutoring business."  (AC ¶¶ 100-01.)  These statements were misleading because 17 Education failed to disclose that the MOE's imminent plans to deepen the regulation of the after-school tutoring market, including its plan to offer tutoring at schools across China, posed a material risk to any future growth.  (AC ¶

---

[4] The underlying premise of Plaintiffs' case is not, as Defendants claim, that "17 Education's business was *too successful* and demand was *too high*."  (MTD 23.)  But even if that were true, it neither guaranteed continued success nor entitled 17 Education to be optimistic about its future in the face of repeated warnings by the MOE that it would further restrict the activities of after-school tutoring businesses and offer their services in public schools across China.

103.)    Recognizing the direct conflict between these representations and the omitted facts, Defendants raise three separate arguments in an attempt to vitiate these allegations.

First, Defendants submit that the statements about the growth of the industry up to the time of the IPO were not inaccurate.  (MTD 22-23.)  That argument misapprehends the law.  As noted above, "even an entirely truthful statement may provide a basis for liability." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 561 (S.D.N.Y. 2011).  In any case, the argument misses the point. Lead Plaintiffs challenge the statements about *future growth* that 17 Education elected to include in its IPO Registration Statement,[5] not the historic progress of the market.

Next, Defendants assert that its "forward-looking statements" are inactionable opinions. (MTD 24-25.)  As an initial matter, the representation that 17 Education presently intended to grow its tutoring business is not an opinion.  As this Court has previously held, opinions require the exercise of "judgment" and are, thus, subjective.  *MetLife*, 129 F. Supp. 3d at 68; *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185-86, 194 (2015) (a "statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not").  Either 17 Education *intended* to grow, or it did not. *See In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2016 WL 2757760, at *4 (S.D.N.Y. May 11, 2016) (Kaplan, J.) (that company "planned to adopt measures" was subject to verifiable "truth").  In any case, an opinion statement is actionable if (1) the speaker did not "hold the stated belief," **or** (2) omitted facts which call into question the "basis for . . . the opinion."  *MetLife*, 129 F. Supp. 3d at 69-70.  Here, the known facts regarding the MOE's forthcoming reform measures discussed above provide ample support for both under the short and plain statement standard of Rule 8(a).

---

[5] Defendants point out that the statement about the anticipated growth of the after-school tutoring market—but not the statement about 17 Education's plan to continue growing—reflected "projections made by a third-party research firm." (MTD 24 n.17.)  Either way, 17 Education decided to include those statements in its IPO materials.

Finally, Defendants incorrectly argue that these statements are protected by the "safe harbor" of the PSLRA for forward-looking statements. (MTD 23.) But material omissions of the type here fall outside the protection of the safe harbor. *See, e.g.*, *Rudani v. Ideanomics, Inc.*, 2020 WL 5770356, at *6 (S.D.N.Y. Sept. 25, 2020) ("Courts in this Circuit have consistently held that material omissions are not protected by the PSLRA safe harbor") (collecting cases). In addition, these statements were not accompanied by "meaningful cautionary language," as they must for the safe harbor to apply, 15 U.S.C. §78u-5(c)(1)(A)(i), given that those disclosures were themselves misleadingly incomplete for all the reasons discussed *supra* Part I.B.1. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 770 & n.5 (2d Cir. 2010) ("cautionary language that is misleading in light of historical fact cannot be meaningful" for PSLRA safe harbor); *see also In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013) (same for cautionary statements that "superficially warn[] of possible risks while failing to disclose critical facts" which make the risk more likely).

## II.    THE PREMATURE AFFIRMATIVE DEFENSES RAISED IN THE MOTION DO NOT DEFEAT LEAD PLAINTIFFS' CLAIMS

In their Motion, Defendants submit that Plaintiffs' claims are barred by the statute of limitations and an absence of loss causation. (MTD 19, 32.) These are both affirmative defenses to Plaintiffs' claims. Unlike a defense which negates the truth of alleged facts, an affirmative defense asserts "new facts" which, "if true, will defeat the plaintiff's . . . claim, *even if all allegations in the complaint are true*." *Carroll v. Trump*, 590 F. Supp. 3d 575, 581-82 (S.D.N.Y. 2022) (Kaplan, J.).

