USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/20/2023

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **Wong Haping, et al.,** | |
| **Plaintiffs,** | |
| **-against-** | |
| **17 Education & Technology Group Inc., et al.,** | |
| **Defendants.** | |

**1:22-cv-09843 (LAK) (SDA)**

**REPORT AND RECOMMENDATION**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

**TO THE HONORABLE LEWIS A. KAPLAN, UNITED STATES DISTRICT JUDGE:**

This case arises out of statements made in connection with the initial public offering ("IPO") of 17 Education & Technology Group Inc. ("17 Education").[1] The First Amended Complaint ("FAC") alleges violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"). (FAC, ECF No. 37, ¶¶ 134-56.)

Pending before the Court is a motion by Defendants 17 Education, Cogency Global Inc. ("Cogency") and Colleen A. De Vries ("De Vries") (the "Moving Defendants"), pursuant to Rules 8(a) and 12(b)(6) of the Federal Rules of Civil Procedure, for an Order dismissing the FAC of

---

[1] The statements are contained in the Registration Statement, filed on November 13, 2020 on Form F-1 (the "Initial IPO Registration Statement"); the amendment to the Initial IPO Registration Statement filed on November 27, 2020 on Form F-1/A (the "Amended IPO Registration Statement," and together with the Initial IPO Registration Statement, the "IPO Registration Statement"); the registration statement filed on November 27, 2020 on Form F-6 to register the American depositary shares ("ADSs") representing the Class A ordinary shares to be issued in connection with the IPO; and the registration statement filed on April 30, 2021 on Form S-8 (the "S-8 Registration Statement"). (FAC ¶¶ 1, 64-66, 81.)

Plaintiffs Wong Haping ("Haping") and He Xianghong ("Xianghong") (collectively, "Plaintiffs").[2] (Moving Defs.' 3/31/23 Not. of Mot., ECF No. 61.)

For the reasons set forth below, I respectfully recommend that the Moving Defendants' motion be GRANTED and that this action be dismissed in its entirety.

**FACTUAL BACKGROUND[3]**

I.    **Parties**

Plaintiffs purchased ADSs pursuant and/or traceable to either the IPO Registration Statement or the S-8 Registration Statement. (FAC ¶ 19.) 17 Education is a holding company registered in the Cayman Islands that operates in the People's Republic of China ("PRC") through several wholly owned subsidiaries. (*Id*. ¶ 33.) To comply with PRC laws regarding foreign ownership, those subsidiaries, in turn, conduct 17 Education's business through several China-based variable interest entities (each a "VIE"), whose relationships with 17 Education's direct subsidiaries are defined by a series of contractual arrangements. (*Id*. ¶ 33.) 17 Education provides

---

[2] Defendants Morgan Stanley & Co. LLC, Goldman Sachs (Asia) L.L.C., BofA Securities, Inc., China Renaissance Securities (Hong Kong) Limited and Tiger Brokers (NZ) Limited (the "Underwriter Defendants"), who served as underwriters for 17 Education's IPO, also seek to dismiss the FAC and joined in the arguments contained in the Moving Defendants' motion insofar as such motion related to claims against the Underwriter Defendants. (*See* Underwriter Defs.' 3/31/23 Joinder, ECF No. 64.) Defendants Andy Chang Liu, Michael Chao Du, Dun Xiao, Tuck Lye Koh, Qin Wen, Jiawei Gan and Bing Yuan (collectively, the "Chinese Individual Defendants") have not yet appeared in this action.

[3] For purposes of the pending motion to dismiss, the Court accepts Plaintiffs' allegations as true and draws all reasonable inferences in their favor. *See City of Providence v. BATS Glob. Mkts., Inc*., 878 F.3d 36, 50 (2d Cir. 2017). In addition, the Court includes discussion of relevant sections of the IPO Registration Statement, which is referenced in the FAC, which sections are not included as part of the FAC. *See ATSI Commc'ns v. Shaar Fund, Ltd*., 493 F.3d 87, 98 (2d Cir. 2007) (in considering motion to dismiss, court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

technology-based K-12[4] education services in the PRC for teachers, students and parents. (*Id*. ¶ 32.)

II.     **The IPO**

Although 17 Education initially was established as an in-school service provider, it launched an online after-school tutoring business in 2017, which rapidly grew to comprise 93% of total net revenues as of September 30, 2020, as demand for those services in the PRC increased. (FAC ¶¶ 2, 39-41.) Seeking to capitalize on the success of its after-school tutoring business, 17 Education raised over $300 million from U.S. investors in early December 2020 by conducting an IPO of its ADSs at $10.50 per ADS pursuant to the IPO Registration Statement. (*Id*. ¶¶ 3, 64-68.) Then, in late April 2021, 17 Education registered additional shares issuable in the form of ADSs under its employee share incentive plans in the S-8 Registration Statement. (*Id*. ¶¶ 3, 81.)

Plaintiffs contend that the IPO Registration Statement and the S-8 Registration Statement were negligently prepared and failed to warn U.S. investors that relevant PRC authorities were poised to make sweeping and long-awaited reforms in 2021 to the after-school tutoring industry, including having public schools offer after-school tutoring services and, thus, compete with, if not supplant, private enterprise.[5] (*See* FAC ¶ 4.)

---

[4] "K-12" refers to kindergarten through the last year of high school. (FAC ¶ 2.)

[5] These reforms were designed to address the widespread public concern that businesses in the after-school tutoring industry were placing an excessive burden on students who already faced a heavy school workload (in what became known as a "double burden"). (*See* FAC ¶ 4.)

