**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WONG HAPING and HE XIANGHONG, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>   v.<br><br>17 EDUCATION & TECHNOLOGY GROUP INC., ANDY CHANG LIU, MICHAEL CHAO DU, DUN XIAO, TUCK LYE KOH, QIN WEN, JIAWEI GAN, BING YUAN, COLLEEN A. DE VRIES, COGENCY GLOBAL INC., MORGAN STANLEY & CO. LLC, GOLDMAN SACHS (ASIA) L.L.C., BOFA SECURITIES, INC., CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED, and TIGER BROKERS (NZ) LIMITED,<br><br>     Defendants. | Case No.  1:22-cv-09843-LAK-SDA |

**LEAD PLAINTIFFS' OBJECTIONS TO**
**THE REPORT AND RECOMMENDATION REGARDING DEFENDANTS'**
**MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

    A.    Background on the Company.................................................................................3

    B.    China's Early Measures to Regulate the After-School Tutoring Industry...............3

    C.    China's Renewed Plan to Overhaul the After-School Tutoring Industry ...............5

    D.    The Misleading IPO Registration Statement .........................................................6

    E.    Regulatory Developments After the IPO................................................................6

    F.    The Misleading S-8 Registration Statement .........................................................7

    G.    China's Long-Awaiting After-School Tutoring Reforms......................................8

STANDARD OF REVIEW ....................................................................................................9

ARGUMENT...........................................................................................................................9

I.    LEAD PLAINTIFFS ADEQUATELY PLEAD SECURITIES ACT
VIOLATIONS .................................................................................................................9

    A.    The AC Pleads Actionable Omissions.................................................................10

        1.    The Omitted Facts Were Necessary to Make Various Statements In
the Registration Statements Not Misleading.............................................10

        2.    Item 303 Required Disclosure of the Omitted Facts.................................13

    B.    The AC Adequately Pleads Materiality .................................................................16

II.    LEAD PLAINTIFFS' CLAIMS ARE TIMELY ................................................................19

CONCLUSION......................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Alpha Capital Anstalt v. New Generation Biofuels, Inc.*,
    2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014) ...................................................................17

*Arista Records, LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010) ......................................................................................................9

*Banerjee v. Zhangmen Educ. Inc.*,
    2023 WL 2711279 (S.D.N.Y. Mar. 30, 2023) ...................................................................14, 15

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
    2016 WL 6652731 (S.D.N.Y. Nov. 10, 2016) .............................................................10, 14, 15

*In re CPI Card Grp. Inc. Sec. Litig.*,
    2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) ...................................................................9, 16

*Credit Suisse First Boston Corp. v. ARM Fin. Grp.*,
    2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ...................................................................2, 12

*Dolphin & Bradbury, Inc. v. SEC*,
    512 F.3d 634 (D.C. Cir. 2008) .................................................................................................12

*In re DraftKings Inc. Sec. Litig.*,
    2023 WL 145591 (S.D.N.Y. Jan. 10, 2023) ...................................................................12, 15

*In re Facebook, Inc. Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013) .............................................................................11, 18

*FHFA v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017) ......................................................................................................19

*In re Fuwei Films Sec. Litig.*,
    634 F. Supp. 2d 419 (S.D.N.Y. 2009) .....................................................................................17

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) ....................................................................................................17

*Garnett v. RLX Tech. Inc.*,
    632 F. Supp. 3d 574 (S.D.N.Y. 2022) ..............................................................12, 15, 17, 18

*In re Henry Schein, Inc. Sec. Litig.*,
    2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) .......................................................................13

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) ..................................................................................................................9

*Ia. Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*,
  620 F. 3d 137 (2d Cir. 2010)..................................................................................18

*In re IndyMac Mortg.-Backed Sec. Litig.*,
  718 F. Supp. 2d 495 (S.D.N.Y. 2010)....................................................................17

*In re Lehman Bros. Sec. & ERISA Litig.*,
  903 F. Supp. 2d 152 (S.D.N.Y. 2012)....................................................................14

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011)...........................................................................16, 19

*Liu v. Intercept Pharm., Inc.*,
  2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) ........................................................17

*McKenna v. Smart Techs. Inc.*,
  2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012)...........................................................14

*McKenna v. Wright*,
  386 F.3d 432 (2d Cir. 2004)...................................................................................20

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014).....................................................................10, 11, 12

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
  2022 WL 17815767 (2d Cir. Dec. 20, 2022) ..............................................12, 15, 16

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp. PLC*,
  709 F.3d 109 (2d Cir. 2013)...................................................................................18

*In re Prudential Sec. Inc. Ltd. P'ship Litig.*,
  930 F. Supp. 68, 72 (S.D.N.Y. 1996).....................................................................11

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)...................................................................................18

*Schaffer v. Horizon Pharma PLC*,
  2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ...........................................................15

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019)......................................................................................16

*In re SKAT Tax Refund Scheme Litig.*,
  2020 WL 7059843 (S.D.N.Y. Dec. 2, 2020) ..........................................................20

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010)...................................................................................18

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008)..................................................................................................19

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015)........................................................................................10, 15, 20

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*,
  2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) ....................................................................14, 20

*Wang v. Cloopen Grp. Holding Ltd.*,
  2023 WL 2534599 (S.D.N.Y. Mar. 16, 2023) ....................................................................11, 13

**Statutes**

15 U.S.C. § 77k ............................................................................................................2, 9, 11, 14

15 U.S.C. § 77m..................................................................................................................19

28 U.S.C. § 636(b) ..............................................................................................................1, 9

**Regulations**

17 C.F.R. § 229.303 ...........................................................................................................14, 16

**Rules**

Fed. R. Civ. P. 12..................................................................................................................20

Fed. R. Civ. P. 72..................................................................................................................1, 9

**Other Authorities**

Securities Act Release No. 6835, Exchange Act Release No. 26,831, 43 SEC
  Docket 1330 (May 18, 1989) ..............................................................................................15

