UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| WONG HAPING and HE XIANGHONG, individually and on behalf of all others similarly situated, | : : : |
| | : |
|        Plaintiffs, | : |
| | : |
|        v. | :  22-cv-9843 (LAK) (SDA) |
| | : |
| 17 EDUCATION & TECHNOLOGY GROUP INC., ANDY CHANG LIU, MICHAEL CHAO DU, DUN XIAO, TUCK LYE KOH, QIN WEN, JIAWEI GAN, BING YUAN, COLLEEN A. DE VRIES, COGENCY GLOBAL INC., MORGAN STANLEY & CO. LLC, GOLDMAN SACHS (ASIA) L.L.C., BOFA SECURITIES, INC., CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED, and TIGER BROKERS (NZ) LIMITED, | : : : : : : : : : : : |
| | : |
|        Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS' RESPONSE TO LEAD PLAINTIFFS' OBJECTIONS TO THE
REPORT AND RECOMMENDATION REGARDING DEFENDANTS'
<u>MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT</u>**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ............................................................................................................2

       A.     The Pre-IPO Regulatory Environment...................................................................2

       B.     The Allegedly Omitted Public Comments.............................................................4

       C.     17 Education's IPO and Registration Statement....................................................6

       D.     Post-IPO Regulatory Developments ......................................................................6

       E.     17 Education's S-8 Registration for Its Employee Share Compensation Plan ........8

       F.     In July 2021, Seven Months After the IPO, China Bans For-Profit Tutoring .........8

ARGUMENT ...............................................................................................................................10

I.      PLAINTIFFS' CLAIMS ARE TIME-BARRED............................................................11

II.     PLAINTIFFS FAIL TO ALLEGE ANY MISREPRESENTATION OR OMISSION .....14

       A.     There Was No Actionable Material Misrepresentation or Omission.....................14

       B.     The Bespeaks Caution Doctrine Bars Plaintiffs' Claims ......................................18

       C.     Plaintiffs Cannot Predicate an Omission Claim Based on Information in the Public Domain ...................................................................................................19

CONCLUSION............................................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alpha Capital Anstalt v. New Generation Biofuels, Inc.*,
No. 13-CV-5586 VEC, 2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014)..............................12

*Banerjee v. Zhangmen Education Inc.*,
No. 21-CV-9634 (JPO), 2023 WL 2711279 (S.D.N.Y. Mar. 30, 2023)......................16, 18

*Bettis v. Aixtron SE*,
No. 16 CIV. 00025 (CM), 2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016)........................12

*City of Riviera Beach General Employees Retirement System v.*
*Macquarie Infrastructure Corp.*,
No. 18-CV-3608 (VSB), 2021 WL 4084572 (S.D.N.Y. Sept. 7, 2021),
*vacated and remanded sub nom. Moab Partners, L.P. v. Macquarie Infrastructure*
*Corp.*, No. 21-2524, 2022 WL 17815767 (2d Cir. Dec. 20, 2022)....................................16

*In re Facebook, Inc. IPO Securities & Derivative Litigation*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013)...........................................................................13, 17

*Frankel v. City of N.Y.*,
No. 06 CIV. 5450 LTS/DFE, 2009 WL 465645 (S.D.N.Y. Feb. 25, 2009) ......................10

*In re Fuwei Films Securities Litigation*,
634 F. Supp. 2d 419 (S.D.N.Y. 2009)...............................................................................12

*Garnett v. RLX Technology Inc.*,
632 F. Supp. 3d 574 (S.D.N.Y. 2022)..................................................12, 13, 15, 16, 19, 20

*In re Keyspan Corp. Securities Litigation*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) .........................................................................14, 19

*Liu v. Intercept Pharmaceuticals, Inc.*,
No. 17-CV-7371 (LAK), 2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) ..........................12

*In re Magnum Hunter Resources Corp. Securities Litigation*,
616 F. App'x 442 (2d Cir. 2015) ................................................................................11, 13

*Meyer v. Jinkosolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014)..............................................................................................17

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
No. 21-2524, 2022 WL 17815767 (2d Cir. Dec. 20, 2022)..............................................16

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC,*
    709 F.3d 109 (2d Cir. 2013)..............................................................................................12

*In re Prudential Securities Inc. Ltd. Partnership Litig.,*
    930 F. Supp. 68 (S.D.N.Y. 1996) .....................................................................................17

*S.E.C. v. Bank of America Corp.,*
    677 F. Supp. 2d 717 (S.D.N.Y. 2010)...............................................................................14

*Staehr v. Hartford Financial Services Group, Inc.,*
    547 F.3d 406 (2d Cir. 2008)..............................................................................................12

*Wandel v. Gao,*
    590 F. Supp. 3d 630 (S.D.N.Y. 2022)...............................................................................14

*Wang v. Cloopen Group Holding Ltd.,*
    No. 21-CV-10610 (JGK), 2023 WL 2534599 (S.D.N.Y. Mar. 16, 2023).........................17

**STATUTES**

15 U.S.C. § 77m................................................................................................................11

28 U.S.C. § 636(b)(1) .......................................................................................................10

Defendants[1] respectfully submit this Response to Lead Plaintiffs' Objections (ECF No. 70) ("Obj.") to the Report and Recommendation of the Honorable Stewart D. Aaron (ECF No. 69) ("Report"), pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The Court should adopt Magistrate Judge Aaron's well-reasoned Report and Recommendation and dismiss the Amended Complaint in its entirety with prejudice. After the Chinese government unveiled its July 2021 Ban, which effectively outlawed the private tutoring industry in China, Plaintiffs brought this putative securities class action under Sections 11 and 15 of the Securities Act, faulting 17 Education for failing to warn of this unprecedented and unforeseen regulatory development. Unable to deny that the Company could not have predicted the July 2021 Ban, which was not issued (or even proposed) until *seven months after its IPO*, Plaintiffs predicated their claims on the theory that the Company's IPO and S-8 Registration Statements misleadingly failed to disclose or discuss various public comments by Chinese politicians and regulators, all of which were made more than a year before this Action was filed. Judge Aaron recommended Defendants' Motion to Dismiss be granted on several independently dispositive grounds. Rehashing the same arguments in their Opposition, Plaintiffs object to all of the Report's findings. Their objections should be overruled.