An affirmative defense is usually asserted in an answer, Fed. R. Civ. P. 12(b), but can be invoked on a pre-answer motion if it "appears on the face of the complaint." *Ia. Public Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010). Doing so at this stage, however, subjects the defense to a "more stringent standard" of review. *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). It will be sustained only if "facts supporting the defense appear on the face of the

complaint," and "it appears *beyond a doubt* that the plaintiff can prove *no set of facts* in support of his claim that would entitle him to relief." *Id.* (emphasis added); *see also In re SKAT Tax Refund Scheme Litig.*, 2021 WL 2689908, at *2 (S.D.N.Y. June 30, 2021) (Kaplan, J.) (same).  In other words, the defense fails if there is any "factual dispute" regarding the defense. *Philogene v. Duckett*, 2018 WL 3946447, at *7 (S.D.N.Y. Aug. 16, 2018); *see also* 5 Wright & Miller, Fed. Prac. & Proc. Civil § 1277 (2023) (there must be no "disputed issue of fact" for an affirmative defense to defeat a claim on a pre-answer motion). As explained below, Defendants fail to carry this burden.

### A.      Lead Plaintiffs' Claims Are Timely

The Securities Act has a one year statute of limitations.  *See* 15 U.S.C. § 77m.  The limitations period does not accrue until an investor should have discovered the "violation" of the Securities Act.  *FHFA v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017).  And a violation is not discovered until the investor learns sufficient facts to "plead it in a complaint" with enough "detail" to survive a motion to dismiss.  *Id.*  It undisputed that this action was commenced on July 19, 2022, less than one year after the PRC central government issued the July 2021 Ban and 17 Education announced its anticipated impact on July 26, 2021.  (AC ¶ 91-92.)  Nevertheless, Defendants maintain that the action is untimely because Lead Plaintiffs cite public comments by PRC authorities prior to July 19, 2021 in support of their claims.  (MTD 19.)  Defendants misconstrue the facts and the nature of Lead Plaintiffs' claims.

As an initial matter, none of these "sporadic news reports" are properly considered part of the "total mix of information" that investors are deemed to know as a matter of law. *N.J. Carpenters*, 709 F.3d at 127.  The Court need not go any further.  But even if it were inclined to consider these statements as part of the total mix, Defendants' argument falls apart for several independent reasons.

First, none of the public statements that a reasonably diligent investor would consider would put him or her on notice of misstatements or omissions in the IPO materials.  Investors were

- 29 -

expressly told in the IPO Registration Statement *not* to consider any of the pre-IPO commentary by PRC officials.  (AC ¶ 71.)  If anything, 17 Education should be estopped from arguing that investors should have discovered its misstatements from the very materials it told them *not to review*.  *See Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995) ("A defendant may be equitably estopped from asserting the statute of limitations in cases where . . . defendant's conduct caused the plaintiff to delay in bringing his lawsuit.").  Further, none of the post-IPO statements suggested that there were misstatements or omissions in 17 Education's disclosures *as of the IPO*.  Rather, those statements expressed present concerns and future plans without retrospect.  (AC ¶¶ 73-77, 79.)

More fundamentally, none of the statements or media articles before July 26, 2021—pre-IPO, post-IPO, or otherwise—divulged that the forthcoming reforms would materially impact 17 Education's business.  Contrary to Defendants' rhetoric (MTD 19), Lead Plaintiffs do not allege that 17 Education should have "predicted" the July 2021 Ban based on the MOE's public statements.  Rather, they allege that the Registration Statements should have transparently warned that stricter reforms were on the horizon which posed a material risk to its continued growth and future results.

This does not mean that Lead Plaintiffs are attempting to "have it both ways."  (MTD 20.)  There is an notable information asymmetry between investors, like Lead Plaintiffs, and 17 Education.  Unlike the Company, investors are not in a position to know if, for example, 17 Education was in contact with PRC authorities and secured an exemption from the upcoming regulations or otherwise had reason to believe the change in programming at public schools would not interfere with 17 Education's tutoring business.  And investors had every reason to believe that the absence of an Item 303 disclosure by 17 Education meant "the nonexistence of known trends or uncertainties" reasonably likely to impact future revenues.  *Stratte-McClure*, 776 F.3d at 102 (citation omitted).  That was not apparent until July 26, 2021, when 17 Education disclosed that the

July 2021 Ban "will have a material adverse impact" on its results.  (AC ¶ 92.)