### III.    Pre-IPO Education Reforms Under Consideration In PRC

The FAC discusses the reforms that were under consideration prior to the IPO in some detail. For example, in February 2019, the PRC central government had released an action plan for modernizing China's education system. (FAC ¶¶ 5, 53.) The action plan stated that, by no later than 2022, efforts would be made to reduce the excessive extracurricular burden of primary and secondary students and support primary and secondary schools to generally carry out after-school services, instead of privately-owned businesses. (*Id*.)

By the end of 2019, key leaders in PRC's Ministry of Education ("MOE")—the department responsible for overseeing public schools and after-school tutoring businesses, like 17 Education—had announced that its existing regulations were insufficient to effectively reduce the extracurricular burdens on primary and secondary school students and it planned make deeper reforms to the after-school industry to meet public expectations, in particular by enhancing the after-school services offered in schools throughout PRC's public school system. (FAC ¶¶ 6, 55-59.) Those plans were put on hold as the COVID-19 pandemic swept across the country in early 2020, and national attention shifted to preventing the spread of the disease. (*Id*. ¶¶ 7, 60.)

On November 10, 2020, PRC's Minister of Education stated that the MOE would regulate after-school training institutions, while increasing the supply of public education services in the next phase of reform. (FAC ¶¶ 8, 62.) Soon thereafter, other senior officials explained that the MOE would deepen its regulation of the after-school tutoring industry in 2021 and, to that end, build out after-school education programs at public schools in China. (*Id*.)

4

Notwithstanding the foregoing, according to Plaintiffs, the IPO Registration Statement failed to warn investors that the PRC central government was preparing to fundamentally reform the market in which 17 Education's largest business operated. (FAC ¶¶ 10, 72.) Plaintiffs contend that the IPO Registration Statement contained a lengthy recitation of existing regulations but failed to make any mention of the PRC's reform initiatives, and indicated that 17 Education planned to continue growing its K-12 after-school tutoring business. (*Id*.)

IV.    **IPO Registration Statement Disclosures**

The disclosures contained in the IPO Registration Statement relating to regulations promulgated by PRC authorities and the growth of 17 Education's business, including its K-12 after-school tutoring business, as well as the risks associated therewith, are as follows:

**PROSPECTUS SUMMARY**

*The following summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and financial statements appearing elsewhere in this prospectus. In addition to this summary, we urge you to read the entire prospectus carefully, especially the risks of investing in the ADSs discussed under "Risk Factors," before deciding whether to invest in the ADSs. . ..*

. . .

**Our Strategies**

We are dedicated to enabling all children across China to enjoy high-quality, personalized learning and realize their full potential with our "in-school + after-school" integrated model. We intend to achieve this goal by pursuing the following strategies:

- expand our in-school solution coverage and deepen adoption within our existing network;

- further grow our online K-12 after-school tutoring business;

- continue to focus on the quality of content offering and user experience;

- strengthen our technologies and data analytics capabilities; and

- explore new types of education product offerings.

. . .

***Investing in the ADSs involves risks. See "Risk Factors" beginning on page 20 for factors you should consider before buying the ADSs.***

. . .

**Summary of Risk Factors**

Investing in the ADSs involves significant risks. You should carefully consider all of the information in this prospectus before making an investment in the ADSs. Below please find a summary of the principal risks we face, organized under relevant headings. These risks are discussed more fully in the section titled "Risk factors."

**Risks relating to our business and industry**

Risks and uncertainties relating to our business and industry include, but are not limited to, the following:

. . .

• Uncertainties exist in relation to new legislation or proposed changes in the PRC regulatory requirements regarding online private education and smart in-school classroom solutions, which may materially and adversely affect our business, financial condition and results of operations . . .

. . .

**RISK FACTORS**

*An investment in the ADSs involves significant risks. You should carefully consider all of the information in this prospectus, including the risks and uncertainties described below, before making an investment in the ADSs. Any of the following risks could have a material adverse effect on our business, financial condition and results of operations. In any such case, the market price of our ADSs could decline, and you may lose all or part of your investment.*

. . .

**Risks Relating to Our Business and Industry**

. . .

***Uncertainties exist in relation to new legislation or proposed changes in the PRC regulatory requirements regarding online private education and smart in-school classroom solutions, which may materially and adversely affect our business, financial condition and results of operations.***

The private education industry and smart in-school classroom solution industry in the PRC are subject to regulations in various aspects. Relevant rules and regulations are relatively new and evolving and could be changed to accommodate the development of the education, in particular, the online private

education, markets and the further adoption of smart in-school classroom solutions from time to time.

. . .

Given the foregoing [disclosures regarding existing laws and regulations], the interpretation and application of the existing laws and regulations and the newly promulgated implementation rules and interpretations, if any, that govern the online private education industry and the smart in-school classroom solution industry would create substantial uncertainties regarding the legality of our business operation, which create risks that we may be found to violate the existing laws and regulations and any newly promulgated implementation rules and interpretations. It is also uncertain whether and how PRC government authorities would further promulgate new laws and regulations applicable to online training institutions and the smart in-school classroom solution industry, including those promulgated to apply more stringent social and ethical standards in the education sector in general. There is no assurance that we can comply with any newly promulgated laws and regulations in a timely manner or at all, and any failure to comply may materially and adversely affect our business, financial condition and results of operations.

. . .

### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

You should read the following discussion and analysis of our financial condition and results of operations in conjunction with the section entitled "Selected Consolidated Financial Data" and our consolidated financial statements and the related notes included elsewhere in this prospectus. This discussion contains forward-looking statements that involve risks and uncertainties about our business and operations. Our actual results and the timing of selected events may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those we describe under "Risk Factors" and elsewhere in this prospectus. See "Special Note Regarding Forward-Looking Statements."

. . .

### General Factors Affecting Our Results of Operations

Our results of operations are affected by the general factors driving China's education industry. We have benefited from China's overall economic growth, significant urbanization rate, and higher per capita disposable income of households, and increased penetration of internet and mobile applications in China. Our results of operations are also subject to changes in the regulatory landscape affecting China's education industry, particularly uncertainties relating to both in-school and after-school educational services. The PRC government

7

regulates various aspects of our business and operations, including the qualification, licensing or filing requirements for entities that provide education services and limitations on foreign investments in the education industry. See "Risk Factors—Risks Relating to Our Business and Industry—Uncertainties exist in relation to new legislation or proposed changes in the PRC regulatory requirements regarding online private education and smart in-school classroom solutions, which may materially and adversely affect our business, financial condition and results of operations."

. . .

### INDUSTRY

*The information presented in this section has been derived from an industry report dated September 16, 2020 and commissioned by us and prepared by Frost & Sullivan, an independent research firm, to provide information regarding our industry and our market position in China. Neither we nor any other party involved in this offering has independently verified such information, and neither we nor any other party involved in this offering makes any representation as to the accuracy or completeness of such information. Investors are cautioned not to place any undue reliance on the information, including statistics and estimates, set forth in this section or similar information included elsewhere in this prospectus*. . . .

. . .

### China's K-12 After-School Tutoring Market

China's K-12 after-school tutoring market includes tutoring services for all academic subjects taught in K-12 schools in both offline and online formats. The fierce competition for admission to top schools and universities in China has driven the vast demand for K-12 after school tutoring service in China. The market has grown rapidly over the past few years, and this momentum is expected to continue in the near future. This growth in China's after-school tutoring market has been primarily driven by the significant increase in disposable income of families in China, the significant role that K-12 education outcomes have on a student's life and career and the strong emphasis placed on education in Chinese culture. In the near future, while these factors are expected to continue to drive growth, the increasing adoption of online tutoring courses will serve as the main accelerant for the overall K-12 after school tutoring market, as it will enable many more student to access high-quality, of educational content at their convenience.

. . .

**BUSINESS**

. . .

**Our Strategies**

We are dedicated to enabling all children across China to enjoy high-quality, personalized learning and realize their full potential with our "in-school + after-school" integrated model. We intend to achieve this goal by pursuing the following strategies:

. . .

***Further Grow Our Online K-12 After-school Tutoring Business***

We will continue to explore the synergies between our massive school network and our rapidly growing online after-school tutoring business. We aim to fully develop the content and user base potential of our well-established smart in-school classroom solution in order to drive the continued rapid and largely organic growth of our paid course enrollments. We plan to bring even more measurable improvements in academic performance through further enhancement in learning efficiency and a more personalized learning experience. We also intend to offer additional courses to cater to more diversified learning needs, drive repeat purchase and maximize the lifetime value of our users.

. . .

**REGULATION**

This section sets forth a summary of the most significant rules and regulations that affect our business activities in China or the rights of our shareholders to receive dividends and other distributions from us.

**PRC Regulations**

We operate our business in China under a legal regime created and made by PRC lawmakers consisting of the National People's Congress, or the NPC, the country's highest legislative body, the State Council, the highest authority of the executive branch of the PRC central government, and several ministries and agencies under its authority, including the Ministry of Education, or the MOE, the Ministry of Industry and Information Technology, or the MILT, the State Administration for Market Regulation (formerly known as the State Administration for Industry and Commerce), or the SAMR, and the National Press and Publication Administration (formerly known as the State Administration of Press Publication Radio Film and Television). This section summarizes the principal PRC regulations related to our business.

. . .

9

**Regulation Relating to After-school Tutoring and Educational Apps**

[disclosing February 2018 to June 2020 regulations]

(IPO Registration Statement, ECF No. 62-2, at PDF pp. 2, 6, 9-11 (4-6), 25 (20), 30-31 (25-26), 99-100 (94-95), 127 (122), 129 (124), 133 (128), 138 (133), 155 (150) (emphases in original).[6])

In addition, the IPO Registration Statement expressly informed investors that certain of its disclosures were forward-looking statements:

### SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus contains forward-looking statements that reflect our current expectations and views of future events. The forward-looking statements are contained principally in the sections entitled "Prospectus Summary," "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business." Known and unknown risks, uncertainties and other factors, including those listed under "Risk Factors," may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements.

. . .

We have based these forward-looking statements largely on our current expectations and projections about future events that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include statements relating to:

• our mission, goals and strategies;

• our future business development, financial condition and results of operations;

• the expected growth of the online education industry in China;

. . .

• relevant government policies and regulations relating to our industry;

general economic and business conditions globally and in China . . .

. . .

---

[6] Citations to the IPO Registration Statement are made to the PDF page numbers contained in ECF No. 62-2. Where the PDF pages correspond to page numbers of the Statement itself (aside from the introductory pages), those page numbers are included in parentheses after the PDF page number. For example, PDF page 9 corresponds to page 4 of the Statement.

These forward-looking statements involve various risks and uncertainties. Although we believe that our expectations expressed in these forward-looking statements are reasonable, our expectations may later be found to be incorrect. Our actual results could be materially different from our expectations. Important risks and factors that could cause our actual results to be materially different from our expectations are generally set forth in "Prospectus Summary—Summary of Risk Factors," "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Business," "Regulation" and other sections in this prospectus. You should read thoroughly this prospectus and the documents that we refer to with the understanding that our actual future results may be materially different from and worse than what we expect. We qualify all of our forward-looking statements by these cautionary statements.

(IPO Registration Statement at PDF p. 80 (75).)

**V.      Public Statements Regarding PRC Education Reform (Post-12/2020 & Pre-4/2021)**

Between the time of the December 3, 2020 effective date of the IPO and the filing of the S-8 Registration Statement on April 30, 2021, there were additional public statements made in the PRC regarding education reform that would impact the K-12 after-school tutoring business. (FAC ¶ 9.) For example, in January 2021, PRC's Education Minister declared that the MOE sought to liberate students from after-school tutoring in its forthcoming reforms. (*Id*. ¶¶ 9, 73.) In early March 2021, PRC's President, Xi Jinping, described the after-school tutoring industry as a stubborn disease and vowed that PRC would resolutely reform all activities that infringed on the people's interests under the banner of education. (*Id*. ¶¶ 9, 76.) Later that month, a top MOE official confirmed that double burden reduction was a key task for the MOE in 2021 and reiterated its plan to establish after-school services in PRC's public schools. (*Id*. ¶¶ 9, 79.)

**VI.      S-8 Registration Statement**

Notwithstanding the foregoing public statements, Plaintiffs contend that the S-8 Registration Statement (which was filed on April 30, 2021), like the IPO Registration Statement before it, failed to warn investors that the PRC central government was preparing to

11

fundamentally reform the market in which 17 Education's largest business operated. (FAC ¶¶ 10, 81, 84.) The S-8 Registration Statement incorporated the entirety of the annual report on Form 20-F for the fiscal year ended December 31, 2020 that 17 Education previously filed with the U.S. Securities and Exchange Commission ("SEC") on April 9, 2021 (the "2020 Annual Report"). (*Id*. ¶ 83; *see also* S-8 Registration Statement, ECF No. 62-3, at PDF 4 (2).) The 2020 Annual Report, and therefore the S-8 Registration Statement as well, contained substantially the same regulatory disclosures as those in the IPO Registration Statement. (FAC ¶ 84; *see also* 2020 Annual Report, ECF No. 62-4 at PDF 72-75 (69-72).)

**VII.    The July 2021 Ban**

On May 21, 2021, President Xi Jinping presided over a meeting of the Central Committee's Commission for Deeping Overall Reform, during which it deliberated and adopted the Opinions of Further Reducing the Burden of Homework and Off-Campus Tutoring for Students in the Compulsory Education Period (the "Opinions"), also known as the "double reduction policy." (FAC ¶ 85.) On July 24, 2021, the General Office of the Chinese Communist Party's Central Committee and the General Office of the State Council formally issued the Opinions, which, among other things, banned for-profit tutoring in core school subjects (the "July 2021 Ban"). (*Id*. ¶ 91; *see also* Fumerton Decl., Ex. N, ECF No. 62-14.) The Opinions required all existing after-school tutoring businesses to be "uniformly registered as nonprofits," meaning they could no longer profit from providing tutoring services, and prohibited foreign investment in such businesses, including through contract-based VIE arrangements of the type used by 17 Education. (FAC ¶ 91; Fumerton Decl., Ex. N, at PDF p. 10.) One news article described the Opinions as the "death knell" to the after-school education industry in the PRC. (FAC ¶ 91.) The Opinions had a devastating impact on

the companies that operated in the space, including 17 Education. (*Id*. ¶¶ 12, 94.) By the end of 2021, 17 Education ceased offering all after-school tutoring services. (*Id*. ¶¶ 12, 98.)

17 Education's ADSs have slumped persistently since its IPO. (FAC ¶ 13.) With the ADS price down to $0.83 in November 2021, 17 Education changed the ratio of ADS to Class A ordinary to achieve the same effect as a one-for-four reverse ADS split and thereby increase the trading price of ADSs by a multiple of four. (*Id*. ¶¶ 13, 96.) As of the filing of the FAC, 17 Education's ADSs traded at $1.81, representing a decline of more than 95% from its split-adjusted IPO price. (*Id*. ¶¶ 14, 99.)

## PROCEDURAL HISTORY

On July 19, 2022, a Complaint was filed in the Central District of California by Ziqi Zhang against the Moving Defendants and Underwriter Defendants, among others, alleging securities law claims. (Compl., ECF No. 1.) Thereafter, Haping and Xianghong were appointed as co-lead plaintiffs. (10/24/22 Minutes, ECF No. 24, at 1.)

On November 10, 2022, based upon the parties' stipulation, this action was transferred to this Court. (11/10/22 Order, ECF No. 27.) On December 5, 2022, this action was referred to me for general pretrial purposes and to make reports and recommendations with respect to dispositive motions. (Order of Ref., ECF No. 33.) On January 31, 2023, Plaintiffs filed their FAC. (*See* FAC.) On March 31, 2023, the Moving Defendants filed the pending motion to dismiss. (*See* Moving Defs.' 3/31/23 Not. of Mot.) Also on March 31, 2023, the Underwriter Defendants joined in the motion to dismiss. (*See* Underwriter Defs.' 3/31/23 Joinder.) On May 30, 2023, Plaintiffs filed their opposition to the motion to dismiss. (Pls.' Opp. Mem., ECF No. 66.) On July 14, 2023,

the Moving Defendants filed their reply (Moving Defs.' Reply, ECF No. 67), as to which the Underwriter Defendants filed a joinder. (Underwriter Defs.' 7/14/23 Jointer, ECF No. 68.)