**TABLE OF DEFINED TERMS**

| Defined Term | Definition | Cross Reference |
|---|---|---|
| 17 Education | 17 Education & Technology Group Inc. | Opposition at 1 |
| AC | The First Amended Class Action Complaint filed January 31, 2023 (ECF No. 37) | Opposition at 1 |
| ADS | American depositary shares representing 17 Education's Class A ordinary shares | Opposition at 1 |
| CCP | Chinese Communist Party | Opposition at 6 |
| China | PRC | Opposition at 1 |
| Circular 3 | Circular on alleviating after-school burdens on primary and secondary students issued by several PRC bodies, dated February 13, 2018 | Opposition at 5 |
| Circular 10 | Notice on improving the specific governance and rectification mechanisms of after-school tutoring programs issued by several PRC bodies, dated November 20, 2018 | Opposition at 6 |
| Cogency Defendants | Cogency Global Inc. and Colleen DeVries | Opposition at 1 |
| Company | 17 Education | Opposition at 1 |
| Defendants | 17 Education, the Individual Defendants, the Cogency Defendants, and the Underwriter Defendants | n/a |
| Exchange Act | Securities Exchange Act of 1934 | Opposition at 13 |
| Implementation Plan | Implementation plan for modernizing China's education system through 2022 issued by several PRC bodies, dated February 23, 2019 | Opposition at 6 |
| Individual Defendants | Andy Chang Liu, Michael Chao Du, Dun Xiao, Tuck Lye Koh, Qin wen, Jiawei Gan, and Bing Yuan | n/a |
| IPO | Initial public offering | Opposition at 1 |
| IPO Registration Statement | 17 Education's registration statement on Form F-1 filed in December 2020 (File No. 333-250079) | Opposition at 5 |
| July 2021 Ban | Prohibition of for-profit tutoring businesses set forth in the Opinions | Opposition at 12 |
| Lead Plaintiffs | Wong Haping and He Xianghong | Opposition at 1 |
| MOE | China's Ministry of Education | Opposition at 2 |
| Motion | The Motion to Dismiss filed March 31, 2023 (ECF No. 61) | Opposition at 1 |
| Objections | These Objections to the Report | n/a |
| Online After-School Training Opinions | Opinions on regulating online after-school training issued by several PRC bodies, effective July 12, 2019 | Opposition at 7 |
| Opinions | Opinions on further reducing the burden of homework and off-campus tutoring for students, dated May 21, 2021 | Opposition at 11 |
| Opposition | Lead Plaintiffs' Memorandum of Law in Opposition to the Motion (ECF No. 66) | Objections at 1 |
| PRC | The People's Republic of China | Opposition at 1 |

| Registration Statements | The IPO Registration Statement and the S-8 Registration Statement | Opposition at 1 |
|---|---|---|
| Report | The Report and Recommendation by the Honorable Stewart D. Aaron entered July 20, 2023 (ECF No. 69) | Objections at 1 |
| S-8 Registration Statement | 17 Education's registration statement on Form S-8 filed in April 2021 (File No. 333-255632) | Opposition at 1 |
| Securities Act | The Securities Act of 1933 | Opposition at 1 |
| State Circular 80 | Opinion on the regulation of the development of after-school tutoring programs issued by the State Council, dated August 6, 2018 | Opposition at 6 |
| State Council | Highest authority in the PRC's executive branch | Opposition at 5 |
| Underwriter Defendants | Morgan Stanley & Co. LLC, Goldman Sachs (Asia) L.L.C., BofA Securities, Inc., China Renaissance Securities (Hong Kong) Limited, and Tiger Brokers (NZ) Limited | Opposition at 1 |

Lead Plaintiffs respectfully submit these objections to the Report and Recommendation by the Honorable Stewart D. Aaron on Defendants' Motion, entered July 20, 2023 (ECF No. 69) (the "Report"), pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure.[1]

## **PRELIMINARY STATEMENT**

This is a case about one of the many recent Chinese companies that misled investors about its business and prospects to gain access to U.S. capital markets before it was too late. 17 Education is a China-based technology company that provided a range of "in class" and "after-school" education products, including an online tutoring service which grew rapidly during the COVID-19 pandemic as students studied from home. In December 2020, it held an opportunistic IPO in the United States in which it sold over $300 million of ADS pursuant to the IPO Registration Statement. In April 2021, it registered additional ADS for shares granted to employees in the S-8 Registration Statement.

As alleged, these two Registration Statements failed to disclose that, as of the Company's IPO, bodies in the PRC central government tracked by 17 Education repeatedly stated that its existing rules did not sufficiently regulate the "burdens" placed on students by after-school tutoring programs and it therefore planned to issue more stringent reforms in the near future, just as it had done in the past after making similar announcements, including measures to make after-school tutoring available *at public schools across China*. Rather than warn investors about this alarming development or the risks it posed to 17 Education's tutoring business—which, by the time of the IPO, accounted for *over 90% of its revenues*—the Registration Statements simply summarized the existing rules and stated that it was *uncertain* whether the PRC central government would issue new rules that could adversely affect its business and that it planned to continue growing that business.

In July 2021, a mere seven months after 17 Education's IPO, the MOE, the body responsible for overseeing after-school tutoring programs in China, announced that all public schools would

---

[1] All capitalized terms not otherwise defined herein have the meaning provided in brief that Lead Plaintiffs filed in opposition to the Motion (ECF No. 66) (the "Opposition"), as reproduced in the table of defined terms set forth above.

provide after-school tutoring effective fall 2021, and the PRC central government issued drastic new rules which effectively outlawed after-school tutoring courses by private companies. On July 26, 2021, 17 Education admitted that these reforms would have a material adverse impact on its business. By the end of 2021, it ceased offering online tutoring services in China. As of the filing of the AC in January 2023, 17 Education's ADS traded *95% below its IPO price* of $10.50 per share.

These allegations are more than enough to state a claim under the minimal requirements of Sections 11 and 15 of the Securities Act. In the Report, Magistrate Judge Aaron suggests that Lead Plaintiffs fail to do so because (1) the AC fails to plead material misstatements or omissions; and (2) the claims are barred by the applicable statute of limitations. Respectfully, Lead Plaintiffs submit that these two conclusions misapprehend controlling law and the nature of their claims.