**Plaintiffs' claims are time-barred.** Because it is undisputed that Plaintiffs' claims are predicated on publicly available regulatory statements made more than a year before this Action was filed, the Report properly found that the claims are time-barred. Plaintiffs' objections do not engage with Judge Aaron's reasoning and add nothing to their already-rejected arguments.

---

[1]　Capitalized terms not defined herein have the meanings ascribed to them in Defendants' Opening Brief (ECF No. 63) and Reply Memorandum of Law in Support of the Motion to Dismiss (ECF No. 67) ("Reply"). All citations and internal quotation marks are omitted, and all emphases in quotations are added, unless otherwise indicated.

**Plaintiffs fail to plead any actionable misrepresentation or omission.**  As the Report explains, the Registration Statements accurately disclosed the uncertain regulatory environment and relevant risks that existed at the time.  Because the public comments Plaintiffs claim were omitted did not reveal anything new, much less anything material, Defendants had no duty to include them.  Unable to identify any error in Judge Aaron's legal reasoning, Plaintiffs attack a straw man and argue that the Report adopts categorical rules that "refashion the relevant standards for disclosure." (Obj. at 2.)  But the Report did no such thing.  Rather, it straightforwardly applied Circuit law to the facts of this case.  Because Plaintiffs fail to show that Judge Aaron's application of the law to the Amended Complaint's allegations was in error, the Court should adopt the Report's holding that Plaintiffs fail to plead the existence of a misleading statement or omission.

Moreover, insofar as the challenged statements are forward-looking, the Company's thorough and accurate risk disclosures further support dismissal under the bespeaks caution doctrine.  Plaintiffs' claim that the risk disclosures were inadequate fails because, once again, they fail to plead the existence of any undisclosed material fact that should have been disclosed.

Lastly, the Report correctly concluded that because the allegedly omitted information was already in the public domain, there was no material nondisclosure under Section 11.  Plaintiffs' objections merely repeat arguments in the Opposition without grappling with the Report's well-reasoned explanations for why Plaintiffs' arguments misconstrue the applicable law.

## STATEMENT OF FACTS

### A.    The Pre-IPO Regulatory Environment

17 Education was founded in 2012 and, at the time of its IPO in December 2020, was a leading education technology company in China with an integrated in-school and after-school model.  (AC ¶ 2; Ex. B, IPO Registration Statement at 1, 8.)  The Company offers smart in-school classroom solutions, including data-driven teaching, learning, and assessment.  In 2017, the

2

Company also began providing online K-12 after-school tutoring courses, offering an after-school learning experience that closely integrated with students' in-school education. (AC ¶ 34; Ex. D, 2020 Annual Report at 56.) The Company's net revenues increased by 30.7% from 2018 to 2019, and further increased by 218.6% in 2020. (Ex. D at 89.)

In 2018, China's Ministry of Education ("MOE") and other competent authorities in China began issuing national regulations applicable to the country's massive and rapidly growing private after-school tutoring market. As detailed in the Opening Brief (Br. at 8-11), regulations issued prior to the IPO implemented the Chinese authorities' avowed intention to alleviate the academic burden on students and to increase oversight over a previously underregulated industry. At the time, these Chinese authorities assured market participants that these regulations were meant to encourage, not decimate, the orderly growth of private after-school tutoring businesses. Prior to the time of the Company's IPO, such regulations included:

- Circular 3 (issued February 2018), which authorized inspections of after-school tutoring premises, imposed licensing and permitting requirements, limited curricula to "the level of school textbooks," and banned academic competitions, competency tests, and references to students' after-school performance in school admissions criteria. (Ex. B at 153; AC ¶¶ 46, 106, 120.)

- Circular 80 (issued August 2018), which reiterated permitting requirements and prohibited trainings that were exam-oriented, exceeded approved school syllabi, or were associated with school admissions. (AC ¶ 48; Ex. B at 153.) It also significantly increased government oversight over tutoring institutions by requiring them to file detailed information on their courses, restricting hours of operation, and imposing limits on tuition fee collection. (Ex. B at 153.)

- Circular 10 (issued November 2018), which authorized provincial education authorities to "supervise the online after-school training institutions based on the policies regulating the offline after-school training institutions." (*Id.* at 154.)

- Online After-school Training Opinions (issued July 2019), which mandated a regulatory review of online after-school training institutions to ensure courses did not exceed 40 minutes, class schedules did not conflict with school, and no schoolteachers were hired as private tutors. (*Id.* at 155; AC ¶ 55.)

3

None of these regulations evinced a plan to "hav[e] public schools . . . supplant[] private enterprise" or "fundamentally reform the market" as Plaintiffs claim. (AC ¶¶ 4, 72.) To the contrary, Circular 80 explicitly called for the development of "a long-term mechanism for the well-regulated and orderly development of after-school tutoring institutions," and for "*collaboration between school education and after-school education*." (Ex. E, Circular 80 Art. I.1.)