At the very least, disputes of this type regarding "the timing and content of disclosures only underscores the impropriety of resolving these issues [for an affirmative defense] on a motion to dismiss."  *Levine v. AtriCure, Inc.*, 594 F. Supp. 2d 471, 476 (S.D.N.Y. 2009); *see also Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 642 (S.D.N.Y 2017) (issues of fact surrounding when disclosures revealed the "impact" of change in tax rate on "the future of the company" and corresponding decline in stock price precluded pre-answer limitations defense).  *Nurlybayev v. ZTO Express (Cayman) Inc.*, 2021 WL 1226865, at *4 (S.D.N.Y. Mar. 31, 2021), relied on by Defendants (MTD 19), is not to the contrary.  In that case, unlike here, there was "no dispute that more than one year elapsed between the publication of the information on which Plaintiffs rely to assert their . . . claims and Plaintiffs' motion for leave to amend to assert those claims."  *Id.*[6]

### B.      Defendants' Negative Causation Argument Is Meritless

While Lead Plaintiffs need not allege loss causation to state a Section 11 claim, the absence of it, known as "negative causation," is an affirmative defense to such a claim.  *In re Lehman Bros. Sec. & ERISA Litig.*, 131 F. Supp. 3d 241, 265 (S.D.N.Y. 2015) (Kaplan, J.).  To prevail, a defendant "bears the burden of demonstrating that something other than the misstatement . . . caused plaintiff's loss."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009).  Because this is "fact-intensive," *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007), it is usually inappropriate to raise the defense before summary judgment.  *See Facebook*, 986 F. Supp. 2d at 523 (collecting cases).  Nevertheless, Defendants insist that none of the losses sustained by investors were caused by the alleged misstatements or omissions because it is apparent from the face of the

---

[6] Defendants' remaining cases are similarly off-point because all involved earlier disclosures that directly revealed what was allegedly omitted in the IPO filing.  *See Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 521 (S.D.N.Y. 2016) ("This article clearly describes the allegedly misrepresented facts undergirding the Complaint"); *Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 351-52 (S.D.N.Y. 2014) (similar).

AC that (1) 17 Education lost 78% of its stock price before the July 2021 Ban; and (2) the July 2021 Ban did not expressly reveal that 17 Education made misstatements or omissions in its Registration Statements. (MTD 33.)  They are wrong.

Defendants claim that 17 Education cannot be responsible for the "drop in its stock price . . . prior to any alleged corrective disclosures." (MTD 33.)  That may be true as a general matter upon competent proof, but the fact that its stock price declined before the July 2021 Ban—the only fact Defendants cite in support of their defense—does not, at the pleading stage, *disprove* a connection between those declines and the misconduct alleged.  As Judge Holwell explained in *Levine*, 508 F. Supp. 2d at 274, the official announcement of an adverse event does not *negate* the factual presumption, applicable in all Section 11 cases, that earlier declines were caused by the misconduct, particularly when facts suggest the undisclosed risks "leak[ed]" into the marketplace earlier.  *See also In re WRT Energy Sec. Litig.*, 2005 WL 2088406 (S.D.N.Y. Aug. 30, 2005) (same).  Here, Defendants neglect to mention that the steady decline in 17 Education's stock price began in early March 2021 (Ex. W), when President Xi Jinping condemned after-school tutoring firms as a "stubborn disease" and vowed to "reform" their activities.  (AC ¶ 76.)  They also ignore that the stock price continued to tumble thereafter as new details about the potential shape of the new reforms were reported during that time, as evidenced from the numerous media articles that Defendants attach to their Motion.  (Exs. O-R.)

In any case, it is undisputed, and evident from Exhibit W, that the stock price declined on heavy volume in response to July 2021 Ban and several disclosures between then and December 2021, which revealed its impact on 17 Education's business.  (AC ¶¶ 89-98.)  As such, this is not a case where it is apparent from the face of the complaint that the "share price went up between the date of the [corrective disclosures] and the date [plaintiff] filed suit," as in *Amorosa v. AOL Time*

*Warner, Inc.*, 409 F. App'x 412, 417 (2d Cir. 2011), relied on by Defendants. (MTD 33.)[7]

The remaining argument that the July 2021 Ban did not "reveal any prior misrepresentation or omission" (MTD 33) is unpersuasive as "Defendants have not offered an alternative explanation" for the losses and, thus, fail to carry their burden of *proving* the affirmative defense on a pre-answer motion. *Inovalon Holdings*, 254 F. Supp. 3d at 644. Moreover, a corrective disclosure "need not be a 'mirror image' tantamount to a confession." *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *29 (S.D.N.Y. Mar. 23, 2017); *see also Facebook*, 986 F. Supp.2d at 487 (that disclosure did not mention subject of misconduct is "not fatal"). Loss causation requires only that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). An industry ban was plainly within the zone of risk concealed by Defendants' misstatements and omissions regarding the MOE's plans to issue more stringent reforms for that very industry. *See In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 305-06 (S.D.N.Y. 2011) (Kaplan, J.) (explaining materialization of concealed risk approach for loss causation).