**LEGAL STANDARDS**

## I.      Motion To Dismiss

A defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In deciding a motion to dismiss, the Court "must accept as true all of the factual allegations contained in a complaint[,]" but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted). Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

## II.     Sections 11 And 15 Of The Securities Act

"Sections 11 . . . and 15 of the Securities Act impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain

14

material misstatements or omissions." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010). Section 11 of the Securities Act provides for liability where "any part of the registration statement, when such part became effective, contain[s] an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). To state a claim under Section 11 of the Securities Act, "a plaintiff need show that a registration statement: (1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statement therein not misleading." *Arfa v. Mecox Lane Ltd.*, 10-CV-09053, 2012 WL 697155 (RWS), at *4 (S.D.N.Y. Mar. 5, 2012), *aff'd*, 504 F. App'x 14 (2d Cir. 2012) (internal quotation marks omitted). Thus, "Section 11 imposes strict liability on issuers and signatories, and negligence liability on underwriters, '[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 156 (2d Cir. 2012) (quoting 15 U.S.C. § 77k(a)).

"When analyzing offering materials for compliance with the securities laws, [courts] review the documents holistically and in their entirety." *In re Morgan Stanley*, 592 F.3d at 365. To evaluate whether a statement is untrue, "the veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir. 2010). "The literal truth of an isolated statement is insufficient; the proper inquiry

requires an examination of defendants' representations, taken together and in context." *In re Morgan Stanley*, 592 F.3d at 366. Some "literally accurate" statements can, "through their context and manner of presentation, [become] devices which mislead investors." *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

With respect to the required element of materiality, the Second Circuit has "consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000). A misstatement or omission is material where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (internal quotation marks omitted).

> With respect to the scope of information to be disclosed,
>
> [i]n general there is no duty to disclose a fact in the offering documents merely because a reasonable investor would very much like to know that fact, . . . but [d]isclosure is required . . . when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading. Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.

*Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (internal quotation marks and citations omitted). "A defendant is not required to disclose all known information, but has a duty to disclose any information that is necessary to make other statements not misleading." *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 182 (S.D.N.Y. 2003) (citation and quotation omitted).

Under the "bespeaks-caution" doctrine, "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found

16

the statement materially misleading." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010); *see also Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (under "bespeaks caution" doctrine, "alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering"). If the bespeaks caution doctrine does apply, "then the touchstone of the inquiry is not whether isolated statements within a document were true but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Banerjee v. Zhangmen Educ. Inc.*, No. 21-CV-09634 (JPO), 2023 WL 2711279, at *7 (S.D.N.Y. Mar. 30, 2023) (quoting *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)). Item 303 of S.E.C. Regulation S-K requires disclosure of "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii).[7] The failure to disclose information required under Item 303 can serve as the basis of claims under Section 11. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).

Section 15 creates liability for certain "control persons" when a person or entity whom the control person actually controls commits a primary violation of Section 11 of the Securities Act. *See City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 716, 720

---

[7] "Strictly speaking, Item 303 does not apply to foreign corporations," but "the SEC has stated that its interpretations of Item 303 apply to Management Discussion & Analysis [MD & A] disclosures drafted pursuant to Item 5 of Form 20-F, which does apply to foreign corporations." *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619 n.5 (S.D.N.Y. 2021) (internal quotation marks omitted).

(S.D.N.Y. 2013). "If liability does not lie under Section 11, liability under Section[ ] . . . 15 cannot lie either." *Banerjee*, 2023 WL 2711279, at *5.

**DISCUSSION**

I.      **The FAC Does Not Plausibly Allege A Section 11 Violation**

In support of their motion to dismiss Plaintiffs' Section 11 claim, the Moving Defendants argue that the FAC does not allege any material misstatement or actionable omission. (Moving Defs.' Mem., ECF No. 63, at 22-32.) Plaintiffs argue in opposition that the IPO Registration Statement failed to disclose that the Chinese government planned to make deeper reforms to the after-school tutoring industry in the near future, including by providing tutoring service at public schools in China and that this failure rendered positive statements in the IPO Registration Statements (regarding the regulatory landscape for after-school tutoring services in China, 17 Education's existing customer base and planned growth for its after-school tutoring business) materially misleading. (Pl.'s Opp. Mem. at 14-28.)

Viewing the FAC holistically, the Court finds that Plaintiffs have not plausibly alleged a Section 11 violation. First, the IPO Registration Statement did not misleadingly state or omit facts related to the regulatory landscape in the PRC. Second, even if the FAC plausibly had alleged an actionable misstatement or omission, facts regarding the regulatory landscape already were in the mix of public information at the time of the IPO and thus would not qualify as material. Third, in light of 17 Education's cautionary language about the prospect of future enhanced regulation, the "bespeaks-caution" doctrine protects the statements at issue.

A.        **Existence Of Misleading Statement Or Omission**

The FAC does not plausibly plead a misleading statement or omission because the IPO Registration Statement adequately disclosed the possibility of future regulations. The IPO Registration Statement prominently noted as a risk factor that "***[u]ncertainties exist in relation to new legislation or proposed changes in the PRC regulatory requirements regarding online private education and smart in-school classroom solutions, which may materially and adversely affect [17 Education's] business, financial condition and results of operations***." (IPO Registration Statement at PDF p. 30 (25) (emphasis in original).) In addition, the IPO Registration Statement went so far as to state: "There is no assurance that we can comply with any newly promulgated laws and regulations in a timely manner or at all, and any failure to comply may materially and adversely affect our business, financial condition and results of operations." (*Id*. at PDF p. 32 (27).) These statements fairly alerted investors to the prospect that heightened regulation could be undertaken and the attendant risks. Thus, no Section 11 claim has been stated. *See Banerjee,* 2023 WL 2711279, at *7 (dismissing Section 11 claims where Registration Statement included extensive precautionary disclosures of possible regulatory risks in China regarding afterschool tutoring); *Garnett v. RLX Tech. Inc*., No. 21-CV-05125 (PAE), 2022 WL 4632323, at *18 (S.D.N.Y. Sept. 30, 2022) (dismissing claims of misstatements and omissions as to possibility of future, unfavorable regulations of e-cigarettes in China where defendant company's offering materials included cautionary language regarding risk of such regulations).

Plaintiffs argue that these disclosures are insufficient because they failed to disclose not just that the MOE could tighten the existing regulations, but that it planned to do so. (Pls.' Opp. Mem. at 22.) However, unlike the cases cited by Plaintiffs, here, the relevant risk (*i.e*. regulatory

19

changes) had not yet occurred at the time of the IPO Registration Statement *Cf. In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized.").

Moreover, as in *Garnett*, Plaintiffs have not alleged facts that would render the expected regulatory changes a foregone conclusion. *See Garnett*, 2022 WL 4632323, at *19; *see also Banerjee*, 2023 WL 2711279, at *10. Thus, this case is distinguishable from the cases Plaintiffs cite where defendants failed to disclose "hard facts critical to appreciating the magnitude of the risks described." *Credit Suisse First Bos. Corp. v. ARM Fin. Grp., Inc.*, No. 99-CV-12046 (WHP), 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001).

**B.     Materiality Of Alleged Misleading Statements Or Omissions**

Even assuming that the FAC plausibly pled misleading statements and omissions, the FAC would not state a Section 11 claim for three reasons: (1) the information that 17 Education did not disclose already was within the public domain and thus there was no material nondisclosure; (2) 17 Education's cautionary statements about the prospect of further regulations in China protects it under the "bespeaks-caution" doctrine, rendering such statements immaterial; and (3) 17 Education complied with Item 303 of S.E.C. Regulation S-K.

**1.     Information In Public Domain**

"Where allegedly undisclosed material information is in fact readily accessible in the public domain, the Second Circuit has found that a defendant may not be held liable for failing to disclose this information." *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) (dismissing securities fraud complaint where defendant disclosed it was subject to regulation and

information about that regulation was a "matter[ ] of public record"); *see also Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) ("[W]here information is equally available to both parties, a defendant should not be held liable to the plaintiff under the securities laws for failure to disclose.").

In the present case, the FAC recites, and relies upon, various public comments by politicians and regulators in China that were critical of the private education industry. (FAC ¶¶ 52-54, 56-62, 73-79.) Plaintiffs argue that 17 Education failed to warn investors about these comments and the proposed reform initiatives. (*See*, *e.g.*, *id*. ¶¶ 4-5 (referring to failure to disclose February 2019 action plan to reduce "excessive" burden on students by supporting primary and for secondary schools to provide after-school services, instead of privately-owned businesses).) However, since the information that Plaintiffs allege should have been disclosed already was in the public domain, there could have been no material nondisclosure under Section 11. *See Garnett*, 2022 WL 4632323, at *23 (dismissing Section 11 claim where allegedly nondisclosed information was, to considerable extent, already in mix of public information at time of IPO, and thus did not qualify as material).

Plaintiffs suggest that, because the information that was in the public domain emanated from a foreign government, *i.e.*, the PRC, such information should not be considered as part of the total mix of information available to investors. (*See* Pls.' Opp. Mem. at 24.) However, the issuer in this case is based in the PRC and information emanating from the PRC government obviously must be considered as part of the total mix, as other courts in this district have found.

*See*, *e.g.*, *Garnett*, 2022 WL 4632323, at *23 ("[s]tatements by Chinese government authorities regarding their regulatory aspirations" considered as part of "the mix of public information").[8]

Plaintiffs rely on statements in the IPO Registration Statement that investors "should rely only on the information contained in this prospectus or in any free writing prospectus" and that 17 Education and the Underwriter Defendants had "not authorized anyone to provide [investors] with any information other than that contained in this prospectus or in any free writing prospectus prepared by or on behalf of" them to argue that the PRC public pronouncements contained in the media should not be considered as part of the relevant mix of information available to investors. (*See* Pls.' Opp. Mem. at 24 (citing FAC ¶ 71).) In support of that argument, Plaintiffs cite to two cases, *i.e.*, *SEC v. Bank of Am. Corp.*, 677 F. Supp. 2d 717 (S.D.N.Y. 2010), and *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487 (S.D.N.Y. 2013), neither of which is apposite.

In *Bank of Am. Corp.*, the bank defendant was seeking to avoid liability for failing to disclose that bonuses would be paid to certain officers because there were media reports predicting that bonuses would in fact be paid, which was not allowed. *See Bank of Am. Corp.*, 677 F. Supp. 2d at 719 ("In effect, the Bank is arguing that, even though it expressly warned its shareholders to disregard the media, it can now defend itself by asserting that a reasonable shareholder would have disregarded these warnings and, by consulting the media, perceived that the Bank's alleged lies were immaterial."). Here, it is the public pronouncements made in the PRC

---

[8] The information in the public domain was in the time period prior to the filing of the IPO Registration Statement, and also in the time period between the filing of the IPO Registration Statement and the filing of the S-8 Registration Statement. (*See* FAC ¶¶ 9, 73-79.)

that are part of the total mix of information available to investors, not media predictions or speculation about them.

In *Facebook*, the offering materials advised investors not to rely on reports in the public media due to concerns about accuracy. *See Facebook*, 986 F. Supp. 2d at 522 ("We have in the past received, and may continue to receive, a high degree of media coverage, including coverage that is not directly attributable to statements made by our officers and employees, that incorrectly reports on statements made by our officers or employees, or that is misleading as a result of omitting information provided by us, our officers, or employees."). In the present case, by contrast, the media reports to which Plaintiffs themselves cite in the FAC relate to public pronouncements by the PRC, and there is no suggestion that the media reporting was inaccurate.

### 2.      Bespeaks-Caution Doctrine

The cautionary disclosures set forth in Background Facts Section IV and Discussion Section I.A., *supra*, also warrant dismissal under the bespeaks-caution doctrine. Since 17 Education "adequately bespoke caution as to [the] risk [of further PRC regulations], the same disclosures addressed [in Background Facts Section IV and Discussion Section I.A.] above warrant dismissal of [the Section 11] claims because investors were similarly 'warn[ed] of the specific contingency that lies at the heart of the alleged misrepresentation.'" *See Banerjee*, 2023 WL 2711279, at *12 (quoting *Gregory P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004)); *see also Garnett*, 2022 WL 4632323, at *24 ("the related 'bespeaks caution' doctrine also protects RLX,

23

given the Offering Materials' multiple cautionary statements about future Chinese regulation of e-cigarettes").

### 3.   Item 303

In support of their Section 11 claim, Plaintiffs also rely on Item 303 of S.E.C. Regulation S-K, which requires disclosure of known trends or uncertainties that a registrant reasonably expects will have a material unfavorable impact on net sales or revenues or income from continuing operations. (*See* Pls.' Opp. Mem. at 14-20 (citing 17 C.F.R. § 229.303(a)(3)(ii) (2020)).) Item 303 does not salvage Plaintiffs' Section 11 claims for three reasons. First, "courts in this district have dismissed residual Item 303 claims where, as here, they are mere 'redundant' restatements of otherwise-failed Section 11 complaints due to the clear overlap in standards." *See Banerjee*, 2023 WL 2711279, at *13 (citing *Schaffer v. Horizon Pharma PLC*, No. 16-CV-01763 (JMF), 2018 WL 481883, at *14 (S.D.N.Y. Jan. 18, 2018)). Second, as in *Banerjee*, "Plaintiffs allege no misstatement or omission separate from the rest of their allegations, and unique to Item 303, to support any inference of falsity or omission." *See id*. (emphases omitted). Third, as in *Banerjee*, "Defendants complied with Item 303's disclosure obligations: They did disclose all negative events, trends, and the like associated with adverse Chinese government actions at the time of their IPO." *Id*.

Since Plaintiffs have not pled a Section 11 violation, they also have not pled a Section 15 violation. *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011) ("Because Plaintiffs failed to plead a § 11 claim, their § 15 claim necessarily fails."). Accordingly, it is

respectfully recommended that Counts I, II and III be dismissed against all Defendants, including the Moving Defendants, the Underwriter Defendants and the Chinese Individual Defendants.[9]

## II.    Plaintiffs' Claims Are Time-Barred

Even assuming, *arguendo*, that Plaintiffs have pled a Section 11 claim based upon 17 Education's failure to disclose information regarding the regulatory landscape for after-school tutoring services in the PRC, such claim is time-barred.

"A statute of limitations affirmative defense normally cannot be decided on a motion to dismiss." *Essex Cap. Corp. v. Garipalli*, No. 17-CV-06347 (JFK), 2018 WL 6618388, at *2 (S.D.N.Y. Dec. 18, 2018). However, "[w]here the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss." *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989); *see also McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) ("[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint."). "Such a motion is properly treated as a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted rather

---

[9] Even though the Chinese Individual Defendants have not yet appeared in this action, the claims against them should be dismissed, since Plaintiffs have not stated a claim under Section 11 or Section 15 of the Securities Act. "A district court has the power to *sua sponte* dismiss claims against nonmoving defendants for failure to state a claim, as long as the plaintiff has been given an opportunity to be heard." *Whitfield v. O'Connell*, No. 09-CV-01925 (WHP), 2010 WL 1010060, at *7 (S.D.N.Y. Mar. 18, 2010), *aff'd*, 402 F. App'x 563 (2d Cir. 2010) (citing *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991)). In the present case, the Moving Defendants argued in their moving memorandum for dismissal of the claims against the Chinese Individual Defendants (*see* Moving Defs.' Mem. at 1 n.1), and Plaintiffs had an opportunity to be heard in their opposition memorandum. Thus, the claims against the Chinese Individual Defendants are appropriately dismissed, even though they have not yet appeared in this action. *See In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 14-CV-09826 (WHP), 2017 WL 95176, at *4 (S.D.N.Y. Jan. 10, 2017) (dismissing Section 11 and Section 15 claims against Chinese individual defendants who had not yet appeared).

than a Rule 12(b)(1) motion to dismiss for lack of jurisdiction over the subject matter." *Ghartey*, 869 F.2d at 162.

An action asserting claims under Sections 11 must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m; *see also Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 349 (2d Cir. 1993) (claims under Sections 11 of Securities Act governed by statute of limitations in 15 U.S.C. § 77m). "A securities-law violation is discovered when the plaintiff learns sufficient information about the violation to plead it in a complaint with enough detail and particularity to survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss." *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017) (quotations and alterations omitted) (citing *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)). "A plaintiff is charged with knowledge of any fact that 'a reasonably diligent plaintiff would have discovered.'" *Nomura*, 873 F.3d at 119 (2d Cir. 2017) (quoting *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010).) Accordingly, "the limitations period commences . . . when [ ] a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation." *City of Pontiac*, 637 F.3d at 174; *see also Merck*, 559 U.S. at 651-53 (same).[10]

The Moving Defendants argue, and the Court agrees, that if the various public comments that Plaintiffs cite should have allowed 17 Education to predict and disclose the July 2021 Ban in

---

[10] Although *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010), addressed the statute of limitations under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), the weight of authority in this Circuit has applied *Merck* to alleged violations of Section 11 of the Securities Act. *See Yi Xiang v. Inovalon Holdings, Inc.*, 268 F. Supp. 3d 515, 519-22 (S.D.N.Y. 2017) (collecting cases).

its December 2020 and April 2021 registration statements, those same public comments, under Plaintiffs' own reasoning, also should have put Plaintiffs on notice of their claims here. (*See* Moving Defs.' Mem. at 20; Moving Defs.' Reply at 2.) Moreover, numerous prominent media sources—including Reuters, Bloomberg, The Wall Street Journal and The Economist—reported in June 2021 on the potential for an industry-wide crackdown in China on education technology firms (*see* Fumerton Decl., Exs. O to R, ECF Nos. 62-15 to 62-18),[11] thus putting Plaintiffs on notice of their Section 11 claims at the latest in June 2021. This action was not commenced until July 19, 2022, more than a year later. (*See* Compl., ECF No. 1.) Accordingly, any Section 11 claim is time-barred.

Since Plaintiffs' Section 11 claims are time-barred, Plaintiffs necessarily cannot state a Section 15 claim. *See Hutchison*, 647 F.3d at 490. Accordingly, it is respectfully recommended that this action be dismissed against all Defendants on the separate and independent ground of the statute of limitations.

Because the Court finds that this action should be dismissed for failure to state a Section 11 (or Section 15) claim, and/or on limitations grounds, the Court need not consider the Moving Defendants' arguments that Plaintiffs' claims are barred under the negative causation doctrine. (*See* Moving Defs.' Mem. at 6, 32-33).[12] The Court also need not address whether or not "any

---

[11] "Why China Is Cracking Down on Education-TechFirms," Bloomberg News, June 9, 2021 (Fumerton Decl., Ex. O); "China to unveil tough new rules for private tutoring sector-sources," Reuters, June 16, 2021 (*id.*, Ex. P); "China Takes Aim at Educational Costs as It Seeks to Reverse Birthrate Decline," Wall St. J., Jun 24, 2021 (*id.*, Ex. Q ("Among the [new policies planned] are new laws and tighter regulations aimed at private education companies that offer tutoring services, which have been blamed for fueling competition and increasing education costs for urban families."); "China is clamping down on cram schools," Economist, June 26, 2021. (*Id.*, Ex. R.)

[12] As the Moving Defendants themselves acknowledge (*see* Moving Defs.' Mem. at 6), loss causation is not an element of a claim under Section 11. Thus, "[a]s an affirmative defense, the burden of disproving loss

ADS[s] were issued pursuant or traceable to the S-8 Registration Statement" (*see* Moving Defs.'

Reply at 10 (emphasis omitted)), and the associated issue of whether Plaintiffs have standing to

challenge the S-8 Registration Statement. (*See* Moving Defs.' Mem. at 7, 33-34; Moving Defs.'

Reply at 9-10.)

### III.   <u>No Leave To Amend</u>

In their Opposition Memorandum, Plaintiffs request that, "[s]hould the Court find that the [FAC]

contains deficiencies," they be given leave to amend. (Pls.' Opp. Mem. at 35 n.8.) Because Plaintiffs' claims

should be dismissed as time-barred, amending the FAC would be futile and it therefore is respectfully

recommended that leave to amend be denied. *See Trakansook v. Astoria Fed. Sav. & Loan Ass'n*, No. 07-

2224-CV, 2008 WL 4962990, at *2 (2d Cir. Nov. 21, 2008) (affirming denial of leave to amend time-barred

claims).

### <u>CONCLUSION</u>

For the foregoing reasons, I respectfully recommend that the Moving Defendants' motion

to dismiss be GRANTED and that this action be dismissed in its entirety.

Dated:      New York, New York
            July 20, 2023

_____
**STEWART D. AARON**
**United States Magistrate Judge**

---

causation falls on defendants." *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007). As such, the affirmative defense of negative causation generally is not properly raised in a Rule 12(b)(6) motion. *See In re WRT Energy*, Nos. 96-CV-03610 (JFK), 96-CV-03611 (JFK), 2005 WL 2088406, at *2 (S.D.N.Y. Aug. 30, 2005) (vacating earlier Rule 12(b)(6) dismissal for failure to establish loss causation and observing that "[t]o conclude otherwise places a burden of pleading loss causation on the plaintiffs, and removes the burden of establishing negative causation from the defendants, where it properly lies.").

*           *           *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1). Any requests for an extension of time for filing objections must be addressed to Judge Kaplan.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).