*First*, the AC alleges facts sufficient to establish actionable misstatements and omissions based on the statements that 17 Education made in the Registration Statements as well as Item 303 of Regulation S-K, and readily satisfies the standard for materiality. In recommending otherwise, the Report misplaces reliance on case-specific holdings primarily from two recent decisions involving similar claims against Chinese companies cited by Defendants which, properly viewed, have no application in this case. If adopted by the Court, the Report would establish harsh, new rules and bright-line exceptions which would refashion the relevant standards for disclosure and deprive investors with meritorious claims from securing relief in this case and many others. *See* Part I, *infra*.

*Second*, in deciding that the claims are untimely, the Report improperly equates what a company is alleged to know about regulatory developments with what investors should know. But the two are not the same and simply alleging a China-based company tracked such information internally does not factor into whether it is deemed available to investors as a matter of law. In addition, several issues of fact defeat a limitations defense at this stage. *See* Part II, *infra*.

## STATEMENT OF FACTS

### A.    Background on the Company

17 Education is a technology company that provides a range of digital "in-school" and "after-school" products to K-12 teachers and students in China.  (AC ¶¶ 32-34.)  Although initially conceived as a provider of in-school curriculum management tools, the Company launched an online K-12 after-school tutoring service in 2017.  (AC ¶ 34.)  By the end of 2018, 17 Education's online tutoring business accounted for approximately 30.2% of its total net revenues. (AC ¶ 41.)

Between 2018 and 2020, the market for online education services in China experienced rapid growth.  (AC ¶ 38.)  The demand for online education services in China accelerated even more with the onset of the COVID-19 pandemic in early 2020 as students were encouraged to engage in online education as they studied from home.  (AC ¶ 39.)  Due to the far larger customer base for online tutoring than in-class products, 17 Education's online tutoring business quickly outstripped the size, and importance, of its in-class products.  (AC ¶ 41.)  By September 30, 2020, 17 Education's online tutoring business comprised approximately *93% of its total net revenue*. (AC ¶ 41.)

To capitalize on the rapid growth of its after-school tutoring business, 17 Education raised $300 million by holding an IPO of its ADS in the United States at $10.50 per ADS pursuant to the IPO Registration Statement, which commenced on December 4, 2020.  (AC ¶¶ 64-65, 68, 70.)

### B.    China's Early Measures to Regulate the After-School Tutoring Industry

Due to the scarcity of upper-level education resources in China, students face intense pressure to succeed throughout their academic life.  (AC ¶ 36.)  Consequently, over 75% of K-12 students used some form of after-school tutoring to gain a leg up over their peers in the competition to secure admission to one of China's limited upper-level education institutions.  (AC ¶¶ 36-37.)

Long before 17 Education's IPO, powerful bodies within the PRC government declared that the excessive workload imposed by after-school tutoring programs had become detrimental to the

well-being of K-12 students and, accordingly, their activities required regulation and oversight.  (AC ¶ 42.)  For example, in December 2017, China's President and paramount leader, Xi Jinping, and senior leaders of the State Council, the highest authority of the PRC's executive branch, identified the "heavy extracurricular burdens for primary and middle school students" as a "prominent problem[] in education" and vowed to take targeted measures to address it.  (AC ¶ 45.)

Soon thereafter, the PRC central government issued a series of reforms designed to standardize the activities of businesses in the burgeoning industry.  On February 13, 2018, several agencies, including the MOE, jointly promulgated Circular 3, which prohibited after-school tutoring programs from providing training beyond the student's academic level or conducting exam-oriented training, and authorized relevant authorities to conduct inspections to ensure compliance.  (AC ¶ 46.)  On August 6, 2018, the State Council issued State Circular 80, which clarified that after-school tutoring businesses were prohibited from conducting training beyond the corresponding school syllabus or corresponding national curricular standards.  (AC ¶ 48.)  On November 20, 2018, several agencies jointly issued Circular 10, which made online after-school tutoring programs subject to the same regulations as brick-and-mortar tutoring programs.  (AC ¶ 49.)

By February 2019, the PRC central government made clear that it planned to take additional steps to combat perceived abuses by tutoring programs.  On February 23, 2019, the State Council and the Central Committee of the CCP, the party's highest body when the National Congress is not in plenary session, released the Implementation Plan for modernizing China's education system through 2022, which stated in no uncertain terms that "efforts will be made to reduce the excessive extracurricular burden of primary and secondary students and support primary and secondary schools to generally carry out after-school services," rather than private enterprise.  (AC ¶ 53.)

- 4 -

Senior MOE officials also stated that additional reforms were necessary to adequately alleviate extracurricular burdens that K-12 students continued to face.  For example, on March 12, 2019, the Minister of Education, Chen Baosheng, explained that after-school tutoring businesses "shifted" their practices in response to the reforms in 2018 and, as such, new measures were necessary.  (AC ¶ 54.)  A month later, another MOE official stated that the 2018 reforms were only an initial "step" in the comprehensive effort to reduce extracurricular burdens.  (AC ¶ 54.)

As previewed by the MOE, six government bodies, including the MOE, issued the Online After-School Training Opinions, which placed further restrictions on online tutoring courses, including limiting classes to 40 minutes and prohibiting classes after 9:00 p.m.  (AC ¶ 55.)

**C.      China's Renewed Plan to Overhaul the After-School Tutoring Industry**

By the time of 17 Education's IPO, the PRC central government believed that its existing regulations did not sufficiently address the extracurricular burdens placed on students by after-school tutoring courses.  In November 2019, a senior MOE official informed media that excessive extracurricular burden remained a "problem" and, consistent with the Implementation Plan, the MOE was preparing new measures for the next stage of reform to "improve the level of . . . after-school services" at China's public schools. (AC ¶ 58.)  Then, in December 2019, the head of the MOE department responsible for overseeing after-school tutoring services explained that the regulation of after-school tutoring courses made "staged progress" but stressed that "more efforts are required" to effectively alleviate the burdens that students in such courses faced.  (AC ¶ 59.)

These plans were put on hold as the COVID-19 pandemic swept across the country in early 2020 and national attention shifted to preventing the spread of the disease. (AC ¶ 60.)

However, top officials made clear that the MOE planned to resume the industry clampdown in late 2020.  For example, on November 10, 2020, China's Minister of Education stated that the MOE would "regulate after-school tutoring institutions, while increasing the supply of public

- 5 -

education services" in the next phase of reform. (AC ¶ 62.) On December 2, 2020, another senior official confirmed that the MOE planned to "[d]eepen the governance of off-campus training institutions, and effectively reduce the excessive extracurricular burden of students and the burden of family education expenditures." (AC ¶ 62.) The following day, the MOE official responsible for overseeing after-school tutoring stated that China "will" take new measures in the near future to build out after-school education programs at public schools in China. (AC ¶ 62.)

**D.      The Misleading IPO Registration Statement**

Despite the steady stream of repeated announcements, the IPO Registration Statement painted a rosy picture of the Company's prospects without warning investors that relevant authorities were preparing to fundamentally reform the market in which its largest business operated.

The IPO Registration Statement provided that 17 Education's tutoring services were subject to a variety of PRC regulations, and contained a lengthy summary of existing regulations formally promulgated by PRC authorities governing "After-school Tutoring and Educational Apps," including Circular 3, State Circular 80, Circular 10, and the Online After-School Training Opinions. (AC ¶¶ 72, 106.) But rather than warn investors about the MOE's planned reforms, the IPO Registration Statement declared that it was "*uncertain* whether and how PRC government authorities would further promulgate new laws and regulations applicable to online training institutions" without making *any mention* of the planned reforms described above or their potential impact. (AC ¶¶ 108-09.) To the contrary, that filing touted that 17 Education planned to *continue growing* its K-12 after-school tutoring business. It also informed investors that, unlike competitors that were seemingly the target of the MOE's ire, its courses "*cater to students' learning needs*." (AC ¶ 104.)

**E.      Regulatory Developments After the IPO**

After 17 Education's IPO, the warnings by the PRC central government became even more pronounced. In January 2021, China's Education Minister stated that abuses by after-school tutoring

firms was an "urgent problem" and declared that the MOE sought to "liberate students from after-school tutoring" in its forthcoming reforms. (AC ¶ 73.) On February 4, 2021, the MOE specifically stated that its work goals for 2021 included both (1) increasing the after-school services at public schools in China; and (2) decreasing the extracurricular workload of students who receive after-school tutoring. (AC ¶ 75.) Even President Xi Jinping castigated after-school tutoring firms as a "stubborn disease" and resolved to reform the industry in March 2021. (AC ¶ 76.) Later that month, a top MOE official confirmed that "double burden reduction" was a key task for the MOE in 2021 and reiterated its plan to "strengthen the role of schools as the main place for education." (AC ¶ 79.)

### F.    The Misleading S-8 Registration Statement

On April 30, 2021, 17 Education filed the S-8 Registration Statement to register over 100,000,000 shares of its Class A ordinary shares issuable upon the vesting or exercise of awards previously granted reserved for future issuance under its employee incentive plans. (AC ¶ 81.) The S-8 Registration Statement specifically noted that the Class A ordinary shares being registered therein may be represented by ADS upon their deposit. (AC ¶ 81.) The S-8 Registration Statement was the only other registration statement filed by 17 Education to register Class A ordinary shares under the Securities Act other than the IPO Registration Statement. (AC ¶ 82.)

The S-8 Registration Statement expressly incorporated the entirety of 17 Education's annual report on Form 20-F for the fiscal year ended December 31, 2020, previously filed with the SEC on April 9, 2021. (AC ¶ 83.) That document contained substantially the same regulatory disclosures as those in the IPO Registration Statement. In other words, it continued to summarize the existing regulatory environment and potential risks relating thereto without making *any mention* of the regulatory developments described above or otherwise warn investors that that "double burden reduction" was one of the MOE's key tasks for 2021, and that it sought to "liberate students from after-school tutoring" through its reforms. (AC ¶¶ 84, 120, 122-23.)

- 7 -

### G.     China's Long-Awaiting After-School Tutoring Reforms

Relevant authorities did exactly what they said they would do.  Consistent with its previous public statements, on July 13, 2021, the MOE announced that all compulsory education institutions in China would provide students with after-school tutoring services starting in fall 2021.  (AC ¶ 88.)  Then, on July 24, 2021, bodies at the highest levels in the PRC central government, including the Central Committee of the CCP and the State Council, formally issued the Opinions.  (AC ¶ 91.)  The Opinions imposed a number of draconian restrictions, including, most notably, that all existing after-school tutoring businesses must be "uniformly registered as nonprofits," meaning they could no longer profit from providing tutoring services (the "July 2021 Ban").  (AC ¶ 91.)  Industry insiders described the July 2021 Ban as the "death knell" to the after-school education industry in PRC and stated that "[m]aking the sector nonprofit is just as good as eradicating [it]."  (AC ¶ 91.)

On July 26, 2021, 17 Education issued a press release in response to the Opinions.  (AC ¶ 92.)  The release stated that it was "carefully considering the provisions of the Opinions and assessing their implications for the Company's business" but revealed for the first time that the reforms set out in the Opinions "*will have a material adverse impact on the Company's results of operations and prospect*."  (AC ¶ 92.)  On August 25, 2021, 17 Education issued another press release in which it informed investors that it "will stop offering online [tutoring] classes over weekends, national holidays and school break periods," in accordance with the Opinions and reiterated that "*compliance . . .will have a material adverse impact on its business*."  (AC ¶ 94.)

On December 6, 2021, 17 Education announced that it would "*cease offering tutoring services related to academic subjects to [K-12] students . . . in mainland China by the end of 2021*," and, instead, focus on the in-school products which comprised a mere 7% of its net revenue.  (AC ¶ 98.)  Following this announcement, 17 Education's stock price continued to tumble and has not recovered.  As of the filing of the AC, it traded at less than 95% of its IPO price.  (AC ¶ 99.)

## STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1) and Rule 72(b), this Court must review *de novo* the portions of the Report to which Lead Plaintiffs object.  *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 116 (2d Cir. 2010) (objections to recommendations on dispositive matters "must be reviewed by the district judge *de novo*").  Upon doing so, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge" or "recommit the matter to the magistrate judge with instructions."  28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b) (same).

## ARGUMENT

In the AC, Lead Plaintiffs bring simple and well-pled claims for violations of Sections 11 and 15 of the Securities Act.  The Report recommends that the Court dismiss these claims with prejudice because the AC does not plausibly allege any such violations and they are time-barred by the statute of limitations.  Lead Plaintiffs respectfully submit that the grounds set forth in the Report for reaching these two conclusions are flawed and contrary to controlling law.

## I.      LEAD PLAINTIFFS ADEQUATELY PLEAD SECURITIES ACT VIOLATIONS

Unlike its counterpart in the Exchange Act, Section 11 of the Securities Act imposes liability when a registration statement contains a material misstatement or omission.  *See In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, at *2 (S.D.N.Y. Oct. 30, 2017) (Kaplan, J.); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983) (Section 11 establishes a "stringent standard of liability").  The Report reasons that the AC fails to state a Section 11 claim because it does not plausibly allege (i) an actionable misstatement or omission; or (ii) materiality.[2]  As explained below, the AC adequately pleads material omissions under controlling law.

---

[2] The Report recommends dismissing the Section 15 claim solely because the AC fails to plead a primary violation. Report at 24, 27.  The Court should therefore sustain the Section 15 claim to the extent the Section 11 claim stands.

- 9 -

### A.    The AC Pleads Actionable Omissions

At its core, the AC alleges—and the Report properly accepts as true (at 3 n.5, 18)—that, when each Registration Statement became effective, PRC authorities planned to make deeper reforms to the after-school tutoring industry in the near future to regulate the "excessive" burdens imposed on students by such businesses, including measures to make after-school tutoring available at public schools across China, and neither filing disclosed this to investors.  Under settled law, a fact omitted from a disclosure document is actionable if there is a duty to disclose it, which can arise if (i) a statute or regulation requires disclosure; or (ii) disclosure is necessary to make the statements that were made not misleading.  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015); *see also City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.* (*MetLife III*), 2016 WL 6652731, at *8 (S.D.N.Y. Nov. 10, 2016) (Kaplan, J.) (same).  The Report acknowledges this legal rule (at 15), but fails to adhere to it, instead inventing a harsh, new disclosure standard and invoking bright-line exceptions that, if adopted, would frustrate the most meritorious of claims.

#### 1.    The Omitted Facts Were Necessary to Make Various Statements In the Registration Statements Not Misleading

It is axiomatic that "once a company speaks on an issue or topic, there is a duty to tell the whole truth."  *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014).  The AC alleges that 17 Education made misleading statements in the Registration Statements relating to:  (1) the regulatory landscape for after-school tutoring and potential changes thereto, including its risk disclosures; (2) its existing customer base and bespoke product offerings; and (3) its planned growth.  The Report submits that the AC fails to plead an actionable misstatement because, even accepting all allegations as true, new regulation "had not yet occurred" and was not otherwise a "foregone conclusion" at the time of each filing.  (Report at 19-20.) Respectfully, this catch-all misunderstands relevant law and in no way addresses, much less dispenses with, the misstatements in (2) or (3).

To begin, the law does not *require* that a risk must "occur" for a generic risk disclosure on that same topic to be misleading. The case cited by the Report, *In re Facebook, Inc. IPO Securities & Derivative Litigation*, 986 F. Supp. 2d 487 (S.D.N.Y. 2013), stated so because the risk had, in fact, materialized *in that matter*. *Id.* at 516. By adopting this as the standard for disclosure in *all* cases, the Report imposes an unnecessary standard that obscures whether a risk warning is truly misleading. As a case cited by *Facebook* makes clear, the proper inquiry asks if the risks are "significantly greater or more certain than those portrayed in the prospectus." *Id.* (citing *In re Prudential Sec. Inc. Ltd. P'ship Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (Pollack, J.)). In each Registration Statement, 17 Education represented that it was "uncertain" whether China would issue new regulations and stated that any such changes "may" adversely affect its business. (AC ¶¶ 108-09, 122-23.) A reasonable investor reading what "may" happen if uncertain events transpire would understand the risk to be a "hypothetical" possibility. *Wang v. Cloopen Grp. Holding Ltd.*, 2023 WL 2534599, at *12 (S.D.N.Y. Mar. 16, 2023). In such cases, the Second Circuit has instructed that "a generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's *calculation of probability*." *Meyer*, 761 F.3d at 251 (emphasis added).[3]

The AC pleads those facts here. Before the IPO, MOE officials repeatedly stated that one way they planned to regulate the burdens on students was by having public schools across China provide after-school tutoring. (AC ¶¶ 4, 41, 58, 62.) Those same officials also made clear that the MOE not just *could* issue these changes, but that it "planned to" and "will" do so in the next phase of reform. (AC ¶ 62.) These statements must also be read in light of the prior directive from the CCP to shift after-school services away from private enterprise by no later than 2022. (AC ¶ 53.) Indeed, subsequent statements confirmed that this was an "urgent problem" that the MOE planned to address

---

[3] As an example of this principle, *Meyer* explained that an issuer cannot warn about the "risk of fire" but omit the fact that "the sprinkler system has been found to be inoperable." 761 F.3d at 252. This example shows that the specific risk addressed in the warning need not transpire at the time of the filing for the disclosure to be misleading.

*in 2021*.  (AC ¶¶ 73-75.)  In addition, the MOE had track record of carrying out its stated plans to address excess burden in the past. (AC ¶¶ 45-49, 54-55.)  Thus, far from being distinguishable (Report at 20), this case is no different from those where defendants failed to disclose "hard facts critical to appreciating the magnitude of the risks described."  *Credit Suisse First Boston Corp. v. ARM Fin. Grp.*, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001); *see also Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008) (there is a "critical distinction between disclosing the risk a future event *might* occur" and that a key customer "*actually planned*" to take that action).

Equally flawed is the Report's conclusion that this challenge fails because the AC does not allege that the planned reforms were a "foregone conclusion."  The case the Report cites, *Garnett v. RLX Technology Inc.*, 632 F. Supp. 3d 574 (S.D.N.Y. 2022), frames its discussion in those terms because the plaintiff there proceeded on the theory that the reforms ultimately issued *were a "foregone conclusion"* at the time of the misstatements.  *Id.* at 610.  The Second Circuit's recent decision in *Moab Partners, L.P. v. Macquarie Infrastructure Corporation*, 2022 WL 17815767 (2d Cir. Dec. 20, 2022), dispels any suggestion that *Garnett* established a new, universal rule of law. Citing the same holding from *Meyer* excerpted above, the Second Circuit held that generic risk disclosures "did not reveal the information necessary for the investing public to make a proper assessment of the alleged risks" by failing to disclose a *proposed* regulation.  *Id.* at *4.  As observed by the same Judge who decided *Garnett* in another matter, the Second Circuit held as such in *Moab Partners* "even though some market experts believed the regulation would be revised or its effective date extended."  *In re DraftKings Inc. Sec. Litig.*, 2023 WL 145591, at *38 (S.D.N.Y. Jan. 10, 2023).

Finally, the holdings recited in the Report—which primarily arose in the context of risk disclosures—offer no basis to dismiss the claims as to the remaining misstatements.  For example, 17 Education represented in the Registration Statements that its "library of tutoring courses . . . cater

- 12 -

to students' learnings needs." (AC ¶¶ 104, 118.) That statement is misleading because, regardless of whether new regulations were set in stone, the MOE declared prior to the IPO that new reforms—in whatever form they took—were necessary because it deemed the burdens placed on students by after-school tutoring businesses to be "excessive." (AC ¶¶ 57-59, 62.) Whether 17 Education "catered" to its students' learning needs was not mere puffery, as Defendants previously argued, but an assurance of fact made in the context of an industry which faced a series of regulatory clampdowns that restricted course content in an effort to standardize the burdens on students. (AC ¶¶ 45-48, 55.) Reinforcing the conclusion that this assertion was not puffery, the statement "identified specific sources" that allowed 17 Education to meet its "customers' needs," as in *In re Henry Schein, Inc. Securities Litigation*, 2019 WL 8638851, at *16 (E.D.N.Y. Sept. 27, 2019).

Similarly, 17 Education told investors that (i) "the trusted relationships we have developed with [customers]" to date "provide us with a large and familiar pool of prospective tutoring customers"; (ii) the recent growth in the after-school tutoring market is "expected to continue" through 2024; and (iii) "we intend to . . . further grow our online K-12 after-school tutoring business." (AC ¶¶ 100-02, 116.) These statements failed to disclose that the MOE's imminent plan to offer tutoring at public schools across China posed a material risk to any further growth. *See Wang*, 2023 WL 2534599, at *9, 11 (statement in IPO materials that Chinese company had a "loyal customer base" conveyed "legitimate expectation of stability" undermined by declining customer retention). Lead Plaintiffs address the applicability of the bespeaks caution doctrine *infra* Part I.B.

### 2. Item 303 Required Disclosure of the Omitted Facts

Lead Plaintiffs also allege that 17 Education was obligated to disclose the danger posed by the imminent reforms under Item 303 of Regulation S-K. (AC ¶¶ 111-14, 125-27.) As of the IPO, Item 303 required registrants to "[d]escribe any known trends or uncertainties . . . that [it] reasonably expects will have a material . . . unfavorable impact on net sales or revenues or income from

- 13 -

continuing operations." 17 C.F.R. § 229.303(a)(3)(ii) (2020).[4] Consistent with Second Circuit law, this Court has held that disclosure is required under Item 303 "where a trend . . . or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the company's financial condition or results of operation." *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, 2019 WL 1368787, at *10 (S.D.N.Y. Mar. 26, 2019) (Kaplan, J.) (citation omitted). Nevertheless, the Report circumvents any consideration of that standard and instead concludes, relying exclusively on *Banerjee v. Zhangmen Education Inc.*, 2023 WL 2711279 (S.D.N.Y. Mar. 30, 2023), that (i) the Item 303 claim is "redundant" of the main Section 11 claim; (ii) the AC does not challenge an omission that is "separate" and "unique" to Item 303; and (iii) 17 Education "complied with Item 303" by making various risk disclosures. (Report at 24.) The wholesale adoption of these holdings as a matter of law is improper and sets a dangerous precedent that this Court should not sustain.

First, with respect to (i) and (ii), there is no basis in law or logic to categorically prohibit Item 303 claims which are "redundant" of traditional Section 11 claims or do not otherwise challenge "unique" omissions. A standard omission claim turns on the substance of the statements made in the relevant disclosure document, *see supra* Part I.A.1, whereas an Item 303 claim turns on whether there is a "trend" or "uncertainty" reasonably likely to have a material impact on future results. In other words, the same allegations may satisfy Item 303 even if they do not render any prior statements misleading. *See McKenna v. Smart Techs. Inc.*, 2012 WL 1131935, at *14 (S.D.N.Y. Apr. 3, 2012) (Item 303 can trigger a duty to disclose even if "the Prospectus does not contain misleading statements" on that topic). Indeed, this Court sustained an Item 303 claim based on the non-disclosure of information that otherwise failed to render affirmative statements misleading in *MetLife III*, 2016 WL 6652731, at *10-11. *Cf. In re Lehman Bros. Sec. & ERISA Litig.*, 903 F.

---

[4] Effective February 10, 2021, *i.e.,* before the filing of the S-8 Registration Statement, the SEC reorganized and amended Item 303 to provide that disclosure is required if any trends or uncertainties "are reasonably likely to have," as opposed to *will* have, a material impact on future results. 17 C.F.R. § 229.303(b)(2)(ii) (2021).

- 14 -

Supp. 2d 152, 174 (S.D.N.Y. 2012) (Kaplan, J.) (declining to decide if Item 303 required disclosure because misleading statements required disclosure "independently").[5]

This is particularly true if the Court adopts the proposed rule that cautionary language cannot be misleading unless regulatory changes are "a foregone conclusion." (Report at 20.) By its terms, Item 303 covers *uncertainties*, including matters such as "whether [a] contract will be renewed" or a "proposed" regulation. Securities Act Release No. 6835, Exchange Act Release No. 26,831, 43 SEC Docket 1330 (May 18, 1989). In such cases, issuers are directed to evaluate "the consequences of the known . . . uncertainty  on the assumption that it will come to fruition" unless it is objectively reasonable to conclude that is unlikely. *Id.* at *6. Indeed, the Second Circuit recently held that *proposed* regulatory changes can trigger Item 303 liability "even if Defendants could not determine with certainty that [the proposed changes] would be implemented" in *Moab Partners*, 2022 WL 17815767, at *3; *see also DraftKings*, 2023 WL 145591, at *38 (acknowledging that "an anticipated regulatory . . . change" can trigger Item 303 disclosure under *Moab Partners*).

Here, the AC pleads facts which satisfy that standard. Approximately 93% of 17 Education's revenues derived from after-school tutoring, which the Company acknowledged was "subject to a variety of PRC regulations" promulgated by the MOE. (AC ¶¶ 41, 72.) 17 Education's admitted "exposure" to changes in that regulatory regime decrease the plausibility that management was unaware of announcements by the MOE about reforms to the industry it operated in. *Stratte-McClure*, 776 F.3d at 104. In addition, 17 Education's CEO described the evolution of government policy and repeatedly represented that it was "closely monitoring" policy changes during its first two investor calls in 2021. (AC ¶¶ 78, 86.) These "admission[s]" strengthen the inference of pre-IPO

---

[5] The handful of cases which have endorsed the "redundant" rule the Report cites, including *Banerjee*, are not to the contrary. Properly read, these cases simply held that allegations "largely redundant" of those *already deemed insufficient to plead a trend or likely uncertainty* were similarly inadequate for purposes of Item 303. *Banerjee*, 2023 WL 2711279, at  *13; *see also DraftKings*, 2023 WL 145591, at *38 (same); *Garnett*, 632 F. Supp. 3d at 612 (same); *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *14 (S.D.N.Y. Jan. 18, 2018) (same). But that is simply not the case here.

knowledge. *CPI Card Grp.*, 2017 WL 4941597, at *4.  Further, it would not be "objectively reasonable" to conclude that the MOE's stated plan was unlikely to occur for all the reasons discussed *supra*, Part I.A.1.  Thus, 17 Education was required to *assume* "it would come to fruition." *Moab Partners*, 2022 WL 17815767, at *3.  Lastly, the MOE's plan to offer tutoring at schools across China could not be anything short of material for 17 Education, as explained *infra*, Part I.B.

Finally, it is incorrect to conclude that 17 Education's existing disclosures satisfied Item 303. The MD&A in 17 Education's filings—the area where Item 303 requires disclosure—simply stated that it was "subject to changes in the regulatory landscape affecting China's education industry," and referred investors to the accompanying risk factors which, in turn, provided that "uncertainties exist in relation to . . . proposed changes in the PRC regulatory requirements regarding online private education" which "may" adversely affect the Company's results.  (Report at 6-8.)  At most, these disclosures reflect the truism that authorities *could* issue adverse regulations, not that it *planned to do so* by offering tutoring at public schools.  By failing to disclose this, 17 Education undermined Item 303's core purpose of informing investors about uncertainties "reasonably likely to cause reported financial information not to be necessarily indicative of future operating results."  17 C.F.R. § 229.303(a).  More fundamentally, Item 303 requires the disclosure of not just "whether," but "to what extent," the uncertainty may reasonably impact future revenues and 17 Education's disclosures unquestionably did not do so.  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718-19 (2d Cir. 2011).

### B.    The AC Adequately Pleads Materiality

As the Report recognizes, a fact is material if "there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares."  *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019).  But because this is mixed question of law and fact, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that

reasonable minds could not differ on the question of their importance." *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 501 (S.D.N.Y. 2010) (Kaplan, J.). The Report eschews this issue by concluding that the omitted information was immaterial *as a matter of law* because (i) it was already public and, thus, part of the total mix of information; and (ii) it is protected by the bespeaks caution doctrine. (Report at 20-23.) Neither principle has any application in this case.

The first fails to appreciate that "truth-on-the-market" is an "intensely fact-specific" defense rarely appropriate for resolution on a motion to dismiss. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). This Court applied that very principle to reject an identical argument based on information released by a *U.S. government agency* in *Liu v. Intercept Pharmaceuticals, Inc.*, 2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) (Kaplan, J.). As the Court explained there, that defense requires analysis of whether the information was "reasonably available" and "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information." *Id.* at *6 n.70. These issues are, of course, compounded by publications made overseas, much less a different language, and courts have extended the same logic to such materials. *See Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, 2014 WL 6466994, at *9 (S.D.N.Y. Nov. 18, 2014) (reports by foreign government agencies); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 438 (S.D.N.Y. 2009) (Chinese news articles). As one court put it, arguing to the contrary is "an oversimplification of the law." *Alpha Capital*, 2014 WL 6466994, at *9 & n.16.

Seizing on a holding from *Garnett*, the Report argues to the contrary by pointing out that "the issuer in this case is based in the PRC." (Report at 21.) *Garnett* drew no such distinction. In fact, *Garnett* stated that there is "force" to the argument that announcements by PRC bodies are not "readily accessible" but decided otherwise because they were reported in "English-language" articles published before the IPO there by prominent newspapers, including *The New York Times* and *The*

- 17 -

*Wall Street Journal*.  632 F. Supp. 3d at 608.  Defendants here cite three English-language articles published before the IPO (from 2013 - 2020), but none mention the MOE's plan to deepen its reform of the industry in 2021, much less the proposal to offer tutoring at schools across China.  *See* Fumerton Decl. Ex. T, U, V.  Thus, none made the omitted material a matter of "public knowledge." *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp. PLC*, 709 F.3d 109, 127 (2d Cir. 2013).

In addition, the Report disregards that 17 Education told investors in its IPO Registration Statement that they should *not rely on any information outside its four corners*.  (AC ¶ 71.)  It is of no moment, as the Report suggests (at 22-23), that two other cases addressing similar disclaimers involved different *sources* of public information.  When a disclaimer advises investors to "not rely" on certain information, it would be "unreasonable" to include that very information in the total mix of information considered by investors.  *Facebook*, 986 F. Supp. 2d at 522.  The same is true here.

As for the second point, the bespeaks caution doctrine treats certain statements as immaterial as a matter of law if they would be unimportant to a reasonable investor due to "adequate cautionary language" in the same materials.  *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).  However, the cautionary language that 17 Education used was "misleading in light of historical fact" for all the reasons stated *supra*, Part I.A.1, and, thus, not adequate.  *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 770 & n.5 (2d Cir. 2010); *see also Rombach*, 355 F.3d at 173 ("The bespeaks caution doctrine does not serve if it is abused or gamed.").  At the very least, the doctrine applies *only* to "forward-looking" statements.  *Ia. Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F. 3d 137, 142 (2d Cir. 2010).  Thus, it does not vitiate Lead Plaintiffs' Item 303 claim, which is based purely on "an omission of present fact."  *Id.*  In addition, several of the affirmative misstatements are not forward-looking.

Unencumbered by these two issues, the materiality of the omitted information is apparent. After-school tutoring accounted for *93% of 17 Education's revenue* before the IPO.  (AC ¶ 41.)

Because this was such a "significant" part of 17 Education's business, "a reasonable investor would almost certainly want to know information related to that segment" which could negatively impact "its future revenues." *Litwin*, 634 F.3d at 720. At a minimum, the MOE's stated plan would either place public schools in direct competition with 17 Education or, worse, supplant it. (AC ¶ 4.) It beggars belief that a reasonable investor would find this to be *unimportant* as a matter of law.

## II.    LEAD PLAINTIFFS' CLAIMS ARE TIMELY

The Securities Act has a one year statute of limitations. 15 U.S.C. § 77m. The limitations period does not accrue until an investor should have discovered the "violation," meaning facts sufficient to "survive a . . . motion to dismiss." *FHFA v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017). The Report reasons that Lead Plaintiff was on notice of their claims over one year before the initial complaint was filed because it relies on public statements by PRC officials from before July 19, 2021, to plead that 17 Education should have included additional disclosures in its two Registration Statements. (Report at 25-27.) It would be plain error to adopt that conclusion.

At the most basic level, it does not follow that an investor would be on notice of the MOE's plans before July 19, 2021, simply because the MOE's statements are alleged to put 17 Education—a China-based education firm—on notice by then. Those statements were known by 17 Education because, unlike investors, it admittedly tracked policy changes for business reasons. (AC ¶¶ 78, 86.) This does not mean that the MOE's statements were part of the "total mix of information" deemed available to investors as a matter of law, nor could they be at this stage for all the reasons stated *supra* p. 17. That controls here. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 432 (2d Cir. 2008) (specialty publications not included in "total mix" were insufficient to put plaintiffs on notice for statute of limitations). The four news articles from June 2021 cited by the Report do not compel a different conclusion. As noted, those articles reported on "the potential for an industry-wide crackdown" (Report at 27), but *none* reveal that the MOE planned to provide after-school

- 19 -

tutoring at public schools across China and, thus, provide notice of the "violation" pled here.

Even assuming *arguendo* that information was part of the "total mix," it would still be insufficient as regards the Item 303 claim. Because an affirmative defense, like the statute of limitations, is usually reserved for an answer, Fed. R. Civ. P. 12(b), it will be sustained on a pre-answer motion only if "facts supporting the defense appear on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). None of the public statements or media articles before July 19, 2021, disclosed the potential *impact* of the MOE's stated plans on 17 Education's business. To the contrary, the absence of an Item 303 disclosure by 17 Education conveyed to investors "the nonexistence of known trends or uncertainties" likely to impact future revenues. *Stratte-McClure*, 776 F.3d at 102. That was not apparent until July 26, 2021, when 17 Education disclosed that the July 2021 Ban "will have a material adverse impact" on its results. (AC ¶ 92.) This is not a mere academic issue. It is demanded by the text of the rule and Item 303 claims are regularly dismissed for failing plead a likely impact on future results. *E.g.*, *Tempur Sealy*, 2019 WL 1368787, at \*10 (dismissing Item 303 claim for failing to plead impact of trend on future results).

The same is true for the affirmative misstatements in the IPO Registration Statement. With respect to the MOE's pre-IPO announcements, 17 Education expressly told investors *not to consider any of that information*. With respect to the MOE's post-IPO announcements, none suggested that there were misstatements or omissions in 17 Education's disclosures *as of the IPO*. Rather, they expressed present concerns and future plans without retrospect. (AC ¶¶ 73-77, 79.) These are precisely the type of "factual issue[s]" which defeat a limitations defense on a 12(b)(6) motion. *In re SKAT Tax Refund Scheme Litig.*, 2020 WL 7059843, at \*8 (S.D.N.Y. Dec. 2, 2020) (Kaplan, J.).

## CONCLUSION

For the foregoing reasons, and all those set forth in the Opposition to the Motion, Lead Plaintiffs respectfully object to the Report and request that the Court deny the Motion in its entirety.

Dated: August 3, 2023

Respectfully submitted,

*/s/ Justin D. D'Aloia*
Jeremy A. Lieberman
Justin D. D'Aloia
POMERANTZ LLP
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
jdaloia@pomlaw.com

*Counsel for Lead Plaintiffs and the Class*

Junbo Hao
HAO LAW FIRM
Room 3-401 NO. 2 Building
No. 1 Shuangliubei Street
100024 Beijing
People's Republic of China
Telephone: +86 137-1805-2888
jhao@haolaw.cn

*Additional Counsel for Lead Plaintiffs*