## B.  The Allegedly Omitted Public Comments

Just as with the above-described regulations, Chinese officials' public comments before the Company's IPO did not reveal any incipient, much less imminent, plan to replace private after-school tutoring with public school programs. Plaintiffs claim that "officials . . . made clear that the MOE not just *could* issue these changes, but that it 'planned to' and 'will' do so in the next phase of reform." (Obj. at 11 (emphasis in original).) But no official said anything of the sort. (AC ¶ 62.) Instead, Plaintiffs are quoting *their own allegations* in the Amended Complaint (*id.*)—a sleight of hand that only highlights the futility of their Section 11 claim, as Plaintiffs' claim is *premised* on the alleged omission of this purported (and non-existent) "imminent plan" (Obj. at 13). The other quote attributed to the MOE—that it "will" issue reforms—also does not say what Plaintiffs claim. What the MOE official actually said was that "China will take further steps to . . . guide the development of after-school education." (AC ¶ 62.) This statement did not announce (or even mention) new reforms. In fact, it was an expression of support for the "development" of after-school tutoring businesses—a sentiment consistent with the MOE's statement three weeks earlier, on November 10, 2020, that it was necessary to "*support and standardize the development of private education*." (Ex. G, Nov. 10, 2020 Chen Baosheng Speech, at 3.) These statements confirm that the MOE supported private after-school tutoring at the time, notwithstanding their objective to offer more public school tutoring. At no point did any official suggest that these goals were mutually exclusive.

4

Other public pronouncements on which Plaintiffs rely are not to the contrary.  Plaintiffs assert that a February 2019 Implementation Plan "stated in no uncertain terms that 'efforts will be made to . . . support primary and secondary schools to generally carry out after-school services,' rather than private enterprise." (Obj. at 11; AC ¶ 53.)  But the reference to private enterprises is not a quote, and Plaintiffs cite no language (nor can they) showing that the government's "support" of public school tutoring manifested a desire to exclude or eradicate private institutions.  (*Id.*) Plaintiffs use a similarly misleading pleading tactic with respect to a November 2019 statement by an MOE official, whom they claim said that "the MOE was preparing new measures for the next stage of reform to 'improve the level of . . . after-school services' at China's public schools." (Obj. at 5; *see* AC ¶ 58.)  As with the pre-IPO regulations, the actual quoted statements do not express any regulatory intention to eradicate, supplant, or even limit private after-school tutoring.

Finally, Plaintiffs cannot point to any public statement by any Chinese official identifying a specific timeline for new regulations, let alone announcing a plan "to shift after-school services away from private enterprise *by no later than 2022*," or "*in 2021*." (Obj. at 11-12 (second emphasis in original).)  Plaintiffs purportedly base these assertions on the February 2019 Implementation Plan (which stated goals through 2022) and the MOE's work goals for 2021, which stated that authorities would "support" or "improve" after-school tutoring at public schools.  (AC ¶¶ 53, 75.) Aside from saying nothing about "private" tutoring, these statements articulated no time frame for any new regulations, much less what these to-be-issued regulations would provide.  Indeed, Plaintiffs also allege that similar comments appeared in the government's Five Year Plan ending in *2025*, confirming it was far from clear that new regulations were imminent as of the time of the Company's IPO in December 2020.  (*Id.* ¶ 77.)

### C.    17 Education's IPO and Registration Statement

On December 4, 2020, 17 Education launched its IPO.  (*Id.* ¶ 70.)  In compliance with its disclosure obligations, 17 Education disclosed all existing regulations impacting the private after-school tutoring industry.  (Ex. B at 153-56.)  The Company stressed that the "education industry in China [is] highly regulated by the PRC government," and "***the interpretation and implementation of current PRC laws and regulations are still evolving, and new laws and regulations may also be promulgated***."  (*Id.* at 27; *see also* AC ¶¶ 108-09.)  It also specifically warned investors about the risks associated with both existing and new legislation or regulations:

> ***Uncertainties exist in relation to new legislation or proposed changes in the PRC regulatory requirements regarding online private education and smart in-school classroom solutions, which may materially and adversely affect our business, financial condition and results of operations***. . . .   [T]he interpretation and application of the existing laws and regulations and the newly promulgated implementation rules and interpretations, if any, that govern the online private education industry and the smart in-school classroom solution industry would create ***substantial uncertainties regarding the legality of our business operation***, which create risks that we may be found to violate the existing laws and regulations and any newly promulgated implementation rules and interpretations.
>
> ***It is also uncertain whether and how PRC government authorities would further promulgate new laws and regulations applicable to online training institutions*** and the smart in-school classroom solution industry, including those promulgated to apply more stringent social and ethical standards in the education sector in general.  ***There is no assurance that we can comply with any newly promulgated laws and regulations in a timely manner or at all, and any failure to comply may materially and adversely affect our business, financial condition and results of operations.***  (Ex. B at 25-27 (first emphasis in original); Ex. D at 10-12 (same).)

### D.    Post-IPO Regulatory Developments

Following the IPO, uncertainty remained regarding the extent to which Chinese authorities would further regulate the private after-school tutoring industry.  On March 11, 2021, China issued its 14th Five-Year Plan (2021-2025) for Economic and Social Development and 2035 Long-Term Objectives Outline, which reiterated that one of the government's goals would be to "regulate after-school training."  (AC ¶ 77.)  But the Amended Complaint does not allege that this post-IPO

Plan specified how the industry would be regulated or when additional regulations would be forthcoming. (*See id*.) Plaintiffs also point to aspirational public statements by Chinese public officials calling for further regulation and highlighting the need to "reduce the burden" on students and "[i]mprove the level of after-school services in primary and secondary schools." (*Id.* ¶¶ 73-80.) Again, none of these statements disclosed any particular measures or timeline, and certainly did not indicate that the private after-school tutoring industry would be effectively eradicated. (*Id*.)

Indeed, the actions and statements of Chinese authorities in the weeks and months after the IPO suggested that the private after-school tutoring industry would be allowed to operate alongside public schools. On January 7, 2021, the Minister of Education, speaking of future efforts to regulate after-school tutoring institutions, said that the MOE aimed to "propose requirements regarding training schools' conditions, training contents, teaching materials and lesson plans, tuition fees management, advertising methods, and teachers' qualifications." (Ex. I, Jan. 7, 2021 Chen Baosheng Speech, at 7; *see* AC ¶ 73.) Similarly, on February 4, 2021, the MOE released 40 objectives for 2021, one of which was "deepen[ing] the governance of after-school training institutions," including by "reduc[ing] the burden of students' heavy homework." (AC ¶ 75.) And on March 31, 2021, another MOE official stated that the MOE would "strictly review training institutions' licenses and filings, strengthen the supervision of training content, innovate fee management methods, standardize training behaviors and seriously investigate and deal with illegal training behaviors." (Ex. J, Mar. 31, 2021 Lv Yugang Speech, at 1; *see* AC ¶ 79.) None of these statements or documents so much as suggested, much less announced as a matter of public policy, that after-school services would be "shift[ed]" "away from private businesses . . . in favor of primary and secondary schools by 2022," as Plaintiffs claim. (AC ¶ 78.)

7

### E.    17 Education's S-8 Registration for Its Employee Share Compensation Plan

Encouraged by the authorities' measured public statements about the private tutoring industry, 17 Education remained optimistic about its future growth.  The Company expanded the scale of its online after-school tutoring services by hiring more than 1,500 tutors in 2020 and Q1 2021, in anticipation of an expected increase in student enrollments.  (Ex. D at 97; Ex. K, May 25, 2021 Form 6-K at 3.)  Net revenues from online K-12 tutoring services for Q1 2021 skyrocketed to RMB 463.0 million—representing a year-over-year increase of 118%—which accounted for 97.6% of total net revenues in Q1 2021.  (Ex. K at 3.)

On April 30, 2021, the Company filed the S-8 Registration Statement to register Class A ordinary shares that were to be issued under its employee share incentive plans.  (AC ¶ 81; Ex. C, S-8 Registration Statement.)  The S-8 Registration Statement did *not* register any new ADS to be issued to public investors, such as Plaintiffs.  (*See* Ex. C.)  Rather, it explained that the "Class A ordinary shares being registered therein *may* be represented by ADS *upon deposit* of such shares with the depositary." (*Id.* at 1; AC ¶ 81.)  The Amended Complaint does not allege that any Class A ordinary shares were issued pursuant to the S-8 Registration Statement and deposited in exchange for ADS that were then traded in the public market.

### F.    In July 2021, Seven Months After the IPO, China Bans For-Profit Tutoring

On May 21, 2021—after both Registration Statements at issue—Chinese officials privately "deliberated and adopted" the July 2021 Ban.  (AC ¶ 85.)  Even weeks after this meeting, the regulatory environment remained uncertain.  Observers continued to speculate about what, if any, regulations would be issued in the wake of the meeting, including potential "bans on online courses for kids six years old or younger," "restrictions on homework and mandatory licensing for all teachers," or "a moratorium on weekend classes."  (Ex. L, *Beijing's Concerns About Overworked Students Upend the Plans of China's Edtech Startups*, Fortune, 1-2 (May 31, 2021, 3:52 AM).)

8

On July 24, 2021, *seven months after the IPO*, China issued the transformative July 2021 Ban.  (AC ¶ 91.)  The announcement sent "shockwaves" through the private education sector.  (Ex. M, Samuel Shen et al., *China Bars For-Profit Tutoring in Core School Subjects*, Reuters, 2 (July 23, 2021, 2:39 PM).)  The July 2021 Ban required, for the first time, that existing after-school tutoring institutions "be uniformly registered as non-profit institutions" and prohibited them from "be[ing] listed to raise financing" or "engaging in capitalized operations."  (*Id.*; Ex. N, July 2021 Ban, Art. IV, 13.)  Commentators called the July 2021 Ban a "death knell" that amounted to "eradicating" the entire private after-school education industry in China.  (AC ¶ 91.)

Shortly thereafter, on July 26, 2021, 17 Education issued a press release noting that the July 2021 Ban would have a material adverse impact on its business:

> The Company will continue to comply with all applicable rules and regulations in providing educational services, including those rules and regulations to be adopted following the policy directives of the Opinion.  The Company is carefully considering the provisions of the Opinion and assessing their implications for the Company's business.  *The Company expects the Opinion, related rules and regulations, and the compliance measures to be taken by the Company will have a material adverse impact on the Company's results of operations and prospect.* (*Id.* ¶ 92.)

On December 6, 2021, the Company announced it would "cease offering tutoring services related to academic subjects to students from [K-12] in mainland China by the end of 2021," but would continue to explore opportunities in educational products and services unrelated to K-12 after-school tutoring services in accordance with relevant rules and regulations.  (*Id.* ¶ 98.)

Shareholders initiated this Action on July 19, 2022.  On January 31, 2023, Lead Plaintiffs filed the Amended Complaint.  Defendants filed a Motion to Dismiss, arguing that (i) Plaintiffs' claims were time-barred; (ii) Plaintiffs failed to plead a material misrepresentation or omission; (iii) their claims were barred under the negative causation doctrine; and (iv) Plaintiffs lacked Securities Act standing to bring a claim based on the S-8 Registration Statement.  (Br. at 1-7.)

9

Shortly after the Parties completed briefing on the Motion to Dismiss, on July 20, 2023, Judge Aaron issued the Report, which recommended that the Court grant Defendants' Motion and dismiss the Amended Complaint in its entirety.  (Report at 2.)  Specifically, the Report held that:

> Viewing the FAC holistically, the Court finds that Plaintiffs have not plausibly alleged a Section 11 violation.  First, the IPO Registration Statement did not misleadingly state or omit facts related to the regulatory landscape in the PRC.  Second, even if the FAC plausibly had alleged an actionable misstatement or omission, facts regarding the regulatory landscape already were in the mix of public information at the time of the IPO and thus would not qualify as material.  Third, in light of 17 Education's cautionary language about the prospect of future enhanced regulation, the "bespeaks-caution" doctrine protects the statements at issue.  (*Id.* at 18.)

Judge Aaron also recommended granting dismissal for the separate and independent reason that Plaintiffs' claims were time-barred (*id.* at 25), and that because Plaintiffs failed to state a Section 11 claim, their Section 15 claim should also be dismissed (*id.* at 24, 27).  In light of these determinations, Judge Aaron found it was unnecessary to consider Defendants' remaining negative causation and standing arguments.  (*Id.* at 27.)  Plaintiffs timely filed their objections to the Report.

As explained further below, the Court should reject Plaintiffs' objections, adopt the Report, and dismiss the Amended Complaint in its entirety with prejudice.

## **ARGUMENT**

This Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  Although the Court must review *de novo* "those portions of the report . . . to which objection is made," *id.*, "[w]hen a party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the report strictly for clear error." *Frankel v. City of N.Y.*, No. 06 CIV. 5450 LTS/DFE, 2009 WL 465645, at *2 (S.D.N.Y. Feb. 25, 2009).  "Similarly, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke *de novo* review."

10

*Id.* Because Plaintiffs' objections largely rehash the same arguments raised in the Opposition, the Report should be reviewed for clear error. Regardless, even under *de novo* review, the Court should adopt the Report's recommendation to dismiss the Amended Complaint in its entirety.

## I.    PLAINTIFFS' CLAIMS ARE TIME-BARRED

The Report correctly found that Plaintiffs' claims are time-barred. Section 11 claims must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. This limitations period begins to run upon the occurrence of events that "would have led a reasonably diligent plaintiff to have discovered the facts underlying his claim." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x 442, 447 (2d Cir. 2015).

Here, there is no dispute that all of Plaintiffs' claims are premised on Defendants' alleged failure to disclose or discuss certain public comments made by Chinese politicians and regulators between September 2018 and March 2021, well over a year before this Action was filed on July 19, 2022. (AC ¶¶ 52-54, 56-62, 73-79; *see* Opp. at 30.) Plaintiffs' claims are plainly time-barred, since, as the Report correctly observed, "those same public comments, under Plaintiffs' own reasoning, also should have put Plaintiffs on notice of their claims here." (Report at 27.) Moreover, because "numerous prominent media sources—including Reuters, Bloomberg, The Wall Street Journal and The Economist—reported in June 2021 on the potential for an industry-wide crackdown . . . Plaintiffs [had] notice of their Section 11 claims at the latest in June 2021." (*Id.*)

Plaintiffs' objections repeat the same arguments as the Opposition and should be rejected. First, Plaintiffs argue it is improper to decide "at this stage" whether the public comments were part of the "total mix of information" available to investors, as this requires a fact-specific inquiry that is "rarely appropriate for resolution on a motion to dismiss." (Obj. at 17, 19; *cf.* Opp. at 31.) But Plaintiffs identify no facts whatsoever explaining why a reasonably diligent investor would

have been unable to discover these public comments (as Plaintiffs did for this litigation). To the extent Plaintiffs suggest that the comments were not available to investors because they were made by Chinese officials (*see* Obj. at 17), several courts in this Circuit have found that "regulatory actions of foreign governments [are] 'publicly known' to investors in the United States where the information was equally available to investors and the defendant issuer, even if not necessarily widely circulated." *Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 609 (S.D.N.Y. 2022) (collecting cases); *see Bettis v. Aixtron SE*, No. 16 CIV. 00025 (CM), 2016 WL 7468194, at *13 (S.D.N.Y. Dec. 20, 2016) (information in the public domain where "there are no facts to suggest that [defendant] had any greater access to information regarding Chinese government subsidies than Plaintiff himself").[2] Indeed, in a factually similar case alleging defendants' failure to disclose Chinese comments relating to the potential regulation of e-cigarettes, Judge Engelmayer held that "[s]tatements by Chinese government authorities regarding their regulatory aspirations . . . were, by nature, *public* information" and "to a considerable extent, already in the mix of public information at the time of [the] IPO." *Garnett*, 632 F. Supp. 3d at 607 (emphasis in original).

Second, although Plaintiffs do not dispute that they had notice of the June 2021 news articles discussing the possibility of an industry-wide crackdown, they claim that "none reveal that the MOE planned to provide after-school tutoring at public schools across China." (Obj. at 19-20.) Not so. For example, the June 16, 2021 Reuters article stated that "President Xi Jinping last week said schools should be responsible for student learning, rather than tutoring companies." (Ex.

---

[2] Plaintiffs' cases are inapposite as they involved *company-specific* information uniquely within defendants' control. *See, e.g.*, *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 418, 432 (2d Cir. 2008) (company's kickback scheme); *Liu v. Intercept Pharms., Inc.*, No. 17-CV-7371 (LAK), 2020 WL 1489831, at *6 n.70 (S.D.N.Y. Mar. 26, 2020) (reports of issues with company products), *aff'd*, No. 20-3488, 2022 WL 2165621 (2d Cir. June 16, 2022); *Alpha Cap. Anstalt v. New Generation Biofuels, Inc.*, No. 13-CV-5586 VEC, 2014 WL 6466994, at *9 (S.D.N.Y. Nov. 18, 2014) (reports of company's violations); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 438 (S.D.N.Y. 2009) (company's acquisitions); *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 127 (2d Cir. 2013) (company's underwriting guidelines).

P at 3; *see also* Ex. Q at 2 ("At stake for Beijing is ensuring that education . . . remains under the firm control of the state.").)  Although these "articles did not disclose the particulars of the . . . pronouncements by Chinese regulators, . . . they absolutely captured the broader point that intensified national-level regulation of such products might be nigh," and "put a member of the public with an interest in investing in [17 Education] on clear notice that tightened regulations were under active consideration and worth investigating."  *Garnett*, 632 F. Supp. 3d at 608.  Plaintiffs' other assertion that "[n]one of the public statements or media articles . . . disclosed the potential *impact* of the MOE's stated plans on 17 Education's business" also fails.  (Obj. at 20 (emphasis in original); *cf.* Opp. at 30.)  As the Second Circuit has made clear, inquiry notice does not require that investors discover "every specific allegation that a plaintiff chooses to put in his complaint."  *Magnum Hunter*, 616 F. App'x at 447.

Third, Plaintiffs contend that the pre-IPO public comments are not part of the total mix of information because the IPO Registration Statement warned that investors "should rely only on the information contained in this prospectus."  (AC ¶ 71; Obj. at 20.)  But the Report considered and rejected this claim, and found Plaintiffs cited no applicable legal support for the assertion that a reasonable investor reading this warning would reasonably believe she should not consider *external* information not specific to the company.  (Report at 22.)  Plaintiffs' cases were distinguishable as they related to articles speculating about the *company*, not accurate reports of *external* factors like regulatory developments.  (*Id.* at 22-23.)  Citing no new authority, Plaintiffs object that this distinction "is of no moment," and inexplicably quote from *In re Facebook, Inc. IPO Securities & Derivative Litigation*, 986 F. Supp. 2d 487, 522 (S.D.N.Y. 2013)—already distinguished in the Report—for the conclusory and unsupported claim that "it would be

13

'unreasonable'" to hold external sources were in the total mix of information in light of this warning. (Obj. at 18.)

Plaintiffs fail to identify any error in Judge Aaron's analysis. As Plaintiffs' prior cases explain, where a company warns investors not to rely on outside information, "one must ask what a reasonable investor would reasonably consider the total mix of information in [that] case." *S.E.C. v. Bank of Am. Corp.*, 677 F. Supp. 2d 717, 719 (S.D.N.Y. 2010) (cited at Opp. at 24). Although investors should appropriately take company-specific information published by non-company sources information with a grain of salt—the gist of the Company's cautionary language cited by Plaintiffs—it would be nonsensical for investors to turn a blind eye to the whole host of external factors (political, economic, or regulatory) that might affect the Company's business, and the Company urged no such thing. *See Wandel v. Gao*, 590 F. Supp. 3d 630, 642-43 (S.D.N.Y. 2022) (no actionable omission absent allegations that defendants "possessed some greater knowledge" than the public, despite offering documents' instruction to rely only on information therein). In fact, the Company did just the opposite, and expressly directed investors to the "[u]ncertainties [that] exist in relation to new legislation or proposed changes in the PRC regulatory requirements regarding online private education." (Ex. B at 25.)

## II.  PLAINTIFFS FAIL TO ALLEGE ANY MISREPRESENTATION OR OMISSION

### A.  There Was No Actionable Material Misrepresentation or Omission

"Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed." *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003). Here, the Report correctly concluded that "[t]he FAC does not plausibly plead a misleading statement or omission because the IPO Registration Statement adequately disclosed the possibility of future regulations." (Report at 19.) Specifically, in addition to disclosing all existing regulations impacting its business (AC ¶ 10) and even draft

14

regulations that had been pending for several years (Ex. B at 152-53), the Company warned that "*[u]ncertainties exist in relation to new legislation or proposed changes in the PRC regulatory requirements regarding online private education and smart in-school classroom solutions, which may materially and adversely affect our business, financial condition and results of operations*" (*id.* at 25).  It also warned that "*[t]here is no assurance that we can comply with any newly promulgated laws and regulations in a timely manner or at all, and any failure to comply may materially and adversely affect our business, financial condition and results of operations*." (*Id.* at 27.)  As the Report correctly found, "[t]hese statements fairly alerted investors to the prospect that heightened regulation could be undertaken and the attendant risks."  (Report at 19.)

Plaintiffs admit the uncertain regulatory landscape and relevant risks were disclosed.  (*See* Opp. at 21-22.)  Still, as in the Opposition (*id.* at 22), they argue that the Registration Statements failed to disclose that "PRC authorities planned to make deeper reforms to the after-school tutoring industry in the near future" by "mak[ing] after-school tutoring available at public schools across China" (Obj. at 10).  Plaintiffs' attempt to relitigate these arguments fail.

To begin with, Plaintiffs fail to show that there was any legal duty to make this disclosure. It is well-established that the "duty to tell the whole truth" (Opp. at 10) "do[es] not create an affirmative duty to disclose any and all material information . . . simply because it may be relevant or of interest to a reasonable investor."  *Garnett*, 632 F. Supp. 3d at 596.  Rather, "[a]n omission is actionable only when disclosure of information is 'necessary' to make the statements in the registration statement and/or prospectus 'not misleading.'"  *Id.*

Here, the fatal flaw in Plaintiffs' case is that at the time the Registration Statements were filed, *no new regulations had been issued (or even proposed)*.  The above risk disclosures warning of uncertainties with respect to new regulations thus accurately reflected the state of affairs at the

15

time those statements were made.  Indeed, the Company further warned that any new rules "**would create substantial uncertainties regarding the legality of our business operation**" and candidly told investors it could not assure them of compliance with any new regulations "in a timely manner **or at all**," all of which could have a materially adverse effect on its business.  (Ex. B at 25, 27.) These disclosures—which went so far as to "disclose[] the possibility that [new regulations] would be existential," *Banerjee v. Zhangmen Educ. Inc.*, No. 21-CV-9634 (JPO), 2023 WL 2711279, at *10 (S.D.N.Y. Mar. 30, 2023)—were not misleading, as "it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency." *Garnett*, 632 F. Supp. 3d at 597. Indeed, venturing a more definitive statement in the midst of this uncertainty would have been misleading, as it would suggest a level of clairvoyance the Company did not have.[3]

Nonetheless, Plaintiffs assert that the Company misleadingly omitted that regulators "made clear" they "planned to" implement new adverse regulations in the "near future."  (Obj. at 11-12.) As shown above, no official cited in this case stated that they "planned to" do any such thing. (*Supra* Statement of Facts § B.)  That quote is *Plaintiffs' own* speculative characterization of the regulator's intentions.   (AC ¶ 62.)   Plaintiffs cannot object to dismissal of their Amended Complaint by simply putting their wished-for, but unsupported and unsourced, factual assertions inside quotation marks.  Chinese officials' *actual* statements continued to show solicitude for the healthy development of the private after-school industry.  In fact, just three weeks before the IPO, the Minister of Education said that it was necessary to "**support and standardize the development**

---

3    The Second Circuit's decision in *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, No. 21-2524, 2022 WL 17815767 (2d Cir. Dec. 20, 2022) (summary order) is not to the contrary.  There, it was misleading for a fuel storage company to generically warn of the risk of possible "changes in government regulations" without disclosing the expected impact of a specific upcoming regulatory cap on the type of fuel at issue. *Id.* at *3-4. Here, no specific regulations were proposed, making it impossible for 17 Education to try to predict their potential impact.  Plaintiffs also repeatedly mischaracterize the regulation in *Moab* as merely "proposed" (Obj. at 12, 15), when in fact it was "adopted" in October 2008, "formally fixed" in October 2016, and set to take effect in the beginning of 2020.  *City of Riviera Beach Gen. Emps. Ret. Sys. v. Macquarie Infrastructure Corp.*, No. 18-CV-3608 (VSB), 2021 WL 4084572, at *2-3 (S.D.N.Y. Sept. 7, 2021).

16

*of private education*, [] regulate after-school tutoring institutions, *[and] inspire the motivation of all parties while increasing services provided by public education*." (Ex. G at 3.)

Plaintiffs' straw man objection that the Report adopted a "new, universal rule of law" "for disclosure in *all* cases" fails. (Obj. at 11-12 (emphasis in original).) Nowhere did the Report recommend the adoption of a categorical rule. In context, the language Plaintiffs quote from the Report holding that disclosure was not required where the regulatory changes "had not yet occurred" and were not a "foregone conclusion" merely confirms Judge Aaron's proper application of existing precedent—including cases cited by Plaintiffs (*see* Opp. at 22 (quoting *Facebook*, 986 F. Supp. 2d at 516))—to the facts of this case (Report at 19-20). As their own cases confirm, Plaintiffs must plead the existence or occurrence of a material undisclosed fact that renders the risk disclosures misleading.[4] Plaintiffs failed to do so.

Because Plaintiffs fail to plead the necessary predicate to their claims, i.e., that regulators announced an imminent plan to replace private tutoring with public school programming, it was unnecessary for Judge Aaron to assess whether the Company's statements regarding its customers and growth were misleading for failing to disclose that non-existent "fact." (*See* Obj. at 13.) Moreover, the statements that "we intend to further . . . grow" and that growth is "expected to continue" are forward-looking. (*Id.*). Hence, as the Report concluded, they are protected under the bespeaks caution doctrine. (Report at 16, 23; *see infra* § II.B.) Similarly, given the Report's finding that the public comments were immaterial as they were in the public domain (Obj. at 20-

---

[4]     *See, e.g.*, *In re Prudential Sec. Inc. Ltd. P'ship Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (warning that value of products "could" decline misleading as experts warned defendant value "would decline radically"); *Facebook*, 986 F. Supp. 2d at 511-12 (disclosure that mobile usage "may" impact revenue misleading where internal projections showed revenue was declining); *Wang v. Cloopen Grp. Holding Ltd.*, No. 21-CV-10610 (JGK), 2023 WL 2534599, at *12 (S.D.N.Y. Mar. 16, 2023) (hypothetical warning insufficient as company was experiencing a significant increase in customer nonpayment). Indeed, the calculation of probability standard that Plaintiffs argue controls here necessarily requires the existence of "undisclosed facts on the ground." (Obj. at 11); *see Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) ("failure to disclose *then-ongoing* and serious pollution violations would cause a reasonable investor to make an overly optimistic assessment of the risk").

23; *see infra* § II.C), it was also unnecessary to assess whether the statement that courses "cater to students' learning needs" was misleading for failing to disclose that officials publicly stated "the burdens placed on students by after-school tutoring businesses [were] 'excessive.'"[5]  (Obj. at 13.)

Moreover, the Report correctly concluded that Plaintiffs failed to plead a duty to disclose under Item 303.  As shown above, the Company clearly disclosed the uncertainties relating to new or proposed regulations as well as the potential material adverse impact on its business.  (Ex. B at 25-27.)   Hence, the Report's finding that "Defendants complied with Item 303's disclosure obligations" should be adopted.  (Report at 24.)  Plaintiffs' objection that the Company did not disclose "that [regulators] *planned to* [issue adverse regulations] by offering tutoring at public schools" is duplicative of their claim above, and fails for the same reasons.  (Obj. at 16 (emphasis in original).)  Plaintiffs also object that "there is no basis in law or logic to categorically prohibit Item 303 claims which are 'redundant' of traditional Section 11 claims or do not otherwise challenge 'unique' omissions."  (*Id.*)  This is yet another straw man—again, the Report did not propose *any* categorical rule.  (*Id.*)  Rather, it correctly observed that "courts in this district have dismissed residual Item 303 claims, where, as here, they are mere 'redundant' restatements *of otherwise-failed Section 11 complaints*."  (Report at 24 (quoting *Banerjee,* 2023 WL 2711279, at *13).)  Plaintiffs *concede* that dismissal of Item 303 claims is proper when they are "'largely redundant' of those already deemed insufficient," which is precisely the case here.  (Obj. at 15 n.5.)

### B.      The Bespeaks Caution Doctrine Bars Plaintiffs' Claims

The Report correctly concluded that the Company's risk disclosures described above

---

[5]  To the extent the Court is inclined to separately consider these allegations, they fail for the additional reason that, as explained in the Opening Brief and Reply, many of the statements are inactionable puffery or statements of opinion.  (Br. at 4 & n.3; Reply at 6-8.)

(*supra* § II.A) further support dismissal under the bespeaks caution doctrine, "because investors were . . . 'warned' of the specific contingency that lies at the heart of the alleged misrepresentation." (Report at 23.)  Plaintiffs object that the disclosures were insufficient to warn of regulators' purported imminent plans to impose new adverse regulation.  (Obj. at 18.)  For the same reasons explained above (*supra* § II.A), this objection should be rejected.

C.    **Plaintiffs Cannot Predicate an Omission Claim Based on Information in the Public Domain**

The Court should adopt the Report's conclusion that "since the information that Plaintiffs allege should have been disclosed already was in the public domain, there could have been no material nondisclosure under Section 11." (Report at 21.)  *See Keyspan*, 383 F. Supp. 2d at 377 ("Where allegedly undisclosed material information is in fact readily accessible in the public domain, the Second Circuit has found that a defendant may not be held liable for failing to disclose this information.")  Plaintiffs' objections to this determination mirror their objections to the Report's finding that their claims are time-barred, and fail for similar reasons.  (*See supra* § I.)

Plaintiffs' recitation of the general principle that the "truth-on-the-market" defense often involves a fact-specific inquiry that is "rarely appropriate for resolution on a motion to dismiss" adds nothing where, as here, Plaintiffs plead no facts to show that the public comments were not available to investors.  (Obj. at 17.)  As explained above (*supra* § I), Plaintiffs' implication that the statements were not "reasonably available" because they were made by Chinese regulators fails, as courts have held that such announcements are "publicly known" as a matter of law "where the information was equally available to investors and the defendant issuer, even if not necessarily widely circulated." *Garnett*, 632 F. Supp. 3d at 609.  Plaintiffs argue that the Report's reliance on *Garnett* is misplaced because there, the court "stated that there is 'force' to the argument that announcements by PRC bodies are not 'readily accessible' but decided otherwise because they

19

were reported in 'English-language' articles published before the IPO." (Obj. at 17.)  But *Garnett* did not announce a categorical rule that foreign regulatory comments are not public unless reported in English-language newspapers.  Rather, the court merely credited *plaintiffs' specific allegations* that investors faced "multiple impediments" to access the public comments, but ultimately held that investors had equal access to the comments because English-language articles put investors on notice of the need to "investigat[e] before investing."  *Garnett*, 632 F. Supp. 3d at 608.  Here, in contrast, Plaintiffs plead no barriers to access or any facts indicating that the public comments were not "equally available to investors."  *Id.* at 609.  Plaintiffs do not even allege that the statements were not also available in English.  Regardless, Plaintiffs admit that prior to the IPO (Obj. at 18), English-language articles reported on the potential for "intensified national-level regulation," which, as in *Garnett*, put investors on notice "that tightened regulations were under active consideration and worth investigating."  632 F. Supp. 3d at 608.

Plaintiffs' other objection that the comments were not public in light of the Company's warning that investors should rely only on the prospectus fails for the reasons explained above, namely, a reasonable investor would understand that warning to relate to company-specific information and would not disregard publicly available regulatory developments.[6]  (*Supra* § I.)

## CONCLUSION

For these reasons, the Report and Recommendation should be adopted and the Amended Complaint should be dismissed in its entirety with prejudice.

---

[6]   In light of the above, as the Report correctly found, "Plaintiffs necessarily cannot state a Section 15 claim." (Report at 27.)  While Defendants do not object to Judge Aaron's determination that he need not address their remaining arguments where, as here, the Report finds several independent bases for dismissal, Defendants maintain that, for the reasons in the Opening Brief and Reply, dismissal is also warranted under the negative causation doctrine and because Plaintiffs lack Securities Act standing to bring a claim based on the S-8 Registration Statement.

Dated: New York, New York
      August 17, 2023

Respectfully submitted,

/s/ Robert A. Fumerton
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Scott D. Musoff
Robert A. Fumerton
Michael C. Griffin
One Manhattan West
New York, New York 10001
Phone:   (212) 735-3000
Fax:      (212) 735-2000
scott.musoff@skadden.com
robert.fumerton@skadden.com
michael.griffin@skadden.com

*Attorneys for Defendants 17 Education &*
*Technology Group Inc., Cogency Global Inc.,*
*and Colleen A. De Vries*