## III.    LEAD PLAINTIFFS HAVE STANDING TO BRING THE CLAIMS ASSERTED

Buried at the end of the Defendants' brief is a half-hearted argument that Lead Plaintiffs lack standing to challenge the S-8 Registration Statement. (MTD 33-34.) They lack standing, Defendants say, because only purchasers who can "trace" their shares to the S-8 Registration Statement can sue, and Lead Plaintiffs do not allege that any Class A ordinary shares were issued pursuant to that filing. (MTD 34.) This argument confuses the distinct issues of statutory standing and class standing.

---

[7] The other cases cited by Defendants are similarly distinguishable. *See In re State St. Bank & Trust Co. Fixed Income Funds Inv Litig.*, 774 F. Supp. 2d 584, 590-95 (S.D.N.Y. 2011) (share price of mutual fund is determined by trading price of underlying securities based on fund's NAV formula, not statements by the fund regarding the composition of its portfolio); *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 419 (S.D.N.Y. 2009) (issuer's share price declined 90% from the IPO price before "the sole disclosure upon which Plaintiff relies to establish loss causation").

In *DeMaria v. Andersen*, 318 F.3d 170, 178 (2d Cir. 2003), the case cited by Defendants, the Second Circuit held that "aftermarket purchasers who can trace their shares to an allegedly misleading registration statement have standing to sue" *based on the statutory text of Section 11*. Here, Defendants concede (as they must) that Lead Plaintiffs made many purchases of 17 Education's ADS between the filing of the IPO Registration Statement and the S-8 Registration Statement, as set forth in the certifications they filed with the Court (ECF No. 19-3), and, thus, have standing to challenge misstatements and omissions in the IPO Registration Statement. Because there had only been one stock offering at the time of those purchases (AC ¶ 82), there is no question that Lead Plaintiffs have standing to sue Defendants in their own right. *See DeMaria*, 318 F.3d at 177.

But whether Lead Plaintiffs have standing to bring claims on behalf of others who purchased pursuant to a separate registration statement—that is, whether they have "class" standing under Rule 23—"does not turn on whether [they] have statutory or Article III standing." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 158 (2d Cir. 2012). Instead, the relevant question is whether the misconduct implicates the "same set of concerns" as the misconduct giving rise to Plaintiffs' injuries. *Id.* That is assuredly the case here given that S-8 Registration contained *identical* omissions and misstatements as in the IPO Registration Statement with respect to the *same* security issued by the *same* Company. (AC ¶¶ 65, 81, 102-14, 116-27)  No more is required. Whether there are any individuals who fall within that class of investors is an issue for class certification. For present purposes, Lead Plaintiffs are entitled to the reasonable inference that Defendants would not go through the time and expense of filing the S-8 Registration Statement unless they planned to issue some of the 100,000,000 Class A ordinary shares registered therein, and it was reasonably expected that employees would deposit those shares for ADS in the United States, particularly given that the ADS was the only means to publicly liquidate those holdings.

## IV.     THE AC ADEQUATELY PLEADS A CONTROL PERSON CLAIM

To state a control person claim under Section 15 of the Securities Act, a complaint must allege (1) a primary violation of Section 11; and (2) control over the primary violator. *See MetLife*, 928 F. Supp. 2d at 720. The *only* argument Defendants offer to dismiss this claim is that the AC fails to plead a primary violation. (MTD 22 n.16.). Because the AC alleges primary violations for all the reasons stated above, this claim must "stand." *Lehman Bros.*, 799 F. Supp. 2d at 319.

### CONCLUSION

For all the above reasons, Defendants' Motion to dismiss should be denied in its entirety.[8]

Dated: May 30, 2023                              Respectfully submitted,

                                                 */s/ Justin D. D'Aloia*
                                                 Jeremy A. Lieberman
                                                 Justin D. D'Aloia
                                                 POMERANTZ LLP
                                                 600 Third Avenue
                                                 New York, New York 10016
                                                 Telephone: (212) 661-1100
                                                 Facsimile: (212) 661-8665
                                                 jalieberman@pomlaw.com
                                                 jdaloia@pomlaw.com

                                                 *Counsel for Lead Plaintiffs and the Class*

                                                 Junbo Hao
                                                 HAO LAW FIRM
                                                 Room 3-401 NO. 2 Building
                                                 No. 1 Shuangliubei Street
                                                 100024 Beijing
                                                 People's Republic of China
                                                 Telephone: +86 137-1805-2888
                                                 jhao@haolaw.cn

                                                 *Additional Counsel for Lead Plaintiffs*

---

[8] Should the Court find that the AC contains deficiencies, Plaintiffs respectfully request leave to amend. *See* Fed. R. Civ. P. 15(a)(2). Granting leave would be proper under the circumstances. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies").